UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| AMERICAN POWER, LLC | ) | CASE NO. |
| 1819 Troy Street | ) | |
| Dayton, OH  45404, | ) | |
| | ) | JUDGE |
|     Plaintiff, | ) | |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| DOUGLAS O. HARRIS | ) | |
| 1758 E. Mueller Park Road | ) | |
| Bountiful, UT  84010, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| MURRAY J. CRANE | ) | |
| 143 Arbour Stone Cres NW | ) | |
| Calgary, Alberta T3G5A1 Canada, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| MICHAEL T. MORLEY | ) | |
| 678 W. 350 N | ) | |
| Spanish Fork, UT  84660, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| SCOTT LARSON | ) | |
| 813 W. Gouda Court | ) | |
| Midvale, UT  84047, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| KELLY DIER | ) | |
| 5825 Deerfoot Court | ) | |
| Trussville, AL  35173, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| | ) | |

1

HENRY PROCHAZKA                               )
1302 Stonehurst Circle                        )
Ooltewah, TN  37363-9159,                     )
                                              )
And                                           )
                                              )
BERKLEY BUCHANAN                              )
343 County Road 3971                          )
Arley, AL  35541-3025,                        )
                                              )
And                                           )
                                              )
DEKTRIX LLC                                   )
331 South Rio Grande, Suite 203               )
Salt Lake City, UT  84101,                    )
                                              )
And                                           )
                                              )
DEKTRIX TRANSPORTATION SERVICES LLC           )
331 South Rio Grande, Suite 203               )
Salt Lake City, UT  84101,                    )
                                              )
And                                           )
                                              )
DEKTRIX INTERMODAL LLC                        )
331 South Rio Grande, Suite 203               )
Salt Lake City, UT  84101,                    )
                                              )
And                                           )
                                              )
MARMON HIGHWAY TECHNOLOGIES LLC               )
641 South Lawrence Street                     )
Montgomery, AL  36104,                        )
                                              )
And                                           )
                                              )
FONTAINE ENGINEERED PRODUCTS, INC.            )
641 South Lawrence Street                     )
Montgomery, AL  36104,                        )
                                              )
        Defendants.                           )

---

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND THE COMMON LAW

---

Plaintiff American Power, LLC ("AMP"), by and through its Attorney, files this Civil Complaint against Defendants, individually and collectively, Douglas O. Harris ("Harris"), Murray J. Crane ("Crane"), Michael T. Morley ("Morley"), Scott Larson ("Larson"), Kelly Dier ("Dier"), Henry "Hank" Prochazka ("Prochazka"), Berkley "Buck" Buchanan ("Buchanan"), Dektrix LLC and Dektrix Transportation Services LLC, and Dektrix Intermodal LLC (collectively, "The Dektrix Defendants"), Marmon Highway Technologies LLC, ("Marmon"), Fontaine Engineered Products, Inc. (d.b.a. Fontaine Intermodal) ("Fontaine"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§78(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.106-5, and §§12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77l(a)(2) and 77o.  Plaintiff also asserts claims for common law fraud, breach of contract, breach of fiduciary duties, and unjust enrichment.

## JURISDICTION AND VENUE FOR ALL CLAIMS

1.      The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rules 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

2.      The Securities Act claims asserted herein arise under and pursuant to Sections 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77l(a)(2) and 77o, and rules promulgated thereunder by the SEC.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 22 of the Securities Act, 15 U.S.C. §77v, and/or Section 27 of the Exchange Act, 15 U.S.C. §78aa.

4.      This Court also has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. §1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 22 of the Securities Act, and/or Section 27 of the Exchange Act.  The acts and conduct complained of herein occurred in substantial part in this District.  In addition, Defendants have conducted regular, consistent and repeated business in the Southern District of Ohio, 28 U.S.C. §1391(b) (1) and (b)(2), including but not limited to an Assignment of Beneficial Use executed between Plaintiff and the Dektrix Defendants, at or around February 28, 2017, specifically designating Ohio's law as applying to it.

6.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367 because they are so related to the Exchange Act claims and the Securities Act claims that they form part of the same case or controversy under Article III of the United States Constitution.

7.    In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

## NATURE OF THE ACTION

8.    This case involves several financial agreements, arrangements, and investments in the form of preferred membership units ("PMUs") and capital between Plaintiff and Defendants Harris, Crane, Morley, Larson, individually and as Member-Managers and/or employees of Dektrix, involving the exclusive rights of use of Defendant Marmon intermodal loaded flat-decks ("decks") manufactured by Defendant Fontaine Intermodal (dba of Fontaine Engineered Products Inc), which were eventually found to be mechanically defective, rendering the primary basis for

Plaintiff's financial investment and loan, to be worthless, and causing Plaintiff significant economic harm, costs, and expenses. Defendants Buchanan and Dier participated in this fraudulent scheme by, among other things, failing to disclose that the decks that Fontaine had advertised as having been certified by the American Association of Railroads had never, in fact, received any such certification. Defendant Prochazka participated in this fraud by, among other things, leading Plaintiff to believe that its investment would be a refundable deposit on the purchase of the Fontaine Intermodal Decks when instead, Fontaine used Plaintiff's money for its own benefit and without providing any non-defective, safe decks. Such action also primarily involves the Dektrix Defendants' breaches of fiduciary duties and trust, mismanagement, and misuse of Plaintiff's investment, contrary to the parties' contractual agreements.

## **PARTIES**

9.      All preceding paragraphs are incorporated herein by reference.

10.      Plaintiff AMP is a logistics and trucking business, duly licensed, authorized by the U.S. Department of Transportation, and incorporated in the State of Ohio, with the principle place of business at: 1819 Troy Street, Dayton, Ohio, 45404. AMP is owned by Adil Baguirov and Islom Shakhbandarov, who have each assigned any rights that they may have in the present claims to Plaintiff AMP. Baguirov and Shakhbandarov are both citizens of Ohio.

11.      Defendant Dektrix LLC ("Dektrix") is a transportation servicing company, incorporated in the State of Nevada, with a principal place of business located at: 331 South Rio Grande, Suite 203, Salt Lake City, Utah, 84101. According to company documents, Dektrix was formed January 23, 2015, "for the purpose of commercializing a revolutionary intermodal flat-deck shipping solution [and] the Dektrix business model is based on providing door 2 door long-haul shipping solutions, which utilize a revolutionary intermodal flat-deck shipping system,

originally invented by company founder Murray Crane [and] the flat-decks are now in their 4th generation and are manufactured for Dektrix by Fontaine Intermodal, a Berkshire Hathaway Company." See attached herein as Exhibit A.

12.     Defendant Dektrix Transportation Services LLC ("Dektrix Trans") is a transportation servicing company, incorporated in the State of Utah, with a principal place of business located at: 331 South Rio Grande, Suite 203, Salt Lake City, Utah, 84101.  Dektrix Trans is a wholly-owned subsidiary of Dektrix LLC.

13.     Defendant Dektrix Intermodal LLC ("Dektrix Intermodal") is the parent company of Dektrix LLC incorporated in the State of Utah, with a principal place of business located at: 331 South Rio Grande, Suite 203, Salt Lake City, Utah, 84101.  Dektrix Intermodal is owned by three member-managers of Dektrix LLC, identified in the subsequent paragraphs herein, who own a majority stake in Dektrix LLC.

14.     Defendant Douglas O. Harris ("Harris") is the General Manager and Member of Dektrix and Dektrix Trans with principal offices located at: 331 South Rio Grande, Suite 203, Salt Lake City, Utah, 84101, and a personal residence at: 1758 E. Mueller Park Road, Bountiful, UT 84010.  Harris is a citizen of Utah.  He is married to the sister of Defendant Crane, so that Harris is the brother-in-law of Crane.

15.     Defendant Murray J. Crane ("Crane") is a Member-Manager of Dektrix and Dektrix Trans with principal offices located at: 331 South Rio Grande, Suite 203, Salt Lake City, Utah, 84101, and a personal residence at: 143 Arbour Stone Cres NW, Calgary, Alberta, T3G 5A1, Canada.  Furthermore, Murray Crane is not only Member-Manager of Dektrix but also CEO of Dektrix and Dektrix Trans, and former Executive Vice President of RailDecks, Inc., including inventor, expert, and patent holder of intermodal  flat  deck technology related to the

6

intermodal decks at issue in this case. Crane is a citizen of Canada.

16.    Defendant Michael T. Morley ("Morley") Member-Manager of Dektrix and Dektrix Trans with principal offices located at: 331 South Rio Grande, Suite 203, Salt Lake City, Utah, 84101, and a personal residence at: 678 W. 350 N, Spanish Fork, UT 84660. Morley is a citizen of Utah. He has been friends with Defendant Harris since college.

17.    Defendant Scott Larson ("Larson") is the Comptroller, employee, and/or agent of Dektrix and Dektrix Trans with principal offices located at: 331 South Rio Grande, Suite 203, Salt Lake City, Utah, 84101, and a personal residence at: 813 W. Gouda Court, Midvale, UT 84047. Upon information and belief, Larson holds a corporate interest in Dektrix. Larson is a citizen of Utah.

18.    Upon information and belief, Dektrix LLC, Dektrix Transportation Services LLC, Dektrix Intermodal LLC, along with manager members Harris, Crane, Morley, and Larson, collectively "The Dektrix Defendants" all were managed, worked, and otherwise operated as a single corporate entity.

19.    Defendant Marmon Highway Technologies LLC ("Marmon") is a Berkshire Hathaway Company, incorporated in the State of Delaware, with a principal place of business located at: 5915 Chalkville Road, Suite 300, Birmingham, Alabama, 35235, and a registered mailing address of 641 South Lawrence Street, Montgomery, Alabama 36104.

20.    Defendant Kelly Dier was President of Marmon Highway Technologies LLC, until October 12, 2016, when he became its Chairman. Dier resides at 5825 Deerfoot Court, Trussville, Alabama 35173, and is a citizen of Alabama. Dier and Marmon shall be collectively known as "the Marmon Defendants."

21.    Defendant Fontaine Engineered Products, Inc. d/b/a Fontaine Intermodal,

("Fontaine") is a trailer manufacturer, incorporated in the State of Delaware, with a principal place of business located at: 3515 Industrial Drive, Jasper, AL 35501, and a registered mailing address of 641 South Lawrence Street, Montgomery, AL 36104. It is owned and operated by Defendant Marmon and Berkshire Hathaway.

22.    Defendant Henry ("Hank") Prochazka is Group President for Fontaine Commercial Trailer, Inc., an affiliate of Defendant Fontaine and a subsidiary of Defendant Marmon Highway Technologies with principle offices located at 430 Letson Road, Haleyville, Alabama 35565, and a personal residence at 1302 Stonehurst Circle, Ooltewah, Tennessee 37363. Defendant Prochazka is a citizen of Tennessee. He is the supervisor of Defendant Berkley Buchanan.

23.    Defendant Berkley ("Buck") Buchanan was President of Defendant Fontaine until January 2017, when he became President of Fontaine Fifth Wheel. Buchanan resides in Alabama and is a citizen of Alabama. His personal address is 343 County Road 3971, Arley, Alabama 35541-3025. Buchanan, Prochazka, and Fontaine shall be collectively known as "the Fontaine Defendants."

24.    Defendants Harris, Crane, Morley, Larson, Dier, Prochazka, and Buchanan shall be collectively known as "the Individual Defendants."

**Dektrix, Fontaine, and Marmon Solicit Investment from Plaintiff**

25.    On or about June 16, 2016, the Dektrix Defendants initiated a phone conference with Plaintiff introducing an investment opportunity in Dektrix LLC, an intermodal logistics and shipment company. The opportunity involved a new type of trailer design produced and manufactured by Defendant Fontaine.

26.    In the shipping industry, the term "intermodal" means the shipment of products

using multiple modes of transportation, usually by ship or airplane, by train, and by truck. A shipping container is "intermodal" when it has the ability to be carried on ships, on railroad cars, and as the trailer being pulled by semi-trucks on the highway. Using an "intermodal" container saves significant time and costs associated with having to secure and re-secure loads with every change of mode of transportation.

27. On or about July 28, 2016, the Dektrix Defendants represented by way of email to Plaintiff that Dekrix was a well-established company that had earned an exclusive opportunity to use Fontaine Evolution Intermodal Flat Decks to ship loads. In particular, the email stated the following:

> "Operating History – Dektrix is not a start-up company. Dektrix was first organized in December of 2014. It has moved freight every month since April of 2015. It has two yards, 17 FTE employees (both W-2 and 1099 contractors). It has moved over 814 loads of freight and it has billed more than $2.5M in sales. Dektrix has obtained all of its operating authorities as well as broker authorities. It is authorized to operate on all class 1 railways in North America. . . . It has a fleet of 73 decks and nine 2016 Freightliner tandem axel day cabs which it leases from Penske. . . . Dektrix has executed multiple carrier agreements and has current contracts and relationships with the logistics executives at several companies. Based on Dektrix [sic] performance the executives at Marmon Highway Technologies and Fontaine Intermodal have granted Dektrix a 3 year exclusive opportunity. They will not produce or sell any decks or similar intermodal products to any other individual or entity for three years. These are the accomplishments of a company which has worked very hard and is now posed for rapid growth."

See email dated July 28, 2016, attached as Exhibit B.

28. In July 2016, the Dektrix Defendants presented a number of investor meetings, presentations, and other solicitations to AMP as a prospective investor. On or about July 28, 2016, the Dektrix Defendants provided information concerning the company's operating history, company valuation, and client opportunities. On or about August 5, 2016, the Dektrix Defendants presented a number of investor meetings, presentations, and other solicitations to prospective investors, including AMP, in Dayton, Ohio.

29.    The information provided in July and August 2016 touted the Fontaine Intermodal trailer and the exclusive three-year contract that Dektrix had with Fontaine and its parent corporation, Marmon Highway Technologies.

30.    In particular, the presentations included copies of an August 4, 2016, letter from Marmon President, Kelly Dier.  That letter made it clear that Fontaine, Marmon, and Dektrix, were working together to secure investment money from Plaintiff.  Among other points, that letter stated as follows:

"As you know Fontaine Intermodal has invested several years and millions of dollars in the development of the Evolution Intermodal Flat Deck.  We did this because we believe it has tremendous potential to do for open freight what containerization has already done for packaged, refrigerated and ever fluid freight. . . .

"For the past 18 months we have worked very closely with you and have witnessed first-hand the tenacity of your management team, your innovation and quality work product. We were impressed when you developed your own internal securement program and created a new industry job description called Load-Masters.  We were impressed with your decision to compete head to head with other asset based carriers by procuring your own fleet of trucks, yards, and equipment so you could offer major shippers the true door to door service they require.  We were impressed when you succeeded in securing a major shipping contract which was being serviced by a formidable competitor. . . .

"We agree to grant Dektrix two years of exclusivity from the date Dektrix purchases all of the 73 Intermodal Flat Decks, which are currently being rented to Dektrix and we further agree to grant an additional third year of exclusivity to Dektrix in exchange for purchasing the 43 decks which Fontaine currently holds in inventory in the form of new components, ready for assembly.  Upon receipt of payment for these additional decks Fontaine will expeditiously assemble them and deliver them to Dektrix.

"We are pleased to be taking this next step with Dektrix and hope this period of exclusivity helps you secure your own successful long-term position as the foremost operator of intermodal flat decks."

31.    On August 5, 2016, Crane and Harris gave a presentation to several potential investors, including Plaintiff, in Dayton, Ohio.  Defendant Buchanan called into the meeting and spoke by telephone with the assembled group.  Among other points, Buchanan said, "We stand behind them," meaning Fontaine stood behind Dektrix.  He also said, "We [Fontaine] believe in

this project strongly enough that we have provided them [Dektrix] an offer of exclusivity on the product." He touted Fontaine's relationship with BNSF Railway through Berkshire Hathaway. He described the millions of dollars in development spent by Fontaine.

32.     At the August 5, 2016, investor meeting, Defendant Harris represented that Dektrix would register UCC statements on the Fontaine Intermodal flat decks that Dektrix would purchase from Fontaine with the investor money. The decks would be registered for the benefit of the investors "so that they control the assets, they own these assets."

33.     On or about August 6, 2016, the Dektrix Defendants provided Plaintiff with a number of documents, including among others: 1) the Dektrix Private Placement Memorandum ("PPM"); 2) the Subscription Agreement; and 3) the Dektrix LLC Operating Agreement. See attached Exhibit A.

34.     The PPM dated August 6, 2016, was titled *Confidential Limited Offering Memorandum* $6,000,000.00 Consisting of up to 400,000 Membership Units of Dektrix LLC, Minimum Purchase $50,000. See PPM, attached as Exhibit A. Such PPM included disclaimer language setting forth that "although the placement of the securities described herein by means of this Memorandum is believed exempt from federal and state registration requirements, *there is no exemption from the stringent requirement that every investor in every investment not purchase under any misrepresentation or omission of any material fact. Reasonable effort has been made in the preparation of this Memorandum to present all information which the Company considers to be material, based on facts available to it.*" Id. (emphasis added).

35.     The Fontaine Evolution Intermodal Flat Decks were integral and necessary to Dektrix's business model. As stated in the PPM, "The company's revenue is tied to securing shipping contracts which utilize the Dektrix Intermodal flat-deck solution . . . ."

36.     Transportation by railroad was key to the functionality of the Fontaine Evolution Intermodal Flat Decks being used by Dektrix. The Dektrix Defendants describe the "decks" as having the mechanical and technical ability to "be mounted to an intermodal chassis in exactly the same way as a standard intermodal shipping container [wherein] each deck measures 53' long by 8' wide and 114" high [and] each deck can accommodate payloads of up to 46,000 lbs. of traditional flatbed freight, including: Pipe, Rolled or Banded Metals, Heavy Construction Materials, Irregularly shaped manufactured products [and] once loaded and secured the deck is picked up by a local driver and day-cab for a short-haul to an intermodal rail yard [and] at the rail yard gantry cranes used to stack traditional shipping containers easily attach to the flat-decks and place them onto rail cars [and] Fully loaded flat-decks are designed to be stacked two high for reducing head haul costs [and] Dektrix operates primarily on super high speed railway lanes, providing service in many cases faster than a dedicated truck [and] once the freight arrives at the destination railway hub it is offloaded in exactly the same way [and] a local driver and day cab then deliver the freight to its nearby final destination [and] Dektrix drivers are home every day [and] once offloaded, the decks are designed to be collapsed and stacked for inexpensive repositioning back to the lane origin." See PPM, attached as Exhibit A.

37.     Since the Fontaine decks were so integral to the investment opportunity that was being presented to Plaintiff and Baguirov and Shakhbandarov, they decided to review the information that was publicly available about Fontaine and its Evolution Intermodal Flat Decks, particularly with respect to their compatibility with rail transportation. An easy search on the Internet revealed that Fontaine had issued a press release in 2014 when it introduced the Evolution Intermodal Flat Decks. Those press releases were quoted by several separate industry publications, which all quoted the following description of the decks: "Certified by the Association of American

Railroads, Fontaine's Evolution Intermodal Flat Deck includes multiple patented features related to the deck floor and load securement system."[1]  See, also, attached Exhibit C.

38.     The Association of American Railroads ("AAR") is an industry trade group representing primarily the major freight railroads of North America.  Members of AAR include the following companies:  Amtrak, BNSF Railway Company, Canadian National Railway, Canadian Pacific Railway, CSX Transportation, Norfolk Southern Railway, and Union Pacific Railroad.

39.     The AAR's LinkedIn page describes itself as "the standard setting organization for North America's railroads."[2]  On its website, AAR explains that "AAR establishes safety, security, and operating standards that provide for seamless and safe operations across America's 140,000 mile freight rail network."[3]  With respect to safety, the AAR's Safety and Operations Department publishes a Manual of Standards and Recommended Practices ("MSRP") that includes all regularly adopted specifications, standards, and recommended practices of the AAR.

40.     At the August 5, 2016, investor meeting in Dayton, Defendant Crane was asked a question about the Association of American Railroads.  He responded as follows:

> "Yes, ok, the Association of American Railroads.  It's, they're called the AAR.  They're the largest governing body in the world, so even the steam trains from Europe and things come over and are tested here under their guidance in Pueblo, Colorado."

41.     The AAR, through its Technical Services group, maintains a rigorous certification

---

[1] See e.g., http://www.truckinginfo.com/news/story/2014/01/marmon-highway-technologies-introduces-fontaine-intermodal.aspx; http://www.fleetequipmentmag.com/marmon-highway-technologies-introduces-fontaine-intermodal/; http://trailer-bodybuilders.com/trailers/marmon-highway-technologies-starts-fontaine-intermodal; http://www.globaltrademag.com/departments/dispatches/march-april-2014; https://www.ajot.com/news/marmon-highway-technologies-introduces-fontaine-intermodal; https://www.highbeam.com/doc/1G1-392827947.html, all retrieved on September 13, 2017, and http://www.successfuldealer.com/marmon-highway-technologies-introduces-fontaine-intermodal/ retrieved on September 26, 2017.
[2] https://www.linkedin.com/company/775348/, retrieved on September 13, 2017.
[3] https://www.aar.org/Pages/AboutUs.aspx, retrieved on September 13, 2017.

program for equipment and components to be used in conjunction with railroads, including rail cars and decks. The process for obtaining AAR approval is time consuming and expensive. AAR Technical Services describes the process for obtaining AAR approval for railroad components as having eight separate steps:

- Ensure your company meets the requirements of being a supplier to North American Railroads.

- Obtain and Review AAR Publications (including the relevant portions of the MSRP)

- Submit Application/Design and Obtain Approval (fee is required, listed in the AAR Office Manual, Appendix E)

- Conduct Test, Obtain Test Approval (fee required)

- Obtain Facility Technical Approval (fee required)

- Obtain Facility QA Approval (fee required) (See QA Section of this document)

- Request Conditional Approval

- Request Unlimited Approval[4]

42.     Defendant Crane was a member of the Intermodal Operations Committee of AAR in 2013-14.

43.     AAR approval is a standard of quality, safety, and acceptability for the industry. Suppliers work hard and spend significant amounts of time and money to achieve AAR approval because of its benefits, and they promote their products by stating that they are AAR certified. Plaintiff relied on Fontaine's statements that its Evolution Intermodal Flat Decks had been AAR certified when it decided to invest in Dektrix.

44.     In addition to claiming AAR certification, in a January 16, 2014, press release,

---

[4] http://www.aar.com/standards/approval-process.html, retrieved on September 13, 2017.

Fontaine and Marmon stated that its Evolution Intermodal Flat Deck was "virtually maintenance free." In a video that was on its website in August 2016 and continuing through the date of this Complaint, Fontaine described the Evolution Intermodal Flat Deck to be "stronger" and "safer" than any other deck "to withstand the punishing conditions associated with rail and highway transportation." "It's virtually indestructible yet simple and inexpensive to repair if it's ever damaged." A copy of the January 16, 2014, release is attached as Exhibit D. The video can be found at http://fontaineintermodal.com/products_evolution_flat_deck.html, retrieved October 5, 2017.

45. In describing its manufacturer exclusivity arrangement, the Dektrix Defendants represented that "at the time of this offering *Dektrix has been granted a conditional 3 year exclusivity from Fontaine, such that during the term of exclusivity Fontaine will not build, or sell any intermodal flat decks of any design to any party other than Dektrix which exclusivity is based on two conditions, that Dektrix purchase the 73 decks from Fontaine which are currently in Dektrix's fleet and being rented from Fontaine and second that Dektrix purchase the remaining inventory of 43 Decks from Fontaine, which decks have yet to be assembled by Fontaine* [and] if Dektrix is unable to raise the funds anticipated in this PPM or some alternative way of purchasing the required decks from Fontaine it could lose its exclusivity and have limited protection against competitors" See PPM, attached as Exhibit A (emphasis added).

46. In highlighting the company's various achievements and milestones, the Dektrix Defendants represented that:

- Dektrix raised $1M in its first round of funding January 15, 2015
- Dektrix obtained Broker Authority April 8th, 2015 (DOT # 2596045)
- Dektrix's fleet currently includes: 73 Fontaine Evolution Intermodal Flat Decks (rented / Fontaine Intermodal) and 9 Freightliner 2016 Cascadia

tractors (leased / Penske)

- Dektrix operates two shipping yards: Chicago 4358 w 35th Place Chicago IL 60632 and San Bernardino 673 S. Waterman Ave, San Bernardino CA 92408

- Dektrix has to date competitively won 9 consecutive shipping contracts for Atkore Steel, delivering torque tubes to the Solar Industry including solar projects in: Blythe CA, Imperial CA, Chino CA, Rosamond CA, Jean NV, Goodyear AZ, Borrego Springs CA, Shandon CA, Fullerton CA

- Dektrix currently employs: 1 lane manager, 11 truck drivers, 1 dispatcher, 3 load masters, and 1 company controller

- LLC Managers currently provide General Management, Human Resources, FMCSA Compliance, Operational management, DOT compliance and Sales

- Dektrix has invested in management control systems: Satellites on every deck, Satellites in every truck, E-log reporting systems, HireRight online recruiting HR compliance and DOT, and Geo Force tracking of all assets

- Dektrix has obtained operating authority for all Class 1 railways in North America including: BNSF, CSX, Norfolk Southern, Union Pacific, Canadian Pacific, Canadian National, Kansas City Southern

- Dektrix currently has a partnering relationship with: Fontaine Intermodal a subsidiary of Marmon Highway Technologies, a Berkshire Hathaway company, BNSF railroad system, Penske, TransForce, ProDrivers, and Labor Ready

- Dektrix delivered over 814 loads of freight between April 2015 and June 2016

- Dektrix has consistently billed volumes in excess of $250k monthly

- Dektrix has current assets and resources to deliver: 150 loads of freight monthly or1800 loads of freight annually

- Dektrix currently has more demand for its decks than it can satisfy with 73 decks

- Dektrix is currently taking steps to secure additional decks and fund its ongoing growth

16

- Dektrix is seeking several avenues for capitalization including: This Private Placement Memorandum, An SBA loan, and Equipment financing

See PPM, at pp. 14-16, attached as Exhibit A (emphasis added).

47.     On numerous occasions, the Dektrix Defendants represented to prospective investors including Plaintiff that it had contractual shipping relationships and/or agreements with a number of carriers, including among others, Atkore Steel, Allied Tube Conduit, Logan Aluminum, Inc., and Constellium.

48.     On or about November 30, 2016, the Dektrix Defendants circulated additional information regarding its organizational structure, PPM, current balance sheets, critical relationship details, shipping volumes, and payables, information that Plaintiff would rely upon in eventually making a decision to invest in the Dektrix business model.

49.     On or about December 5, 2016, the Dektrix Defendants provided Plaintiff with various discussion points of a prior November 30, 2016 meeting, again highlighting the company's balance sheet, debt, and payables.

50.     Despite having all of these meetings and direct communications with Plaintiff, none of the Defendants ever disclosed before Plaintiff invested its money that the Fontaine Evolution Intermodal Flat Decks had never, in fact, been approved by the AAR.  None of the Defendants had disclosed that the decks had significant engineering problems and were not safe to use on the highway or on the railroads.

**Plaintiff Invests in and Loans Money to Dektrix**

51.     Based on Fontaine's representation that it had obtained AAR approval of its Evolution Intermodal Flat Decks, and the Dektrix Defendants' representation that it had several active broker-carrier agreements, as well as the other representations described in this Complaint, Plaintiff sought to enter into a "Strategic Partnership" with the Dektrix Defendants.

52.     Specifically, on or about December 5, 2016, the Dektrix Defendants and Baguirov and Shakhbandarov entered into a Membership Purchase Agreement ("MPA"), wherein it was recognized that of the 1,000,000 membership units authorized and 510,000 units issued, that 490,000 units remained but to which only 250,000 were available for purchase.  As such, it was agreed that:

> "Buyer [Plaintiffs] shall pay $350,000 US to Dektrix LLC by wire transfer no later than Monday December 5, 2016 for which Seller [the Dektrix Defendants] will immediately convey 70,000 preferred membership units to Buyer and shall enter said transaction in the organizational records and shall provide Buyer an authorized signed copy of the same."

See MPA, attached as Exhibit E.  Shortly after execution of the foregoing, Plaintiff wired $350,000 to the Dektrix Defendants.

53.     Additionally, it was agreed that Plaintiff as Buyer would retain an option to purchase an additional 130,000 preferred membership units from the Dektrix Defendants by January 15, 2017 with an option to purchase an additional 50,000 common membership units for $500,000, valid until May 2017.  See MPA, attached as Exhibit E.

54.     As part of the MPA, the parties agreed that "Seller hereby grants Buyer the right to a second lien position, which may be evidenced by the Buyer filing a UCC-1 on any of the first 73 intermodal flat-racks the Seller purchases [and] it is expressly understood by both parties that a 1st lien position will most likely be held by the individual or entity extending credit for the acquisition of those intermodal flat-racks and that any security interest herein afforded to the Buyer shall  be subordinate to  those of the 1st lien holder, without cost  to Dektrix,  LLC."   See MPA, attached as Exhibit E.  This paragraph demonstrates the parties' intent that the $350,000 was to be used toward the purchase of the first 73 intermodal flat decks from Fontaine.

55.     On or about January 25, 2017, and despite the Dektrix Defendants' extensive use, experience, and utilization of such intermodal platform technology, advised in writing to the

Marmon and Fontaine Defendants that after inspection of the decks, "about 50% of the fleet have sheered bolts on both the front and rear hub break [sic] assemblies...."

56. On or about early February 2017, the Dektrix Defendants continued to represent, advertise, solicit, and otherwise state to prospective investors, including among others, Plaintiff, that they had working active broker-carrier contracts in place including but not limited with companies such as Atkore Steel, Allied Tube Conduit, Logan Aluminum, Inc., and Constellium.

57. On or about January 30, 2017, and in response to the Dektrix correspondence dated January 25, 2017, the Marmon and Fontaine Defendants wrote to the Dektrix Defendants and terminated the existing lease. The letter demanded prompt return of all decks, thus ending its "exclusive" relationship between Fontaine and the Dektrix Defendants. A copy of this letter is attached to the Complaint as Exhibit F.

58. On or about February 7, 2017, the Dektrix Defendants represented to Plaintiff that the termination of the existing lease with the Marmon and Fontaine Defendants was short-term, and that any issues regarding "sheered bolts" was repairable and could be resolved, and at no time provided Plaintiff any indication that the Marmon and Fontaine Defendants were seeking not only to call back and seek return of all decks, but were actively seeking to physically destroy such decks on the basis that they were unfit, defective, and otherwise unsafe and could no longer be warranted.

59. On or about February 28, 2017, the Dektrix Defendants sought to further its business relationship with the Marmon and Fontaine Defendants by way of an Equipment Purchase Offer Agreement to Sell, wherein in writing Dektrix sought to purchase an initial 73 decks for $1 Million. Each deck was valued at approximately $13,700 ($1,000,000 / 73 = $13,699).

60.     On or about February 28, 2017, and based upon the material representations by the Dektrix Defendants and the Fontaine Defendants, Plaintiff agreed by way of an Assignment of Beneficial Use Agreement to provide Dektrix with an effective bridge loan of $100,000, to be paid back by way of monthly payments of $2,400.00, at an interest rate of 15.4%, with governing law to be in the State of Ohio for purpose of such Agreement.  The terms and conditions of the Agreement required the $100,000 bridge loan to be used for the purchase of assets in the form of Fontaine trailer decks.  Defendant Harris reported to Plaintiff that Defendants Prochazka and Fontaine had agreed to accept Plaintiff's money as a "refundable deposit should things not culminate as we had hoped."  Dektrix wired $50,000 of Plaintiff's money to Fontaine on March 1, 2017.

61.     On or about March 6, 2017, and after a series of culminating events leading up to that time, Plaintiff sent a correspondence to the Dektrix Defendants specifically outlining several management (fiduciary and otherwise), disclosure, and/or transparency issues, including that such issues had breached "our trust and confidence in Dektrix's ability and responsibility to its members and managers such as us...." and most notably, the Dektrix Defendants' misuse of the Plaintiff's investment money for salaries and benefits, as opposed to its explicitly intended and designated use to the purchase of assets (i.e. intermodal flat decks) so that the company could generate cash flow.  Despite an increasingly deteriorating business relationship, Plaintiff continued to work in good faith with the Dektrix Defendants, including but not limited to conducting further business meetings in Dayton, Ohio, and several working proposals for management, compliance, and operational changes, and possibly additional investment funding by Plaintiff, the Dektrix Defendants, in furtherance of their mismanagement and breach of fiduciary duties, opted to reject all of Plaintiff's good faith proposals.

**The Truth about the Fontaine Decks and about Plaintiff's Investment is Revealed**

62.     On or about April 6, 2017, the Dektrix Defendants disclosed to Plaintiff for the first time, that the Marmon and Fontaine Evolution Intermodal Flat Decks, contrary to their prior representations, had never been certified by AAR, and that Defendant Crane, member-manager of Dektrix, had actual knowledge of the lack of certification dating back to May 20, 2015.  Crane obtained this knowledge in a May 20, 2015 email, sent to him by Michael Lesniak with the AAR.

63.     Furthermore, the Dektrix Defendants later admitted that they reported defects in the Evolution decks in 2015 to Buck Buchanan of Fontaine.  Defendants Buchanan and Fontaine had the decks crudely repaired at that time.  Neither the 2015 defects nor the repairs were ever disclosed to Plaintiff before its investment in and loan to Dektrix.

64.     On or about May 22, 2017, the Dektrix Defendants disclosed to Plaintiff: 1) their intent to file for bankruptcy relief, and 2) their position that none of Plaintiff's investment money, including but not limited to the bridge loan of February 28, 2017, was limited for use to asset purchases. At this time, the Dektrix Defendants continued to represent they had active broker-carrier contracts in place, including but not limited to Constellium.

65.     The Dektrix Defendants misused, misallocated, and never used Plaintiff's investment money in a reasonable, sound, prudent, and/or agreed upon manner, rather, such money, including but not limited to the bridge loan, was never used to purchase assets by way of Fontaine trailer decks.  Only $50,000 was given to Fontaine as a deposit toward the purchase of decks.  Rather such investment money was used to repay the bridge loan (approximately $7,500) and otherwise enrich themselves in the form of salaries ($42,000 going directly to Defendants

Crane and Larson).

66.    On or about May 24, 2017, the Dektrix Defendants disclosed for the first time, and despite having actual or prior knowledge regarding the lack of AAR certification, that Defendant Fontaine had written a letter to a creditor of Dektrix asserting that "the decks are not fit for use or safe for use...."  A copy of this letter is attached to this Complaint as Exhibit G.

67.    Despite claiming that the decks are not safe and not fit for use, upon information and belief, Fontaine is continuing to let some customers use the decks.  Fontaine and Marmon have not posted any notices on their websites disclosing the safety problems with the Intermodal Flat Decks.  Both Fontaine and Marmon also continue to market and promote the decks on their websites, as of the date of this Complaint. [5]  They recently updated the Fontaine Evolution Flat Deck user's manual, which includes multiple references to AAR but does not disclose that the decks are not AAR approved.

68.    On May 26, 2017, Defendant Harris reported to Plaintiff that Defendant Prochazka had personally assured Harris that Fontaine would return the $50,000 that Plaintiff had loaned to Dektrix and that Dektrix had sent to Fontaine.

69.    On or about June 26, 2017, Plaintiff advised the Dektrix Defendants that it was still awaiting a response from them regarding the monthly agreed upon payment concerning the Assignment of Beneficial Use of Assets "bridge loan."  No satisfactory response was ever received.  Instead, due to Fontaine's and Dektrix's misrepresentations, omissions, and misuse of Plaintiff's investment and loan, Dektrix had fallen into financial difficulties, and the Fontaine decks that it was leasing had been seized by a creditor, Redlands.

70.    On July 13, 2017, Defendant Harris informed Plaintiff that Defendant Fontaine

---

[5] http://www.fontainetrailer.com/ and http://marmonhitech.com/fontaine_intermodal.html, retrieved on September 21, 2017.

had not returned the $50,000 as Prochazka had "personally assured." Fontaine would not make Dektrix whole for the harm caused by the defective Intermodal decks. Instead, Fontaine and Dektrix used Plaintiff's money to further their own interests: "Regarding the deposit we gave Fontaine – Fontaine gave $22,800 to Redlands to get Redlands to release the decks [to Fontaine]. Fontaine then returned $27,200 which was immediately applied to our banks' overdraft and outstanding credit card balance leaving us with about $100 in cash." Through Defendants' misstatements, omissions, and breaches of fiduciary duties, none of the money was used toward the purchase of Intermodal decks.

71.     In an August 21, 2017, email from Defendant Harris forwarded to Plaintiff, Harris stated as follows:

> "Here is the fraud – Kelly Dier, John Craig, Hank Prochazka, Buck Buchanan, Jess Drommond and others made loud and published claims to reputable reporters and trade journals that the Evolution deck was in fact AAR certified. This certification is not something handed out easily but requires heavy investment in time, money and extensive testing. The benefit of AAR certification is that the user of the deck would be assured its operation would be safe. Shortly after putting the decks in service we had pins shearing in the upright support arms. Those pins were critical to supporting the 60,000 lbs. of another container stacked on top of our deck. When we verbally drew this problem to Fontaine's attention, they asked us to keep it quiet and assured us they would immediately fix the problem. They also told us that they had not experienced this problem with any of their other Evolution decks in use with Boyd Brothers or Prime (not true). The repairs were made in a shoddy way and did not reflect a design improvement. In fact, the solution they proposed was to weld the pins in place, which only exacerbated the problem. Now we had more of the pins shearing. We limped along for several months with Fontaine trying different weights of pins, washers and welds. The problem was never adequately resolved. It wasn't until we were gearing up to service the new Constellium contract in January that we went to Chicago and to California to inspect our fleet. To our surprise many of the main bolts holding the upright arms in place appeared to be missing. In fact, more than 40% of the hub assemblies seemed to have missing bolts. Fontaine provided us a power point presentation demonstrating how we should replace the bolts, apply a lock-tight solution and the problem would be solved. As we tried to implement their plan we discovered the bolts were not missing. They hadn't merely shaken their way out of the socket or been sheered clean. They were in fact exploded within the assembly. The amount of pressure on those bolts must have been inordinate. Not knowing when a pin might explode we realized the entire fleet was unfit to service the Constellium contract."

23

"We put all of our findings in an email to Buck Buchanan, expecting a robust partnering type response assuring us they would fix this and get it done right away. To our surprise there was no such support, only a phone from Hank Prochazka, (Buck's Boss) who said he wanted to give me a heads up that Fontaine would be calling back all of the decks because we had now made the safety issue a discoverable issue (this statement is also verifiable)."

72.     Since this time, and despite Plaintiff's investment money, the Dektrix Defendants have not conducted any substantive shipping and/or transportation activities, including generating any revenue for the company and/or its Members. The Dektrix Defendants have failed to answer Plaintiff's request for corporate, financial, and banking documents, and have failed to respond to requests to repay the $100,000 bridge loan. The Defendants used Plaintiff's money in a fraudulent scheme designed to benefit and pay each other, while Plaintiff is left with nothing of what it invested.

## COUNT I

## (FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULATED THEREUNDER)

73.     The prior paragraphs of this Complaint are incorporated herein by reference as though set forth in full. This claim is asserted against the Dektrix Defendants and the Fontaine Defendants.

74.     The Dektrix Defendants and the Fontaine Defendants, and each of them, carried out a plan, scheme, and course of conduct which was intended to and did deceive Plaintiff into investing in and loaning $450,000 to Dektrix. The purpose of the scheme was to enrich Defendants' companies and themselves through the use of material false statements and omissions intended to secure investment from Plaintiff. Upon information and belief, the Fontaine Defendants and Marmon Defendants received compensation and bonuses that were

24

tied, at least in part, to the successful sale of the 73 Evolution Intermodal Flat Decks, and others, which they knew to be defective, to Dektrix. They assisted Dektrix with securing investment from Plaintiff for the purposes of purchasing the Evolution Decks. The Dekrix Defendants acted with the intent to enrich themselves at the expense of the intended purpose for the investment money, which was to buy assets which could be secured as required by the agreements with Plaintiff.

75.     The Dektrix Defendants and the Fontaine Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information.

76.     The Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Dektrix's value, performance, and continued substantial sales and financial growth, which included among other things, the making of, or the participation in the making of, untrue statements of material facts about Fontaine's Evolution Intermodal Flat Decks, the use of Plaintiff's investment money, and the condition of Dektrix's business, and omitting to state material facts necessary to make the statements made about the Fontaine decks, the use of Plaintiff's investment money, and the condition of Dektrix's business not misleading in light of the circumstances under which they were made, as set forth more particularly herein. They engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the Plaintiff.

77.     The Defendants' primary liability arises from the following facts, among others: (a) the Defendants made the misrepresentations themselves or omitted to state material facts to

make these statements not misleading; (b) the Defendants were high-level executives at

Fontaine, Marmon, and Dektrix; (c) the Defendants, by virtue of their responsibilities and

activities as senior executive officers, were privy to, and participated in, the creation,

development, and reporting of Dektrix's sales, marketing, projections, and/or reports; (d) the

Defendants enjoyed significant personal contact and familiarity with, were advised of, and had

access to other members of Dektrix's management team, internal reports, and other data and

information about the Fontaine decks, the use of Plaintiff's investment money, and the condition

of Dektrix's business; and (e) the Defendants were aware of the dissemination of information by

Fontaine, Marmon, and Dektrix to Plaintiff which they knew or recklessly disregarded was

materially false and misleading.

      78.    The Defendants, and each of them, had actual knowledge of the

misrepresentations and omissions of material facts set forth herein, or acted with severely

reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even

though such facts were available to each of them.  The Defendants' material misrepresentations

and/or omissions were made knowingly or with deliberate recklessness and for the purpose and

effect of concealing adverse information from Plaintiff.  As demonstrated by the Defendants'

misstatements and omissions, the Defendants, if they did not have actual knowledge of the

misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements

were false or misleading.

      79.    The Defendants acted with scienter in that they knew or recklessly disregarded

that the public documents and statements issued or disseminated in the name of the Company

were materially false and misleading, and knowingly or recklessly substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

80.     The Defendants, by virtue of their receipt of information reflecting the true facts regarding Dektrix, its operations, and its business practices, their control over and/or receipt of Dektrix's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning, among other things, Dektrix's quality control policies and procedures, were active and culpable participants in the fraudulent scheme alleged herein.  The Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Defendants.

81.     These facts, in conjunction with the additional indicia of scienter detailed above, collectively support a strong inference of each Defendants' scienter.

82.     At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity and believed them to be true.  Had Plaintiff known of the true nature and prospects of the Fontaine Evolution Intermodal Flat Decks, the use of Plaintiff's investment money, and the condition of Dektrix's business, which were not disclosed by the Defendants, then Plaintiff would not have purchased or otherwise acquired its interest in Dektrix or otherwise invested in Dektrix.

83.     By virtue of the foregoing, the Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff

suffered damages in connection with its investments in Dektrix.

## COUNT II

### (FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS)

85.    Plaintiff repeats and realleges the allegations set forth above above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

86.    The Individual Defendants acted as controlling persons of Dektrix within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with Dektrix, Fontaine, and Marmon, participating in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

87.    In addition, the Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

88.    As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate

result of the Defendants' wrongful conduct, Plaintiff suffered damages in connection with its investment and loan to Dektrix.

## COUNT III

### (FOR VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT AGAINST ALL DEKTRIX DEFENDANTS)

89.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Dektrix Defendants.

90.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act against all Dektrix Defendants.

91.     Defendants were sellers, offerors, and/or solicitors of purchasers of the investment interest offered pursuant to the Private Placement Memorandum ("PPM").

92.     The PPM contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and concealed and failed to disclose material facts.  The Defendants' actions of solicitation included participating in the preparation of the false and misleading PPM.  Dektrix, acting through its employees, agents, and others, solicited such purchases for its personal financial gain through the preparation and dissemination of the PPM.

93.     Dektrix, its employees and agents, and the Defendants owed Plaintiff a duty to make a reasonable and diligent investigation of the statements contained in the PPM to ensure that such statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew, or in the exercise of reasonable care by their employees and agents should have known, of the misstatements and omissions contained in the PPM as set forth above.

94.     Plaintiff invested in Dektrix pursuant to and/or traceable to the defective PPM.

Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the PPM.

95.     By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff has the right to rescind and recover the consideration paid for its investment in Dektrix, together with interest thereon.

**COUNT IV**

**(FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT
AGAINST THE DEKRIX DEFENDANTS)**

96.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Dektrix Defendants.

97.     This Count is brought pursuant to Section 15 of the Securities Act against the Dektrix Defendants.

98.     The Dektrix Defendants each were control persons of Dektrix by virtue of their positions as directors and/or senior officers of Dektrix.  The Dektrix Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major members of Dektrix.  Dektrix controlled the Dektrix Defendants and all of the Dektrix's employees.

99.     The Dektrix Defendants each were culpable participants in the violations of Section 12 of the Securities Act alleged in the Count above, based on their having authorized the issuance of the PPM and having otherwise participated in the process of soliciting investment in Dektrix.

## COUNT V

### (COMMON LAW FRAUD)

100.     The prior paragraphs of this Complaint are incorporated herein by reference as though set forth in full.

101.     At all relevant times and places, Defendants, collectively and individually, represented, warranted, advertised, and otherwise claimed both orally and in writing on several occasions, which was determined to be false, misrepresented, inaccurate, omitted, and otherwise never disclosed to Plaintiff, including but not limited to the following:

a)     Fontaine's and Marmon's intermodal flat deck technology was warranted, safe, and otherwise AAR certified and approved for use in hauling, shipping, and/or other transportation activities;

b)     Fontaine and Dektrix had a two-year exclusive contract that could only be cancelled by Fontaine due to Dektrix's failure to buy the 73 decks and could not be cancelled by Fontaine due to its own failure to provide decks that were safe and could be used in intermodal transportation;

c)     Dektrix maintained several active business relationships, including but not limited to Broker-Carrier Agreements with several companies, including among others Atkore Steel, Allied Tube Conduit, Logan Aluminum, Inc., and Constellium;

d)     Dektrix was in good standing with Marmon and Fontaine, in terms of its exclusivity contract to purchase 73 Fontaine Evolution Intermodal Flat Decks;

e)     The legitimacy, scope, size, and accuracy of its purported shipping contracts;

f)     Dektrix financials including but not limited revenue, cashflow and percentage margins, and conditions of its operations while understating, misrepresenting, and otherwise omitting its accruing debts, obligations, and operating expenses and costs;

g)     Dektrix's monthly and annual deliveries and loads amounts; its monthly and annual billing volumes; its current monthly and annual assets and resources to deliver;

h)     Dektrix's representations that it had more demand for its decks than it can satisfy

with 73 decks;

i)     Dektrix's and Fontaine's representations, both contractually and orally regarding the intended use of Plaintiff's investment and loan, including but not limited to securing physical assets by way of the purchase of Fontaine Evolution Intermodal Flat Decks;

j)     The scope, severity, and significance of debts accruing to Dektrix, including but not limited to debts, obligations, and other payments owed or due to Fontaine.

102.     The representations were made by Defendants to Plaintiff for the purpose of making profits from such false, misleading, and untrue representations and omissions. The representations and omissions were material and form the basis as to Plaintiff expending money and otherwise relying on Defendants with respect to such servicing, repair and maintenance work.

103.     Defendants knew that the representations and/or omissions were false when made. Defendants intended that Plaintiff act on the representations in the manner reasonably contemplated by Defendants.

104.     Defendants intended that Plaintiff act on the representations knowing that Plaintiff was a well-known, reputable, and connected full-service trucking, shipping, and transportation company.

105.     Plaintiff at the time did not know and could not have known the representations were false.

106.     Plaintiff reasonably relied on the representations and/or the omissions as truthfully presenting all material facts. Plaintiff reasonably relied to its detriment on Defendants' representations, material omissions, warranties, advertisements and claims.

107.     Defendants made the fraudulent representations egregiously, willfully, purposefully, maliciously and with wanton disregard for Plaintiff's rights. Defendants'

concealment was motivated by its actual malice and wanton and purposeful disregard of Plaintiff's rights.

108.    As a direct and proximate result of Defendants' fraud, Plaintiff has suffered the loss of its investment money, and continues to sustain harm, including but not limited to economic harm, damage to reputation, lost earnings and profits, investigation expenses, attorney's fees, and litigation expenses.  Plaintiff is entitled to compensatory and punitive damages, attorney fees and costs, and interest.

## COUNT VI

## (BREACH OF CONTRACT)

109.    The prior paragraphs of this Complaint are incorporated herein by reference as though set forth in full.

110.    The Dektrix Defendants entered a contractual relationship with Plaintiff for trucking transportation work and investments.

111.    The Dektrix Defendants in conjunction with such agreements, made various representations, advertisements, and other characterizations concerning such services, which has been set forth extensively herein, including but not limited to fair dealing, disclosure, transparency, and/or the promise to use the investment money for the purchase of Evolution Intermodal Flat Decks from Fontaine.

112.    Such representations by Defendants, and set forth in the agreements, constitute the various contractual duties, performance, obligation, and/or engagement of Defendants with respect to Plaintiff, and at all relevant times were material to the contractual relationship between Plaintiff and the Dektrix Defendants.

113.    Despite the implied, explicit and/or plain language terms of the agreement,

Defendants materially breached their contractual duties, performance, obligation, and/or engagement of Plaintiff as set forth in the Agreements, including but not limited to failure to use the money as required by the contracts, failure to provide security interests in the Evolution Intermodal Flat Decks as required by the contracts, and spending the money for their own benefit instead of the benefit of Dektrix or its members and investors.

114. Plaintiff has been substantially harmed and/or suffered extensive damages by Defendants' breaches of contract, including but not limited to the loss of its investment money, loss of the benefit of the bargain, as represented, and consequential damages.

## COUNT VII
## (BREACH OF FIDUCIARY DUTY)

115. The preceding paragraphs are incorporated herein by reference as though set forth in full.

116. The Dektrix Defendants, as Member-Managers, fiduciaries, and otherwise, owed to Dektrix LLC and the other members, including Baguirov and Shakhbandarov, fiduciary duties of loyalty and care. The Dektrix Defendants breached their individual and collective duties by engaging in conduct, including but not limited to the following:

a) Fontaine's and Marmon's intermodal flat deck technology was warranted, safe, and otherwise AAR certified and approved for use in hauling, shipping, and/or other transportation activities;

b) Fontaine and Dektrix had a two-year exclusive contract that could only be cancelled by Fontaine due to Dektrix's failure to buy the 73 decks and could not be cancelled by Fontaine due to its own failure to provide decks that were safe and could be used in intermodal transportation;

c) Dektrix maintained several active business relationships, including but not limited to Broker-Carrier Agreements with several companies, including among others Atkore Steel, Allied Tube Conduit, Logan Aluminum, Inc., and Constellium;

d)        Dektrix was in good standing with Marmon and Fontaine, in terms of its exclusivity contract to purchase 73 Fontaine Evolution Intermodal Flat Decks;

e)        The legitimacy, scope, size, and accuracy of its purported shipping contracts;

f)        Dektrix financials including but not limited to revenue, cashflow and percentage margins, and conditions of its operations while understating, misrepresenting, and otherwise omitting its accruing debts, obligations, and operating expenses and costs;

g)        Dektrix's monthly and annual deliveries and loads amounts; its monthly and annual billing volumes; its current monthly and annual assets and resources to deliver;

h)        Dektrix's representations that it had more demand for its decks than it can satisfy with 73 decks;

i)        Dektrix's representations, both contractually and orally regarding the intended use of Plaintiff's investment and loan, including but not limited to securing physical assets by way of the purchase of Fontaine Evolution Intermodal Flat Decks;

j)        The scope, severity, and significance of debts accruing to Dektrix, including but not limited to debts, obligations, and other payments owed or due to Fontaine;

k)        Dektrix's failure to provide timely quarterly reports and financial information;

l)        Dektrix's failure to regularly and consistently hold membership meetings as required by the Operating Agreement;

m)        Dektrix falsely and failing to timely and/or accurately provide information regarding the true status of its prospective Atkore, Logan and Constellium contracts, among others, including but not limited to the reality that such business contracts were worthless;

n)        Dektrix payments to Neuvante Solutions LLC, a company owned and operated by Manager-Member Douglas Harris, and inactive since December 26, 2014, and only reactivated in March 2017 after suspicious payment issues was raised by Plaintiff.

117.       As a result of these breaches, Plaintiff has suffered the loss of its investment money, and continues to sustain harm, including but not limited to economic harm, damage to reputation, lost earnings and profits, investigation expenses, attorney's fees, and litigation expenses. Plaintiff

is entitled to compensatory and punitive damages, attorney fees and costs, and interest.

## COUNT VIII

### (UNJUST ENRICHMENT)

118.    The prior paragraphs of this Complaint are incorporated herein by reference as though set forth in full.

119.    Defendants came into possession of the payments, investment, and loan money of Plaintiff, Baguirov, and Shakhbandarov and have been unjustly enriched thereby to Plaintiff's detriment.

120.    Defendants enjoyed the use, benefits, and privileges of possession of the aforesaid sums and used it in their fraudulent business activities and self-dealing, deriving substantial revenues and benefits from Plaintiff's investment and loan to Dektrix.

121.    As a direct and proximate result of Defendant's misrepresentations, omissions, and breaches of contract and fiduciary duties, Plaintiff has sustained harm, including but not limited to the loss of its investment and loan money.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as set forth below:

A.  Actual damages in an amount greater than $75,000.00 that will make Plaintiff whole, including but not limited to reimbursement of the amounts invested by Plaintiff and recovery for economic harm, damage to reputation, lost earnings and profits, and investigation expenses in amounts to be proven at trial;

B.  Rescission of the investment agreements and recovery of the consideration pursuant to Section 12(a)(2) of the Securities Act;

C.  Punitive damages in an amount that will dissuade Defendants from so acting in the

future;

D.  Attorneys' fees, expenses and costs of suit;

E.  Pre-judgment and post-judgment interest on such monetary relief;

F.  All other relief that the Court deems equitable and just at law or equity.


Respectfully submitted,

GOTTSCHLICH & PORTUNE, LLP

*/s/ Martin A. Foos*
Martin A. Foos  (0065762)
201 East Sixth Street
Dayton, Ohio 45402
(937) 913-0200
(937) 824-2818 (Fax)
mfoos@gplawdayton.com
***Attorney for Plaintiff***


## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues.


*/s/ Martin A. Foos*
Martin A. Foos

37