**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| AMERICAN POWER, LLC, | : | Case No. 3:17-cv-00347 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| DOUGLAS O. HARRIS, et al., | : | |
| | : | |
| Defendants. | : | |

---

## REPORT AND RECOMMENDATIONS[1]

---

### I.      Introduction

Plaintiff American Power, LLC is a trucking-logistics company headquartered in

Dayton, Ohio.  According to the Complaint, Plaintiff invested in and loaned $450,000 to

Defendant Dektrix LLC, a transportation-servicing company headquartered in Utah.  The

Complaint charges that the investment and loan were fraudulently obtained and ultimately

worthless.  "Plaintiff is left with nothing it invested."  (Doc. #1, ¶ 72).

Plaintiff seeks to impose liability upon Dektrix and various other business entities

and individuals for purported violations of federal securities laws and state common law.

Two groups of Defendants—(1) the Dektrix Defendants, and (2) the Fontaine Defendants—

seek to avoid liability by attacking Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(6) for

failing to state a claim upon which relief could be granted and, as to Plaintiff's fraud claims,

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

for failing to meet the pleading requirements of Fed. R. Civ. P. 9(b) and the Private Litigation Securities Reform Act. (Doc. #s 16, 20). The Complaint must therefore be studied.

## II.     Factual Background

Accepting as true the well-pleaded factual content in Plaintiff's Complaint and construing it in the light most favorable to Plaintiff, *see Ohio Pub. Employees Retirement Sys. v. Fed. Home Loan Mortgage Corp.*, 830 F.3d 376, 382 (6th Cir. 2016), reveals a narrative of deception, misplaced trust, and financial washout.

Dektrix LLC formed in January 2015. Its purpose was to commercialize a "'revolutionary intermodal flat-deck shipping solution…'"[2] *Id*. (Doc. #1, ¶11) (footnote added). This flat-deck shipping solution was manufactured by Defendant Fontaine Engineered Products, Inc. (d/b/a Fontaine Intermodal). It was known as Fontaine Evolution Intermodal Flat Decks. Photos of the Fontaine Flat Deck appear in a company document attached as an Exhibit to the Complaint, *id*. at 47-48, and in Fontaine's Flat Deck Owner's Guide (Doc. #39, Exh. B). Soon after Dektrix was formed, it began renting and using Fontaine Flat Decks.

In June 2016, Dektrix reached out to Plaintiff and others with an investment opportunity related to Dektrix's use of "new type of trailer design produced and manufactured by Defendant Fontaine[,]" referring to the Fontaine Flat Deck. (Doc. #1,

---

[2] In the shipping industry, the term "intermodal" refers to something, like a container, that can be carried on ships, railroad cars, or a trailer being pulled by semi-trucks on a highway. "Using an 'intermodal' container saves significant time and costs associated with having to secure and re-secure loads with every change of mode of transportation." *Id*. at 9.

¶25). The opportunity looked attractive in part because Dektrix held an exclusive opportunity to use the Fontaine Flat Decks. Similar communications from Dektrix followed: In July 2016, the Dektrix Defendants—there are seven of them[3]—told Plaintiff (through an email) that Dektrix "was a well-established company that had earned an exclusive opportunity to use Fontaine Evolution Intermodal Flat Decks to ship loads." *Id.* at ¶27. They also explained to Plaintiff that Dektrix had a successful (albeit brief) history and a promising future:

> Operating History – Dektrix is not a start-up company. Dektrix was first organized in December of 2014. It has moved freight every month since April of 2015. It has two yards, 17 FTE employees [full-time employees] (both w-2 and 1099 contractors). It has moved over 814 loads of freight and it has billed more than $2.5M in sales. Dektrix has obtained all of its operating authorities as well as broker authorities. It is authorized to operate on all class 1 railways in North America…. It has a fleet of 73 decks and nine 2016 Freightliner tandem axel day cabs which it leases from Penske…. Dektrix has executed multiple carrier agreements and has current contracts and relationships with the logistics executives at various companies. Based on Dektrix['s] performance the executives at Marmon Highway Technologies and Fontaine Intermodal have granted Dektrix a 3 year exclusive opportunity. They will not produce or sell any decks or similar intermodal products to any other individual or entity for three years. These are the accomplishments of a company which has worked very hard and is now posed for rapid growth.

*Id.* (citation omitted).

In July and August 2016, the Dektrix Defendants met with Plaintiff and continued to solicit its investment. They informed Plaintiff about Dektrix's operating history, value, and client opportunities. They also showed Plaintiff a letter that Defendant Marmon's President Kelly Dier wrote making it clear, according to the Complaint, "that Fontaine, Marmon, and Dektrix were working together to secure investment money from Plaintiff." *Id.* at ¶29. The

---

[3] The Dektrix Defendants are Douglas O. Harris, Murray J. Crane, Michael T. Morley, Scott Larson, Dektrix LLC, Dektrix Transportation Services LLC, and Dektrix Intermodal LLC.

Complaint quotes the letter at some length, including information about Dektrix's right to exclusive use of the Fontaine Flat Decks:

> We [Marmon] agree to grant Dektrix two years of exclusivity from the date Dektrix purchases all of the 73 [Fontaine] Intermodal Flat Decks, which are currently being rented to Dektrix and we further agree to grant an additional third year of exclusivity to Dektrix in exchange for purchasing the 43 decks which Fontaine currently holds in inventory in the form of new components, ready to assemble….

*Id*.

An eventful meeting occurred on August 5, 2016 during which two Dektrix Defendants, Douglas O. Harris and Murray J. Crane, gave a presentation to Plaintiff and other potential investors. Harris is the general manager of Dektrix; Crane is a Member-Manager of Dektrix (and the patent holder of technology used in the Fontaine Flat Decks). Harris told prospective investors, "Dektrix would register UCC statement on the Fontaine Intermodal flat decks that Dektrix would purchase from Fontaine with the investor money. The decks would be registered for the benefit of the investors 'so that they control the assets, they own the assets.'" *Id*. at ¶32.

Defendant Berkley Buchanan, then-President of Fontaine, also participated in the August 5, 2016 meeting, telling Plaintiff and the others, "We stand behind them,' meaning Fontaine stood behind Dektrix." *Id*. at 31. Defendant Buchanan also said, 'We [Fontaine] believe in this project strongly enough that we have provided them [Dektrix] an offer of exclusivity on the product.'" *Id*. (Plaintiff's brackets). He also "touted Fontaine's relationship with BNSF Railway through Berkshire Hathaway…," and "described the millions of dollars in development spent by Fontaine." *Id*.

Things began to coalesce the next day, August 6, 2016. Dektrix provided Plaintiff

with several documents, including (1) a Private Placement Memorandum "titled *Confidential Offering Memorandum* $6,000,000.00 Consisting of up to 400,000 Membership Units of Dektrix, LLC, Minimum Purchase $50,000…."; (2) a Subscription Agreement; and (3) Dektrix's Operating Agreement. *Id*. at ¶34 (citation omitted).

Plaintiff concluded, based on the Private Placement Memo, that Fontaine Flat Decks "were integral and necessary to Dektrix's business model." *Id*. at ¶35. The Private Placement Memo explained, "'The company's revenue is tied to securing shipping contracts which utilize the Dektrix Intermodal flat-deck solution….'" *Id*.

Plaintiff and its owners—Adil Baguirov and Islom Shakhbandarov—decided to review the information that was publicly available about Fontaine and its Flat Decks "particularly with respect to their compatibility with rail transportation." *Id*. at ¶37. Indeed, "[t]ransportation by railroad was the key to functionality of the Fontaine Evolution Flat Decks being used by Dektrix." *Id*. at ¶36. Baguirov and Shakhbandarov conducted "an easy search of the internet" and found Fontaine press releases in 2014, introducing its Flat Deck. *Id*. at ¶37. The press releases described the Fontaine Flat Deck as "'Certified by the Association of American Railroads, Fontaine's Evolution Intermodal Flat Deck includes multiple patented features related to the deck floor and load securement system.'" *Id*. (footnote and citation omitted). Several industry publications (copies are attached to the Complaint) quoted these assertions. "Plaintiff relied on Fontaine's statements that its Evolution Intermodal Flat Decks had been AAR certified when it decided to invest in Dektrix." *Id*. at ¶43.

The Association of American Railroads (AAR), according to the Complaint, is an

industry trade group primarily representing major freight railroads in North America. It is dedicated to maintaining railroad safety and operating standards. It publishes a Manual of Safety Standards and Recommended Practices "that includes all regularly adopted specifications, standards, and recommended practices …." *Id*. at ¶39. AAR "maintains a rigorous certification program for equipment and components in conjunction with railroads, including rail cars and decks. The process for obtaining AAR approval is time consuming and expensive." *Id*. at ¶41. During 2013-2014, Defendant Crane was a member of AAR's Intermodal Operations Committee.

"In a video that was on its [Fontaine's] website in August 2016 and continuing through the date of [Plaintiff's] Complaint, Fontaine described the Evolution Intermodal Flat Deck to be 'stronger' and 'safer' than any other deck 'to withstand the punishing conditions associated with rail and highway transportation.' It's virtually indestructible yet simple and inexpensive to repair if it's ever damaged.'" *Id*. at ¶44.

"On numerous occasions, the Dektrix Defendants represented to prospective investors including Plaintiff that it had contractual shipping relationships and/or agreements with a number of carriers, including, among others, Atkore Steel, Allied Tube Conduit, Logan Aluminum, Inc., and Constellium." *Id*. at ¶47.

"[N]one of the Defendants ever disclosed before Plaintiff invested its money that the Fontaine Evolution Intermodal Flat Decks had never, in fact, been approved by the AAR. None of the Defendants had disclosed that the decks had significant engineering problems and were not safe to use on the highway or railroads." *Id*. at ¶50.

In December 2016, Plaintiff (through Baguirov and Shakhbandarov) invested in

Dektrix by purchasing "preferred membership units." *Id*. at ¶52. A Membership Purchase Agreement stated that Plaintiff (including Baguirov and Shakhbandarov) "shall pay $350,000 US to Dektrix LLC…, for which [the Dektrix Defendants] will immediately convey 70,000 preferred membership units to [Plaintiff and the two other investors]…." *Id*. (quoting MPA, attached to the Complaint as Exh. E). The Membership Purchase Agreement also granted Plaintiff a second lien on the first 73 Fontaine Flat Decks and, according to Plaintiff, "demonstrates the parties' intent that the $350,000 was to be used toward the purchase of the first 73 intermodal flat decks from Fontaine." *Id*. at ¶54 (quoting Exh. E). Shortly after the Membership Purchase Agreement was executed, Plaintiff wired $350,000 to the Dektrix Defendants. *Id*. at ¶52.

Things soon began to disintegrate. A month later, on January 25, 2017, the Dektrix Defendants advised Marmon and Fontaine (the Fontaine Defendants—there are five of them[4]), "after inspection of the decks, 'about 50% of the fleet have sheared bolts on both the front and rear hub [brake] assemblies.'" *Id*. at ¶55.

Five days later, "the … Fontaine Defendants wrote to the Dektrix Defendants and terminated the existing lease." *Id*. at ¶57. The letter was sent to Dektrix's General Manager Harris. It provided two reasons for the decision to terminate the existing lease: Dektrix's continued failure (1) to pay rent as required by the lease agreement between Dektrix and Fontaine, and (2) "'maintain the decks in good and efficient operating order, in accordance with the manufacturers recommendations, all laws and DOT Regulations and in the same condition or appearance when accepted by [Dektrix]'…." (Doc. #1, Exh. F, *PageID* #174)

---

[4] The Fontaine Defendants are Kelly Dier, Henry Prochazka, Berkley Buchanan, Marmon Highway Technologies LLC, and Fontaine Engineered Products, Inc.

(quoting § 10 of their Dektrix-Fontaine lease agreement).

Yet, all was apparently not lost. A week later, on February 7, 2017, the Dektrix Defendants represented to Plaintiff that the lease termination would be short-term, that any issue with sheared bolts was repairable and could be resolved. The Dektrix Defendants did not at any time indicate to Plaintiff that the Marmon and Fontaine Defendants "were seeking not only to call back and seek return of all decks, but were actively seeking to physically destroy such decks on the basis that they were unfit, defective, and otherwise unsafe…." *Id*. at ¶58.

The Dektrix Defendants attempted to improve the situation—or so it looked—by offering to buy (from the Marmon and Fontaine Defendants) 73 Fontaine Flat Decks for $1 million ($13,699 apiece). But the Dektrix Defendants needed help with these pricey purchases. They therefore turned to Plaintiff and obtained a $100,000 bridge loan to be used by Dektrix for the purchase of the Fontaine Flat Decks. Dektrix General Manager Harris reported to Plaintiff that Defendants Fontaine and Defendant Henry Prochazka[5] "had agreed to accept Plaintiff's money as a 'refundable deposit should things not culminate as we had hoped for.'" *Id*. at ¶60. "Dektrix wired $50,000 of Plaintiff's money to Fontaine on March 1, 2017." *Id*.

On April 6, 2017, the Dektrix Defendants clued in Plaintiff—for the first time— about the fact that the AAR had never certified Fontaine Flat Decks. The import of this becomes clear in light of the Complaint's allegation that Murray J. Crane (remember, he is a Member-Manager of Dektrix) had learned two years earlier—on May 20, 2015—about the

---

[5] Prochazka is Group President of Fontaine Commercial Trailer, Inc., an affiliate of Defendant Fontaine and a subsidiary of Defendant Marmon. (Doc. #1, *PageID* #8).

lack of AAR certification. Crane learned this from an email sent to him on May 20, 2015 by Michael Lesniak with the AAR. *Id*. at ¶62.

Plaintiff alleges, "the Dektrix Defendants later admitted that they reported defects in the [Fontaine Flat] decks in 2015 to Buck Buchanan of Fontaine. Defendants Buchanan and Fontaine had the decks crudely repaired at that time. Neither the 2015 defects nor the repairs were ever reported to Plaintiff before its investment in and loan to Dektrix." *Id*. at ¶63.

On May 22, 2017, further twists in the parties' relationship developed: The Dektrix Defendants informed Plaintiff of their intent to file for bankruptcy relief. They also informed Plaintiff about their position that their use of Plaintiff's investment money, including the bridge loan, was not limited to "asset," meaning Fontaine-Flat-Deck, purchases. *Id*. at ¶64. Indeed, Dektrix "misused, misallocated, and never used Plaintiff's investment money in a reasonable, sound, prudent and/or agreed upon manner, rather, such money, including but not limited to the bridge loan, was never used to purchase assets by way of Fontaine [Flat Decks]. Rather, such investment money was used to repay the bridge loan (approximately $7,000) and otherwise enrich themselves in the form of salaries ($42,000 going directly to Defendants Crane and Larson[6])." *Id*. at ¶65 (footnote added).

Two days later, Dektrix told Plaintiff for the first time that Fontaine (through Defendant Prochazka) had written a letter to a Dektrix creditor warning, in part, that the Fontaine Flat Decks "are not fit for use and are not safe for use…." *Id*. at ¶66 (quoting Exh. G).

---

[6] Defendant Scott Larson is the "Comptroller, employee, and/or agent" of Defendant Dektrix. (Doc. #1, *PageID* #7).

By June 2016, Dektrix "had fallen into financial difficulties, and the Fontaine [Flat Decks] that it was leasing had been seized by a creditor …." *Id*. at ¶69.

In July 2017, Dektrix's General Manager Harris told Plaintiff that Fontaine had not returned its $50,000, as Prochazka had personally assured. *Id*. at ¶70. Plaintiff alleges, "Fontaine would not make Dektrix whole for the harm caused by the defective Intermodal decks. Instead, Fontaine and Dektrix used Plaintiff's money to further their own interests…." *Id*.

In August 21, 2017, Dektrix's General Manager Harris wrote an email, blaming the "fraud" on various Fontaine Defendants. The Complaint quotes the email at length, and given its eye-popping allegations, it is worth repeating:

> "Here is the fraud–Kelly Dier, John Craig, Hank Prochazka, Buck Buchanan, Jess Drommond and others made loud and published claims to reputable reporters and trade journals that the Evolution deck was in fact AAR certified. This certification is not something handed out easily but requires heavy investment in time, money and extensive testing. The benefit of AAR certification is that the user of the deck would be assured its operation would be safe. Shortly after putting the decks in service we had pins shearing in the upright support arms. Those pins were critical to supporting the 60,000 lbs. of another container stacked on top of our deck. When we verbally drew this problem to Fontaine's attention, they asked us to keep it quiet and assured us they would immediately fix the problem. They also told us that they had not experienced this problem with any of their other Evolution decks in use with Boyd Brothers or Prime (not true). The repairs were made in a shoddy way and did not reflect a design improvement. In fact, the solution they proposed was to weld the pins in place, which only exacerbated the problem. Now we had more of the pins shearing. We limped along for several months with Fontaine trying different weights of pins, washers and welds. The problem was never adequately resolved.[7] It wasn't until we were gearing up to service the new Constellium contract[8] in January that we went to Chicago and to California to

---

[7] The Dektrix Defendants assert that the pin-shearing problem was fixed (Doc. #39, *PageID* #466), but at this stage of the case it must be accepted as true that the problem was never adequately resolved, as Harris's email, and consequently, the Complaint alleges.

[8] Dektrix allegedly represented to prospective investors on many occasions that it had contractual shipping arrangements with Constellium and other carriers. (Doc. #1, ¶47).

inspect our fleet. To our surprise many of the main bolts holding the upright arms in place appeared to be missing. In fact, more than 40% of the hub assemblies seemed to have missing bolts. Fontaine provided us a power point presentation demonstrating how we should replace the bolts, apply a lock-tight solution and the problem would be solved. As we tried to implement their plan we discovered the bolts were not missing. They hadn't merely shaken their way out of the socket or been sheared clean. They were in fact exploded within the assembly. The amount of pressure on those bolts must have been inordinate. Not knowing when a pin might explode we realized the entire fleet was unfit to service the Constellium contract."

"We put all of our findings in an email to Buck Buchanan, expecting a robust partnering type response assuring us they would fix this and get it done right away. To our surprise there was no such support, only a phone [sic] from Hank Prochazka, (Buck's boss) who said he wanted to give me a heads up that Fontaine would be calling back all of the decks because we had now made the safety issue a discoverable issue (this statement is also verifiable)."

*Id*. at ¶71 (footnotes added).

Since August 2017, and despite Plaintiff's significant investment in Dektrix, "the Dektrix Defendants have not conducted any substantive shipping and/or transportation activities, including generating any revenue for the company and/or its Members…." *Id*. at ¶72.

It is interesting to note that the name Dektrix, a portmanteau blending decks with tricks, winks toward flat-deck innovation and cleverness as well as flat-deck tricks. Regardless of whether this was intended, Plaintiff advances federal-securities violations against the Dektrix Defendants and the Fontaine Defendants, including:

- Count I—The Dektrix and Fontaine Defendants violated Section 10(b) of the Securities Exchange Act and the Securities and Exchanges Commission's Rule 10b-5.

- Count II—The individual Defendants violated Section 20(a) of the Exchange Act.

- Count III—The Dektrix Defendants violated Section 12(a)(2) of the Securities Act.

- Count IV—The Dektrix Defendants violated Section 15 of the Securities Act.

The Complaint further advances state-law claims of fraud, breach of contract, breach of fiduciary duty, and unjust enrichment.

## III.     Pleading Requirements

Notice pleading is alive in the United States Courts; the "hypertechnical code pleading regime of a prior era...," *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), is not. *See CNH America LLC v. Int'l Union,* 645 F.3d 785, 794 (6th Cir. 2011) (concluding the Complaint's allegations "suffice to meet the modest notice-pleading requirements of Civil Rule 8(a)." (citations omitted)).  The foundational principal of notice pleading is that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief, in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests....'" *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007) (quoting, in part, Fed. R. Civ. P. 8(a)(2); other citation omitted).

To endure an attack under Fed. R. Civ. P. 12(b)(6), a complaint must plead a plausible claim for relief. *Iqbal,* 556 U.S. at 678.  A plausible claim exists if the complaint contains "'sufficient factual matter' to render the legal claim plausible, *i.e.*, more than merely possible." *Iqbal,* 556 U.S. at 678.  Sufficient factual matter is present "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are merely consistent with a defendant's

liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (citation and internal quotations omitted). Labels and conclusions are not enough; "a formulaic recitation of the elements of a cause…,' *id.*, is not enough; and "'naked assertions' devoid of 'further factual enhancement…,'" are not enough, *id.* (citations and brackets omitted).

A complaint charging federal or state fraud triggers additional pleading mandates set by Fed. R. Civ. P. 9(b). *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008); *see Glimcher Co., LLC v. Deavers*, 2:09cv797, 2010 WL 1610709, at *4 (S.D. Ohio 2010) (Frost, D.J.). "[The] complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' At a minimum, [the complaint] must allege the time, place and contents of the misrepresentations upon which they relied. *Frank*, 547 F.3d at 570 (quoting, in part, *Gupta v. Terra Nitrogen Corp.,* 10 F. Supp.2d 879, 883 (N.D. Ohio 1998)). And a securities-fraud complaint must work even harder. "As a check against abusive litigation by private parties…," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007), the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4, imposes stringent pleading requirements:

> To satisfy this heavier, statutorily created burden, plaintiffs must identify each misleading or false statement and explain how it is misleading. 15 U.S.C. § 78u–4(b)(1)(B). In addition, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." § 78u–4(b)(2)(A). These requirements are not easily satisfied.

*In re Omnicare, Inc. Securities Litigation*, 769 F.3d 455, 461 (6th Cir. 2014). Although the PSLRA, in general, places an "elephant-sized boulder…," *id.*, in the path of pleading

securities fraud, "'[w]hen considering a motion to dismiss, [courts] must tread lightly …

engaging carefully with the facts of a given case and considering them in their full

context.'" *Ohio Pub. Employees Retirement Sys.*, 830 F.3d at 388 (quoting *Omnicare*, 769

F.3d at 473).

## IV.    Discussion:  Count I

## A.    <u>Plaintiff's Count I and § 10(b)</u>

Plaintiff claims in Count I that the Dektrix Defendants and the Fontaine Defendants,

and each of them, violated § 10(b)[9] by deceiving and misleading Plaintiff into investing in

Dektrix (in December 2016) and providing a bridge loan to Dektrix (in 2017).  Plaintiff

alleges, in part, "The purpose of the scheme was to enrich Defendants' companies and

themselves through the use of material false statements or omissions intended to secure

investment from Plaintiff…."  (Doc. #1, *PageID* #24).

Section 10(b) bans the "use or employ, in connection with the purchase or sale of any

security ... [of] any manipulative or deceptive device or contrivance in contravention of such

rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors." *Ohio Pub. Employees Retirement Sys.*, 830 F.3d

at 383 (quoting 15 U.S.C. §78j(b)).

A prima facie violation of § 10(b) consists of:

(1) a material misrepresentation or omission by the defendant;

(2) scienter;

(3) a connection between the misrepresentation or omission and the purchase or
sale of a security;

---

[9] References herein to Plaintiff's § 10(b) claim encompass Plaintiff's co-extensive Rule 10b-5 claim.  *See Omnicare*, 769 F.3d at 469, n.1.

(4) reliance upon the misrepresentation or omission;

(5) economic loss; and

(6) loss causation.

*Id.*, 830 F.3d at 383-84 (citation and internal punctuation omitted).

## B.     The Dektrix Defendants' Motion to Dismiss

The Dektrix Defendants fault the Complaint for failing to allege that they made any material misrepresentations or omissions. The Complaint, they say, pins the false representation—*i.e.*, that the Flat Decks were AAR certified—on the Fontaine Defendants and does not accuse the Dektrix Defendants of making any such false representation. The Dektrix Defendants also argue that Plaintiff's Complaint fails under Fed. R. Civ. P. 9 and the PSLRA because (1) it does not plead with particularity who made what statements or omissions and when they made them; (2) Dektrix had no duty to correct the unknown previous AAR-approval misrepresentation made by Fontaine in its 2014 press release; and, (3) AAR approval was not, in fact, material to the transactions between Plaintiff and the Dektrix Defendants. And, the Dektrix Defendants assail Plaintiff's § 10(b) claim on the ground that it fails to allege a material omission by them about any mechanical condition or safety issue posed by the Fontaine Flat Decks, about the Dektrix Defendant's use of Plaintiff's investment money, or about the financial condition of Dektrix's business.

Plaintiff's § 10(b) claim must, as noted above, derive from a material misrepresentation or omission. *Ohio Pub. Employees Retirement Sys.*, 830 F.3d at 383. "Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or

15

omission that was false or misleading; and (2) that this statement or omission concerned a material fact. General allegations of these two components, however, are not enough. Under Federal Rule of Civil Procedure 9(b) and the PSLRA, a plaintiff's complaint must also 'allege the time, place, and content of the alleged misrepresentation [or omission] on which he or she relied [and] the fraudulent scheme....'" *Omnicare*, 769 F.3d at 470 (citation omitted).

An affirmative statement constitutes a misrepresentation when it is misleading or false. *Id.* Misrepresentations containing either hard or soft information are actionable. *Id.* Plaintiff argues that in the Private Placement Memo, the Dektrix Defendants made a materially false statement by implying that the Fontaine Flat Deck had obtained AAR certification. In support of this, Plaintiff relies on the following paragraph:

> Other trailer manufacturers could produce a competitive deck product [meaning, competitive with the Fontaine Flat Deck] but it may take up to three years from the time they make the decision to get into the market to design around the Fontaine patents, test the equipment and go through several production models before the competitive deck would be ready for AAR approval to operate on Class 1 railways.

(Doc. #1, *PageID* #74). Reading this in Plaintiff's favor reinforces the significance of AAR approval for intermodal flat decks and the need for a Dektrix competitor to obtain AAR approval to operate on Class 1 railways. This, in turn, invites the reasonable inferences that Dektrix has a significant head start on potential competitors and a strong competitive advantage over their foes in the marketplace because the AAR had already certified the Fontaine Flat Deck. The Complaint further alleges that the Dektrix Defendants made this material misrepresentation on or around August 6, 2016 when they provided Plaintiff with a copy of the Private Placement Memo. (Doc. #1, ¶33). Although the Dektrix Defendants

claim to have lacked knowledge in 2015 about Fontaine's false-AAR-certification statement, the Complaint alleges that Crane "had actual knowledge of the lack of certification from a May 20, 2015 email, sent to him by Michael Lesniak with the AAR." *Id*. at ¶62. Yet, according to the Complaint, Defendant Crane never disclosed the lack of AAR certification to Plaintiff until April 2017. *Id.*

If, on the other hand, the Private Placement Memorandum is construed differently— *i.e.,* as not saying that the Fontaine Flat Deck's were AAR certified—Plaintiff contends that the Complaint alleges a material misrepresentation by omission. The asserted omission: The Dektrix Defendant's did not tell Plaintiff that the Fontaine Flat Decks were not AAR certified until April 2017.

"In lieu of targeting a defendant's misleading or false statements, a plaintiff may focus on a defendant's omission—its failure to disclose information when it had a duty to do so. A duty to affirmatively disclose 'may arise when there is insider trading, a statute requiring disclosure, or, as relevant in this case, an inaccurate, incomplete[,] or misleading prior disclosure." *Id*. at 471 (citations and internal quotation marks omitted). "[I]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, 131 S.Ct. 1309, 1321 (2011).

The Complaint states that the Dektrix Defendants waited until April 2017 to inform Plaintiff for the first time that the AAR had never certified that the Fontaine Flat Deck.

Again, Dektrix, through Crane, knew in May 2015 that the Fontaine Flat Deck was not AAR certified. Accepting this as true means he knew that the Fontaine Flat Deck was not AAR certified throughout the time the Dektrix Defendants solicited Plaintiff's investment (from June to December 2016) and its bridge loan (from and after late January 2017).

The fact, moreover, that the Fontaine Flat Deck was not AAR certified was material because a reasonable potential investor in Plaintiff's position would have considered it important, if not central, to its decisions to invest in and loan money to Dektrix. *See Omnicare*, 769 F.3d at 472 ("a 'fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" (citation omitted)). This is seen in how highly AAR certification was regarded in the industry and in the high cost and rigor needed to obtain AAR certification. The Complaint explains that the AAR represents primarily the major freight railroads of North American. (Doc. #1, ¶38). The AAR describes itself as "'the standard setting organization for North American railroads. On its website, the AAR explains that '[it] establishes safety, security, and operating standards for seamless and safe operations across America's 140,000 mile freight rail network.'" *Id*. at ¶39 (citation and footnote omitted)). The AAR also regularly adopts safety specifications, standards, and practices in its Manual of Standards and Recommended Practices. *Id*. The Complaint also details the eight-step process for obtaining AAR approval. "Suppliers work hard and spend significant amounts of time and money to achieve AAR approval because of its benefits, and they promote their products by stating that they are AAR certified," according to the Complaint. *Id*. at ¶43. This information, combined with Defendant Crane's comments touting the AAR during the August 2016

18

meeting, create a substantial likelihood that a reasonable potential investor in Plaintiff's position would have found AAR non-certification important, if not central, when deciding whether or not to invest in Dektrix during and after August 2016. *See Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 571 (6th 2008) (citation and internal quotation marks omitted) (A fact is material when "there is a 'substantial likelihood that the disclosure of [it] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'") (citations omitted).

The Dektrix Defendants contend that they did not have an affirmative duty to disclose the Fontaine Flat Deck's lack of AAR certification. This is not so. The Dektrix Defendants had an affirmative duty to disclose this historical fact because once Crane sang the praise of AAR certification during the August 5, 2016 meeting, he was required to be qualify his praise by disclosing to Plaintiff the fact that the AAR had not certified the Fontaine Flat Deck. *City of Monroe Employees Retirement Sys. v. Bridgestone Corp.*, 399 F.3d 651, 673 (6th Cir. 2005) ("We … hold that once Firestone elected to make statements such as the statement regarding the 'objective data,' it was required to qualify that representation with known information undermining (or seemingly undermining) the claim."); *see also Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993) ("corporate officers are not required to speak, but once they do, they must be truthful if their comments are material to investors' decisionmaking."). During the August 5, 2016 meeting, Crane was asked a question about the AAR, and he responded with a somewhat glowing description: "they're the largest governing body in the world, so even the steam trains from Europe … come over and are tested here under their guidance in Pueblo, Colorado." *Id.* at ¶40. Yet,

while Crane praised the AAR in this manner, neither he nor Harris told Plaintiff that the Fontaine Flat Deck was not AAR certified during the meeting or at any time it sought Plaintiff's investment or loan. *Id.* at ¶s 40. Additionally, by talking up the AAR in August 2016, it can be reasonably inferred that Crane was attempting to build Plaintiff's faith in the Fontaine Flat Deck and, hence, in Dektrix's ability to lead the way in the intermodal transportation industry. By failing to disclose the lack of AAR certification, Crane and the Dektrix Defendants provided incomplete and misleading information to Plaintiff. Indeed, no clarification that the Fontaine Flat Decks were not AAR certified came during the August 5, 2016 meeting or in the four months that followed before Plaintiff's December decision to invest or through the time Plaintiff extended bridge loan to Dektrix. Without this clarification, Crane, Harris, and the Dektrix Defendants provided incomplete and misleading material information to Plaintiff that they had an affirmative duty to correct and clarify. *See Omnicare*, 769 F.3d at 471 ("A duty to affirmatively disclose may arise when there is…, an inaccurate, incomplete[,] or misleading prior disclosure.").

Plaintiff asserts in its Memorandum in Opposition that during the meeting on August 5, 2016, "The subjects of AAR certification and the quality and safety of the [Fontaine] Evolution Flat Decks were significant points of discussion." (Doc. #36, *PageID* #404). The Complaint does not explicitly state this, although it reasonably suggests it in part by its recitation of Crane's response to an AAR question. The Complaint's allegations, moreover, show that Dektrix's potential for ongoing financial success depended on the quality and efficacy of the Fontaine Flat Deck.[10] This is seen in the Private Placement Memo. The

---

[10] This is readily seen now in the fact that the simple shearing of bolts gutted the Fontaine Flat Deck's usefulness (at least to Dektrix) and doomed Dektrix's attempt to revolutionize intermodal shipping.

Complaint alleges, "The Fontaine … Flat Decks were integral and necessary to Dektrix's business model. As stated in the [Private Placement Memo], 'The company's revenue is tied to securing shipping contracts which utilize the Dektrix Intermodal flat-deck solution ….'" (Doc. #1, ¶15). Considering the integral and necessary role the Fontaine Flat Deck held in Dektrix's potential for ongoing financial success, combined with Crane's praise of the AAR during the August 5, 2016 meeting, the Dektrix Defendants held an affirmative duty to disclose to Plaintiff that the Fontaine Flat Deck had not been AAR certified.

Dektrix maintains that the Fontaine Flat Deck's lack of AAR certification was not a material fact because "AAR approval is not required to operate on the railroads and was not material to Plaintiff's investment decision." (Doc. #20, *PageID* #241). Yet, even if AAR approval was not necessary for railroad operations, the fact the Fontaine Flat Decks lacked AAR certification was material because, again, Crane's investment pitch on August 5, 2016 touted the AAR, because the quality and efficacy of the Fontaine Flat Deck was integral to weighing the risks of investing in Dektrix against its potential for ongoing success, because the Private Placement Memo used AAR certification as a means of misleading potential investors into thinking Dektrix held a strong competitive advantage. Given these circumstances, "there is a substantial likelihood that the disclosure of [the lack of AAR certification] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Zaluski*, 527 F.3d at 571.

Plaintiff also contends that Dektrix had an affirmative duty to disclose safety and security issues with the Fontaine Flat Decks in 2015. This is correct. The Complaint alleges that in 2015, Dektrix reported defects in the Fontaine Flat Decks—namely, pin

shearing—to Buck Buchanan of Fontaine and that the Flat Decks were "crudely repaired at that time." (Doc. #1, ¶s 63, 71). In his August 2017 email, Defendant Harris wrote, "The repairs were made in a shoddy way and did not reflect a design improvement." *Id*. at ¶71. He noted that the proposed solution "only exacerbated the problem. Now we had more of the pins shearing…. The problem was never adequately resolved…." *Id*. The Complaint further asserts, "Neither the 2015 defects nor the repairs were ever disclosed to Plaintiff before its investment in and loan to Dektrix." *Id*. at 63.

Accepting these facts as true, they identify crucial intelligence about the Fontaine Flat Deck that a reasonable investor would have viewed as significantly altering the mix of information it received about the safety and quality of the Fontaine Flat Deck. Not only would such information be pertinent to whether Dektrix could fulfill its shipping contracts, it potentially exposed Dektrix to liability for personal or property damage caused by shearing bolts. Both events were possible, thus exposing Dektrix to much greater financial risk than Plaintiff knew about. Consequently, Dektrix had an affirmative duty to inform Plaintiff about the "never adequately resolved" (Doc. #1, ¶71) pin-shearing problem before Plaintiff invested in and loaned money to Dektrix.

The Dektrix Defendants contend that the Complaint improperly conflates the terms "pins" and "bolts" and therefore confuses the distinct issues of pin problems in 2015 versus bolt problems in 2017. (Doc. #39, *PageID* #466-67). It does not. The Complaint refers to "defects" that the Dektrix Defendants reported to Fontaine in 2015. *Id*. at ¶63. The Complaint also quotes Harris's email in which he described the pin-shearing problem consistent with the allegation of "defects" in the Fontaine Flat Decks that Dektrix reported

to Fontaine in 2015. Harris also states in his email that later, Dektrix found problems with missing main bolts holding the upright arm in place and a further problem with missing "main bolts in holding the assemblies…." *Id*. at 71. The Complaint, therefore, does not improperly conflate "pins" with "bolts" but alleges facts applicable to problems with pin shearing in 2015 and later problems with missing and sheared bolts.

The Dektrix Defendants also argue that Plaintiff's allegations of "faulty-repair work" and "persistent, ongoing mechanical problem" related to pins is belied by allegations in the Complaint, and that, as a result, Dektrix had no duty to disclose the past, resolved pin issue. (Doc. #39, *PageID* #467) (internal citations omitted). Defendants, however, overlook the allegations in the Complaint that confirm these problems. Harris's email, quoted in the Complaint, asserts that Fontaine's repairs were shoddy, Fontaine's suggested solution (welding the bolts in place) only exacerbated the problem, and the pin-shearing issue in the upright support arms was never adequately resolved.

Plaintiff argues that the Dektrix Defendants' material omissions also include their failure to disclose that the investment funds they acquired would be used for purposes (such as paying salaries) other than purchasing Fontaine Flat Decks. Plaintiff further maintains that the Dektrix Defendants misrepresented Dektrix as having 73 functioning Fontaine Flat Decks (the bolt-shearing problem meant less than 73 Decks were operable), its possession of several active broker-carrier contracts, and its great financial condition. *See* Doc. #1, ¶s 28-32, 45, 54, 58, 60, 65, 69, 70-71. These misrepresentations were material because their addition to the information the Dektrix Defendants provided to Plaintiff painted an inaccurate and incomplete portrait of Dektrix's ability to perform its obligations under

current and future shipping contracts and its ability to profit from the strong competitive advantages it professed to have in the intermodal-shipping market.

The Dektrix Defendants argue that the Complaint improperly fails to comply with the particularity requirements of Rule 9(b) and the PSLRA by engaging in improper group pleading.

"The genesis of the group pleading doctrine is the decision of the Ninth Circuit in *Wool v. Tandem Computers Inc.,* 818 F.2d 1433 (9th Cir.1987), wherein the court explained that doctrine:

> In cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers. Under such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations. *Id.* at 1440.

*In re Huffy Corp. Securities Litigation*, 577 F. Supp.2d 968, 984 (S.D. Ohio 2008) (Rice, D.J.).

As seen above, Plaintiff's Complaint ties individuals together under the business entity with whom each is connected. A group of Dektrix Defendants is therefore identified in the Complaint. The Complaint, however, is not relying on the Dektrix Defendants group representations in the manner contemplated by the group pleading doctrine. Instead, the Complaint sufficiently pleads omissions of material facts by the individual Dektrix Defendants, including their failure to correct and clarify the lack of AAR certification and their decision to follow Fontaine's request keep quiet about the bolt-shearing problem. As to the latter problem, Defendant Harris acknowledged in his email that the Fontaine

Defendants had previously asked Dektrix to withhold information about the 2015 bolt-shearing problem ("they asked us to keep it quiet") and neither Harris nor any other Dektrix Defendant informed Plaintiff about this problem before it invested in and loaned money to Dektrix. Further, three Dektrix individual Defendants (Crane, Harris, and Morley) signed the Membership Purchase Agreement. And a significant part of Plaintiff's bridge loan, $42,000, allegedly went directly to Crane and Larson, rather than for the purchase of the Fontaine Flat Decks. Given these facts, and in light of their ownership interests in Dektrix, the Complaint satisfies the particularity requirements of Rule 9 and the PSLRA and is not subject to dismissal under the group pleading doctrine.

* * *

The Dektrix Defendants contend that the Complaint does not allege facts showing they had the requisite scienter regarding Dektrix's lack of AAR certification, the Fontaine Flat Deck's condition or safety, and Dektrix's failure to purchase Flat Decks with Plaintiff's investment money.

The PSLRA requires plaintiffs to plead scienter by stating "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The required state of mind exists when a defendant embraces an "'intent to deceive, manipulate or defraud.'" *In re Comshare Inc. Securities Litigation*, 183 F.3d 542, 548 (6th Cir. 1999) (citation omitted). Section "10(b) aims to proscribe 'knowing or intentional misconduct.'" *Id.* (citation omitted). "[P]laintiffs may [also] plead scienter in § 10(b) … cases by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to

25

commit securities fraud." *Id.* at 549. "Recklessness sufficient to satisfy 10b–5 is 'a mental state apart from negligence and akin to conscious disregard.' It is 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *Louisiana School Employees' Retirement Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (citation omitted).

To determine whether a defendant acted with this required state of mind, the Court "'must consider the complaint in its entirety' and decide 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Omnicare*, 769 F.3d at 473 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322-23, 127 S.Ct. 2499 (2007)); *see Ricker v. Zoo Entertainment, Inc*., No. 1:11cv490, 2012 WL 3070717, at *4 (S.D. Ohio 2012) (Spiegel, D.J.) ("In the securities fraud context, the Court considers scienter pleadings holistically…."). If the "plaintiff's allegations create a 'powerful or cogent' inference of scienter, a court must compare this inference with other competing possibilities, allowing the complaint to go forward 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Omnicare*, 769 F.3d at 473 (quoting *Tellabs,* 551 U.S at 324, 127 S.Ct. 2499; other citation omitted).

The Complaint's factual allegations create a strong and cogent inference that the Dektrix Defendants intentionally and knowingly, or at least recklessly, misled and deceived Plaintiff into investing in Dektrix. This strong inference arises from the required

comparative analysis. *Matrixx*, 563 U.S. at 48, 131 S.Ct. at 1324; *see Frank*, 646 F.3d at 959.

The material omissions at issue—especially the non-AAR certification and the not fixed bolt-shearing problems—painted a far rosier portrait of Dektrix than its actual ability to utilize Fontaine Flat Decks to revolutionize the shipping industry (using its words). It is, moreover, accurate to observe from Plaintiff's allegations that telling Plaintiff and reasonable potential investors about the bolt-shearing problem would have soured a reasonable investor's interest in Dektrix. The story of the Dektrix Defendants' intentional or reckless conduct is significantly bolstered by Harris's email, which (again) explains that when Dektrix told Fontaine about this problem, Fontaine asked Dektrix "to keep it quiet…." *Id.* Dektrix intentionally or recklessly honored Fontaine's request to keep the bolt-shearing problem quiet by not telling Plaintiff about it throughout the summer and fall of 2016 and into early 2017, when Dektrix was attempting to secure Plaintiff's investment and bridge loan. Dektrix's silence on the pin-shearing problem was imperative to achieve Dektrix's goals of obtaining Plaintiff's investment and maintaining a solid ongoing business relationship with Fontaine. Dektrix's financial success and growth depended upon Fontaine's willingness to manufacture its Flat Decks and exclusively supply Dektrix with its Flat Decks. Fontaine, moreover, was the only manufacturer and supplier of an intermodal flat deck (i.e., the Fontaine Flat Deck), and the quality, safety, and efficacy of the Fontaine Flat Deck depended upon Fontaine's willingness and ability to fix the pin-shearing problem, as it had assured Dektrix it would.

The Dektrix Defendants also intentionally or recklessly misled Plaintiff by failing to

forewarn it about Dektrix's poor financial health in the fall of 2016. Its poor financial health did not come to light until the January 30, 2017 letter Defendant Prochazka sent to Harris. Prochazka's letter documents that Dektrix had not been paying its rent on the 73 Fontaine Decks in its possession and, as a result, Fontaine was terminating their lease agreement with Dektrix. (Doc. #1, Exh. F, *PageID* #174). The letter's reference to Dektrix's "continued failure … to pay rent," *id.*, does not mean that Dektrix had failed to pay rent only in January 2017; it instead reveals that Dektrix had not been paying rent for the Fontaine Flat Decks during at least December and likely previous months in the fall of 2016. Further, the fact that Dektrix was losing its ability to use the Fontaine Flat Decks in late January 2017—only a month after it had secured Plaintiff's investment—shows that Dektrix was in poor financial health during the fall of 2016, when it sought Plaintiff's investment. Additionally, Dektrix held a strong motivation not to tell Plaintiff about this because Dektrix's poor financial health presented a serious impediment to obtaining Plaintiff's, or a reasonable investor's, investment or bridge loan.

The Dektrix Defendants contend that there is no allegation in the Complaint supporting an inference that Dektrix believed the AAR decks still were not certified during the course of Plaintiff's investments (December 2016 through February 2017). (Doc. #39, *PageID* #461). This contention lacks merit. The Complaint alleges that Dektrix disclosed to Plaintiff in April 2017 that the Fontaine Flat Decks "had never been certified by the AAR." (Doc. #1, ¶62). Assuming that the Decks had never been certified by the AAR before April 2017 and given that Crane knew about the lack of AAR certification in May 2015, Plaintiff is entitled to the reasonable inference that Dektrix, through Crane,

believed—or better yet knew—the Fontaine Flat Decks were not certified throughout the time they solicited Plaintiff's investment and bridge loan.

The Dektrix Defendants further argue that, as to Plaintiff's loan or investment in 2017, the Complaint fails to show their scienter regarding any omission that the Fontaine Flat Decks had sheared pins or bolts, were unfit or unsafe to use, or were sought to be physically destroyed. The Dektrix Defendants argue that the Complaint conclusively establishes that they believed the sheared bolts were repairable. The Complaint, in the Dektrix Defendants' view, supports this because Fontaine proclaimed its Deck was "inexpensive to repair if it's ever damaged." (Doc. #1, ¶44). The Dektrix Defendants, however, mistakenly construe the Complaint in their, rather than Plaintiff's, favor. The Complaint alleges:

> On … February 2017, the Dektrix Defendants represented to Plaintiff that the termination of the existing lease with the … Fontaine Defendants was short-term, and that any issue regarding "sheared bolts" was "repairable"

(Doc. #1, ¶58). These allegations do not establish that the Dektrix Defendants actually believed the Decks were repairable. Instead, these allegations merely indicate that the Dektrix Defendants told Plaintiff that they (the Dektrix Defendants) believed the sheared bolts were repairable. In light of all the facts alleged in the Complaint, beginning with those concerning the Dektrix's material omissions in 2016, it is reasonably inferable that Dektrix was continuing to mislead Plaintiff by minimizing the bolt-shearing problem while lauding its own faith in the Fontaine Flat Decks. This reasonable inference is warranted at this stage of the case and aligns with Plaintiff's allegations about the Dektrix Defendant's misrepresentations and misuse of the bridge loan Plaintiff provided them in 2017. The

Dektrix Defendants, for example, allegedly never used the bridge loan to purchase Fontaine Flat Decks but instead used some of this money to enrich Dektrix Defendants Crane and Larson in the form of salaries. And they continued to intentionally or recklessly mislead Plaintiff by saying that "they had active broker-carrier contracts in place, including but not limited to Constellium." *Id*. at ¶64. This representation did not tell the full truth because the Dektrix Defendants "knew their entire fleet was unfit to service the Constellium contract." *Id*. at ¶71. The fact, moreover, that the Dektrix Defendants knew this at the time they were soliciting Plaintiff's 2017 bridge loan can be inferred from many alleged facts that fit together like puzzle pieces, including, (1) their knowledge of the 2015 pin-shearing problem, and the missing-and-shearing-bolt problems they discovered in 2017; (2) their knowledge of their financial problems in late 2016 continuing into 2017; (3) their doubtless desire to remain in Fontaine's good graces during early 2017 by remaining silent about the 2015 bolt-shearing problem; (4) the termination of their Lease Agreement along with their access to Fontaine Flat Decks in late January 2017; and (5) their representation to Plaintiff in February 2017 that the termination of the lease was a short-term problem, even though Dektrix was attempting to solve it with an offer to buy 73 Fontaine Flat Decks for $1,000,000–which it, by itself, could not afford. In addition, the Dektrix Defendants overlook or ignore assertions in the Complaint that they "at no time provided Plaintiff with any indication that … [the] Fontaine Defendants were seeking not only to call back and seek return of all decks, but were actively seeking to physically destroy such decks on the basis that they were unfit, defective, and otherwise unsafe …." (Doc. #1, ¶58). Viewed holistically, *see Omnicare*, 769 F.3d at 473, all of these allegations add up to a strong

inference that the Dektrix Defendants were intentionally or recklessly continuing to mislead Plaintiff into loaning or investing in Dektrix in early 2017.

Lastly, the strong inference that the Dektrix Defendants acted intentionally or recklessly is compelling or at least as compelling as any contrary explanation one could draw from the Complaint. Perhaps the starkest example is that the Complaint provides no factual basis for inferring that there was a compelling contrary explanation for the Dektrix Defendants failure to tell Plaintiff during the Fall 2016 to early 2017 about the 2015 pin-shearing problem, particularly when their silence was at Fontaine's request. Although the Dektrix Defendants allege that the problem was fixed, this is simply an allegation contrary to the Complaint, rather than a competing inference that can be drawn from it. Indeed, once Plaintiff's version of the fraud described in the Complaint is credited, "only … a reasonable person would deem the inference of [the Dektrix Defendants'] scienter cogent and at least as compelling as any opposing inference that can be drawn from the facts alleged." *Matrixx*, 563 U.S. at 48, 131 S.Ct. at 1324.

Accordingly, the Dektrix Defendants' Motion to Dismiss Plaintiff § 10(b) claim lacks merit.

## C.     The Fontaine Defendants' Motion to Dismiss

The Fontaine Defendants argue that the Complaint fails to allege a material misrepresentation or omission by them. They point to Plaintiff's allegation about Fontaine's 2014 press release concerning AAR certification and other statements Fontaine allegedly made, including that the Flat Deck was "virtually maintenance free"; "stronger" and "safer" than any other deck; and able to "withstand the punishing conditions associated with rail and

highway transportation." (Doc. #16, *PageID* #s 201-02). The Fontaine Defendants contend that they had no duty to provide Plaintiff with corrected information about the Flat Decks because the statements were not made in connection with a securities transaction.

Section 10(b) applies to forbidden acts or omissions done "in connection with the purchase or sale of any security …" *Tellabs*, 551 U.S. at 318, 127 S.Ct. at 2507 (quoting 15 U.S.C. §78j(b)).[11] A forbidden act or omission "is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, __, 134 S.Ct. 1058, 1066 (2014). "The 'connection' must 'matter'—under the facts of *Chadbourne*, this meant that the misrepresentation 'ma[de] a significant difference to someone's decision to purchase or to sell a covered security[.]'" *United States SEC v. Crowe*, 216 F.Supp.3d 852, 864 (S.D. Ohio 2016) (Marbley, D.J.).

The Complaint alleges that Fontaine issued the press release in 2014 claiming AAR certification. The press release was quoted by industry publications. Fontaine also placed a video on its website in August 2016, continuing through October 2017 (the date Plaintiff filed its Complaint), advancing additional claims, for instance, that the Fontaine Flat Deck was stronger and safer than any other flat deck. *See* Doc. #1, ¶s 37, 44. The Complaint sufficiently alleges that these misrepresentations by the Fontaine Defendants were material because they made a significant difference in Plaintiff's decision to invest in Dektrix. This

---

[11] In fraud cases brought by private plaintiffs, § 10(b)-5 liability does not reach those who aid and abet a violation. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177, 114 S.Ct. 1439, 1448 (1994).

emerges from the allegation that the Fontaine Flat Decks "were so integral to the investment opportunity that was being presented to Plaintiff and [its owners] Baguirov and Shakhbandarov, they decided to review the information that was publicly available about [the Fontaine Flat Deck] …." *Id.* at ¶37. Additionally, because the 2014 press release and the video continued to be publicly available when Plaintiff was deciding whether or not to invest in Dektrix, these communications coincided with Plaintiff's investment decision. And, the August 2016 presentation to Plaintiff by Defendants Crane, Harris, and Buchanan (Fontaine's president at the time) omitted the fact that Fontaine had not corrected the false claim to AAR certification in the 2014 press release. Taken together, and viewed in Plaintiff's favor, these facts show that Fontaine's misrepresentations in the press release and video made a significant difference to Plaintiff's decision to invest in Dektrix and, as a result, were made in connections with the sale of a security. *See Crowe*, 216 F.Supp.3d at 864.

The Fontaine Defendants argue that they did not have an affirmative duty to disclose the lack of AAR certification because they were not aware that Plaintiff had seen the 2014 press release. (Doc. #16, *PageID* #202). Yet their lack of awareness does not help them at this point in the case because, according to the Complaint, they actively assisted Dektrix in its fraudulent sale of securities starting in early August 2016. They did so by telling Plaintiff in early August 2016 that they fully supported Dektrix and were extending a two-year exclusivity deal to provide only Dektrix with Fontaine Flat Decks. Defendant Dier communicated Marmon's support for Dektrix in his letter of August 4, 2016. Crane and Harris showed this letter to investors, including Plaintiff, during presentations in July and

August 2016.  While all this was happening, Fontaine's misrepresentation in the 2014 press release remained available for investors like Plaintiff to find on the internet.  As a result, once the Fontaine Defendants began to assist Dektrix in its sale of securities, they had a duty to correct their previous misrepresentation that the Fontaine Flat Decks were AAR certified. *See Bridgestone Corp.*, 399 F.3d at 673; *see also Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993) ("corporate officers are not required to speak, but once they do, they must be truthful if their comments are material to investors' decisionmaking.").  Under the Complaint's version of the events, the Fontaine Defendants were not free to stick their heads in the sand in the hope that Plaintiff did not find its press release with its false and misleading statement regarding the Fontaine Flat Deck's AAR certification.

The Fontaine Defendants contend that additional statements in the Complaint provided "soft information" such as the statements in another press release and in video—*i.e.*, the Fontaine Flat Deck is "virtually maintenance free"; "stronger" and "safer" than any other deck; and, "able to withstand the punishing conditions associated with rail and highway transportation."  Soft statements like these, the Fontaine Defendants maintain, are not actionable misrepresentations unless a plaintiff pleads facts showing the statements were made with knowledge of their falsity.

Soft information, including "certain kinds of rosy affirmation," are immaterial as a matter of law.  *Bridgestone*, 399 F.3d at 669.  This includes, "loosely optimistic statements that are so vague, [and] so lacking in specificity, ... that no reasonable investor could find them important to the total mix of information available."  *Id.* (citations and internal punctuation omitted).  "The failure to disclose soft information is actionable only if it is ...

virtually as certain as hard facts." *Id*. (citation and internal punctuation and brackets omitted).

Assuming Fontaine's video or website announced soft information about its Flat Deck (it is stronger, safer, virtually maintenance free, etc.), Plaintiff's Complaint sufficiently alleges that the Fontaine Defendants' new contrary information was virtually as certain as hard facts. "The context of statements is often telling." *Id*. at 672. Here, the context of the alleged statements was their connection to the Fontaine Flat Deck and to the Dektrix Defendants' and the Fontaine Defendants' attempts to convince investors, including Plaintiff, to invest in Dektrix. At that time, in and after August 2016, the Fontaine Defendants possessed actual knowledge of the pin-shearing problem and, hence, actual knowledge that the Fontaine Flat Deck was not, in fact, virtually maintenance free or stronger or safer than any other intermodal flat deck. Defendant Harris's email explains, as noted previously, "Shortly after putting the decks in service we had pins shearing in the upright support arms. Those pins were critical to supporting the 60,000 lbs. of another container stacked on top of our deck. When we verbally drew this problem to Fontaine's attention, they asked us to keep it quiet and assured us they would immediately fix the problem." (Doc. #1, ¶71). The email goes on to say that the repairs were shoddy and only exacerbated the pin-shearing problem and it was never adequately resolved. This information "is virtually as certain as hard facts and contradicts [Fontaine's] prior statement[s]." *Omnicare*, 769 F.3d at 471 (citations omitted). The information is, in other words, "so concrete" that the Fontaine Defendants must have actually known it rendered false Fontaine's previous representations in the 2014 press release and its video. *Id*. And,

35

given the integral and necessary role the Fontaine Flat Deck held in potential investors' decision-making process, a reasonable investor could have found the Fontaine Defendants' statements "important to the total mix of information available." *Bridgestone Corp.*, 399 F.3dat 669 (citations omitted).

Accordingly, the Complaint identifies with particularly, and in compliance with the PLSRA, sufficient material misrepresentations in support of Plaintiff's § 10(b)-5 claim against the Fontaine Defendants.

\* \* \*

The Fontaine Defendants argue that the Complaint fails to raise a strong inference of scienter because it makes only conclusory allegations about Fontaine's alleged intent, motivation, and actions. They assert that the Complaint attributes Dektrix's knowledge to Fontaine without factual support and vaguely alleges that Fontaine assisted Dektrix in securing Plaintiff's investment.

The Fontaine Defendants' Memorandum in Support of their Motion to Dismiss does not advance a reasoned analysis supported by case law concerning their lack-of-scienter assertion. *See* Doc. #16, *PageID* #203. Instead, they did so in their Reply. This is improper because it deprives Plaintiff of an opportunity to address arguments raised for the first time in the Fontaine Defendants' Reply and because it snuffs out the competition of arguments essential to judicial decision-making. *See Patel v. Lynch*, 830 F.3d 353, 357 (6th Cir. 2016). Additionally, the Complaint advances sufficiently specific factual allegations concerning the Fontaine Defendants' involvement, along with the Dektrix Defendants, in the scheme to intentionally deceive Plaintiff into investing in Dektrix. The Fontaine Defendants did so by

failing to correct its 2014 press release about AAR certification and its misrepresentations in a later press release and video. Perhaps most significantly, the Fontaine Defendants allegedly asked Dektrix to keep the bolt-shearing problem quiet and the Fontaine Defendants' alleged failure to adequately address the bolt-shearing problem. And, the Fontaine Defendants kept the unfixed bolt-shearing problem quiet during the potential-investor meetings in July and August 2016 and thereafter. Doing so, they not only failed to tell Plaintiff essential information about the Fontaine Flat Deck, they also left in place their prior misrepresentations that the Fontaine Flat Deck was "virtually maintenance free"; "stronger" and "safer" than any other deck; and, "able to withstand the punishing conditions associated with rail and highway transportation."

Indeed, once Plaintiff's version of the fraud described in the Complaint is credited, "only … a reasonable person would deem the inference of [the Fontaine Defendants'] scienter cogent and at least as compelling as any opposing inference that can be drawn from the facts alleged." *Matrixx*, 563 U.S. at 48, 131 S.Ct. at 1324.

* * *

The Fontaine Defendants contend that the Complaint fails to sufficiently plead reasonable reliance. The Complaint, they say, does not demonstrate that Plaintiff reasonably relied on the statements in (1) the 2014 press release, (2) Buchanan's support for Dektrix on August 5, 2016, (3) Marmon president Dier's letter, or (4) Fontaine's promotional materials. They assert that the Complaint does not allege they provided the 2014 press release to Plaintiff. Plaintiff instead relied solely on third-party articles on the internet containing a statement regarding AAR certification that was more than two-and-a-

half years old.

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action. It ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159, 128 S.Ct. 761, 769 (2008) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978 (1988) (other citation omitted). "[R]eliance is tied to causation, leading to the inquiry whether [the defendants'] acts were immediate or remote to the injury." *Id*., 552 U.S. at 160, 128 S.Ct. 761; s*ee In re National Century Financial Enterprises, Inc*., 846 F.Supp.2d 828, 877 (S.D. Ohio 2012) (Graham, D.J.).

A rebuttable presumption of reliance arises here due to the Fontaine Defendants' omissions—again, their failure to correct the misrepresentations in Fontaine's 2014 press release and its video. *See Stoneridge*, 552 U.S. at 159, 128 S.Ct. at 769 ("a rebuttable presumption arises … if there is an omission of a material fact by one with a duty to disclose …."); *Molecular Technology Corp. v. Valentine*, 925 F.2d 910, 918 (6th Cir. 1991) ("In the case of omission or nondisclosure of material facts, the element of reliance on the part of the plaintiffs may be presumed."). Once Buchanan spoke to potential investors, including Plaintiff, a duty arose that required the Fontaine Defendants to correct Fontaine's previous material misrepresentations in the press release and videos.

In contrast to the Fontaine Defendants' view, the Complaint does more than allege that Plaintiff merely relied on third-party internet articles. The Complaint alleges that Fontaine itself issued the press release about AAR certification in 2014. (Doc. #1, ¶37).

The Complaint combines this allegation with its Exhibit C, which contains copies of 8 separate third-party articles (industry publications) each advancing the exact same incorrect statement about AAR certification of the Fontaine Flat Deck. *Id*. (citing Exh. C). And, Plaintiff relied on Fontaine's video, available in 2016 on Fontaine's website, in which Fontaine made knowingly false statements by describing the Fontaine Flat Deck as stronger and safer than any other flat deck, and virtually indestructible yet simple and inexpensive to repair if it's ever damaged. *Id*. at ¶44. Fontaine advanced these claims despite knowing about the unfixed bolt-shearing problem. The Complaint, therefore, does far more than basing Fontaine's purported liability on third-party statements.

The Fontaine Defendants also argue that the Complaint fails to indicate Plaintiff was reasonably justified in relying on Fontaine's 2014 press release and related articles. They emphasize that Plaintiff did not ask Fontaine if its Flat Deck was AAR certified. Yet, it was reasonable for Plaintiff, knowing what it knew, not to have asked Fontaine about its press release and AAR-certification statement. A reasonable investor in Plaintiff's position could have concluded that no further inquiry about AAR certification was needed beyond Fontaine's affirmative statement in the 2014 press release, beyond the fact that industry publications reported the Fontaine Flat Deck's AAR certification, and beyond Fontaine's assertions in its video that bragged about the strength and efficacy of the Fontaine Flat Deck. In addition, viewing the Complaint in the light most favorable to Plaintiff, Fontaine was the driving force behind the tactic (through 2016) to keep the truth quiet about the Fontaine Flat Deck's bolt-shearing problem. And, Fontaine's present assertion that it would have told the truth about AAR certification, if Plaintiff had only asked about it, constitutes

an allegation beyond the Complaint and not accepted as true at this stage of the case.

The Fontaine Defendants also point out that information about the lack of AAR certification was publicly available and easily obtainable on the AAR's website, which Plaintiff did not bother to visit. This again, however, extends the present pleading inquiry about Plaintiff's justifiable reliance beyond the Complaint and into territory where Defendants rely on unproven allegations inappropriate to resolve at the pleading stage, particularly when Plaintiff challenges these allegations in its Memorandum in Opposition. (Doc. #26, *PageID* #313 and n.4); c*f. Baker v. BP America, Inc*., 768 F.Supp. 208, 214 (N.D. Ohio 1991) ("Whether Krantz should have advised Hawk to evaluate Cimcast and the Venture more closely, or whether he should have discovered the alleged 'misrepresentations' himself as Hawk's attorney, are relevant issues which can be explored only through Krantz's testimony.").

Accordingly, the Complaint pleads with particularity, and in satisfaction of the PSLRA, that Plaintiff justifiably relied on the Fontaine Defendants' material misrepresentations.

* * *

The remaining two elements of Plaintiff's § 10(b) claim against the Fontaine Defendants are economic loss and loss causation, *i.e.,* a causal connection between the material misrepresentation and the loss. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342, 125 S.Ct. 1627, 1631 (2005). The Complaint pleads with particularity that Plaintiff suffered the loss of its entire $450,000 investment in Dektrix (including its bridge loan).

The Fontaine Defendants argue that the Complaint fails to identify any material misrepresentation by them that actually caused Plaintiff's loss. They emphasize, "to touch upon a loss is not to *cause* a loss, as 15 U.S.C. § 78u-4(b)(4) requires." *Dura,* 544 U.S. at 343, 125 S.Ct. at 1632 (italics in original). According to the Fontaine Defendants, the Complaint also makes clear that Dektrix failed to use Plaintiff's investment money as Dektrix and Fontaine had originally agreed.

The Complaint sufficiently alleges a causal connection between the Fontaine Defendants' material misrepresentations and omissions and Plaintiff's lost investment. This causal connection exists through the following allegations: Fontaine's Flat Decks were integral and necessary to the success of Plaintiff's investment in Dektrix; Fontaine misrepresented the quality and efficacy of its Flat Deck through its 2014 press release and later video; and, Buchanan—and through him the Fontaine Defendants—strongly supported Dektrix during the August 6, 2016 meeting with Plaintiff and other potential investors even though he knew about the Flat Deck's bolt-shearing problem and that it had not been adequately repaired. Buchanan's faith in Dektrix, as he explained during the meeting, was bolstered by Fontaine's willingness to provide Flat Decks exclusively to Dektrix for two years. Yet, Fontaine never informed Plaintiff before the date it decided to invest in Dektrix that Dektrix had stopped paying Fontaine the rent due on the Flat Decks as required by contract between Dektrix and Fontaine. Viewing the Complaint in Plaintiff's favor, Fontaine remained silent about this and failed to correct its previous misrepresentations because it wanted to secure Plaintiff's investment in Dektrix—its exclusive customer. Without Plaintiff's investment, Dektrix would have certainly failed sooner, leaving Fontaine

without a valuable customer to utilize its Flat Deck.

Accordingly, the Complaint pleads with particularity the loss and loss causation elements of Plaintiff's §10b-(5) claim against the Fontaine Defendants. And, for all the above reasons, Plaintiff's Count I is not subject to dismissal under Rule 12(b)(6) and the PSLRA.

## V. Discussion: Count II

Plaintiff claims in Count II that the § 10(b) liability attaches to each individual Defendant under § 20 of the Securities Exchange Act because each acted as a "controlling person" of Dektrix due, in part, to their high-level position with Dektrix, Fontaine, and Marmon.

"Section 20(a) of the Securities Exchange Act provides that '[e]very person who ... controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." *Doshi v. General Cable Corp.*, 823 F.3d 1032, 1045 (6th Cir. 2016) (quoting, in part, 15 U.S.C. § 78t(a)). "The term 'control' in this context is defined … as 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *Bridgestone*, 399 F.3d at 666 (quoting, in part, 17 C.F.R. § 230.405). "'Allegations of control are not averments of fraud and therefore need not be pleaded with particularity. They need satisfy only the less stringent requirements of Fed. R. Civ. P. 8.'" *In re National Century Financial Enterprises, Inc*., 504 F.Supp.2d 287, 300 (S.D. Ohio 2007) (Graham, D.J.) (citations omitted).

Both the Dektrix and Fontaine Defendants' focus on the maxim that "control person liability is derivative…." *D.E.&J. Ltd. Partnership v. Conaway*, 133 F. App'x 994, 1001 (6th Cir. 2005). Consequently, if a complaint fails to sufficiently plead a primary violation of § 10(b), claims of control-person liability under § 20 are subject to dismissal. *Doshi*, 823 F.3d at 1045. The Dektrix Defendants' and Fontaine Defendants' reliance on derivative liability is misplaced because Plaintiff's Complaint sufficiently pleads primary violations of § 10(b). Consequently, dismissal for lack of a primary violation is unwarranted. *See Frank*, 646 F.3d at 962-63.

The Complaint, moreover, adequately pleads control-person liability. The Complaint identifies Defendant Dier as president of Marmon Highway Technologies, LLC; Defendant Prochazka as group president for Fontaine Commercial Trailer, Inc., an affiliate of Fontaine and a subsidiary of Defendant Marmon; and Defendant Buchanan as president of Fontaine. In their respective positions, each of these individual Defendants were top officers or directors with "'the possession, direct or indirect, of … power to direct or cause …," *Conaway*, 133 F. App'x at 1001, either Fontaine's or Marmon's material misrepresentations or omissions. Through the exercise of the authority each high-level position provided these individual Defendants, each could have revealed the truth about the Fontaine Flat Deck, but each chose to hide the truth through their omissions. Defendants Kier, Prochazka, and Buchanan also materially misrepresented the Fontaine Flat Deck's capabilities by "'ma[king] loud and published claims to reputable reporters and trade journals that the Evolution [Fontaine Flat] deck was in fact AAR certified.'" (Doc. #1, ¶71) (quoting Harris's August 2017 email). The Complaint further alleges that "'they,'" meaning Dier,

Prochazka, and Buchanan (and others), "'asked us [Dektrix] to keep it [the pin-shearing problem] quiet ....'" *Id*. And, Prochazka allegedly participated in the fraud by "leading Plaintiff to believe that its investment would be a refundable deposit on the purchase of the Fontaine Flat Decks when instead, Fontaine used Plaintiff's money for its own benefit and without providing any non-defective, safe decks." *Id*. at ¶5. These allegations suffice to raise plausible control-person liability claims against Defendants Dier, Prochazka, and Buchanan. *Cf. In re MicroStrategy, Inc. Securities Litigation*, 115 F.Supp.2d 620, 661 (E.D. Va. 2000) ("The question of whether someone qualifies as a controlling person under Section 20(a)..., is 'a complex factual question.' *SEC v. Coffey,* 493 F.2d 1304, 1318 (6th Cir. 1974). As such, it is 'not ordinarily subject to resolution on a motion to dismiss,' and dismissal is appropriate only when 'a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person.'").

Turning to whether the individual Dektrix Defendants are control persons, Plaintiff alleges that Harris, Crane, and Morley are member-managers of Dektrix LLC and Dektrix Transportation Services LLC. Dektrix's Private Placement Memo identifies all three as members of Dektrix's Board of Managers, which "has the exclusive management and control of all aspects of the business of the Company [Dektrix LLC]." (Doc. #1, *PageID* #s 50, 84). This specific allegation supports the Complaint's further statement that "[u]pon information and belief, Dektrix LLC, Dektrix Transportation Services LLC, Dektrix Intermodal LLC, along with manager members Harris, Crane, Morley, and Larson..., all managed, worked and otherwise operated as a single corporate entity." *Id*. at ¶18. Adding this information together, and considering Dektrix's small size and singular purpose, the

Complaint says enough to support the conclusion that each individual Dektrix Defendant Crane, Harris, Morley possessed the power to direct or cause, *see Conaway*, 133 F. App'x at 1001, Dektrix's communications with Plaintiff from July 2016 through December 2016, including its material omissions about AAR certification and the pin-shearing problem. This satisfies Rule 8(a)(2)'s notice requirement and raises plausible control-person liability claims against each of them.

The Complaint identifies Defendant Larson as "the Comptroller, employee, and/or agent of Dektrix and Dektrix Trans[portation LLC]." *Id*. at ¶17. The Complaint explains that $42,000 of Plaintiff's bridge loan to Dektrix went directly to Crane and Larson. *Id*. at ¶65. And, the Complaint declares, "[u]pon information and belief, Larson holds a corporate interest in Dektrix." *Id*. at ¶17. Taken together, these allegations fall short of demonstrating that Larson held any authority to direct or cause Dektrix's communications with Plaintiff in 2016 and 2017. Assuming he accepted some of the fraudulently obtained $42,000, the Complaint states that this was paid to him as a salary without alleging misconduct by him. *Id*. at ¶65. Further, neither this nor the Complaint's other allegations indicate that Larson had the authority to control or direct Dektrix's communications with Plaintiff. The Complaint therefore fails to raise a plausible claim of control-person liability against Defendant Larson.

Lastly, the Dektrix Defendants correctly note that the term "the Company" is undefined in the Complaint, particularly as it is used in Count II. They contend that this failure to adequately plead the identity of the entities over whom Count II is asserted is fatal to Count II. (Doc. #20, *PageID* #261, n.18). Plaintiff's slapdash reference to "the

Company" in Count II is certainly unhelpful.  But it is not fatal to Plaintiff's control-person liability claim because the Complaint must be construed in the light most favorable to Plaintiff.  *Ohio Pub. Employees Retirement Sys.*, 830 F.3d at 382.  Doing so exposes the individual Dektrix Defendants (except Larson) to control-person liability, as discussed above.

Accordingly, Count II is not subject to Rule 12(b)(6) dismissal except as to Defendant Larson.

## VI.    Discussion:  Plaintiff's Counts III-VIII

Plaintiff voluntarily dismisses Counts III and IV of the Complaint.  (Doc. #36, *PageID* #423).

Plaintiff asserts in Count V that Defendants, collectively and individually, committed common law fraud against it.

Both the Dektrix Defendants and the Fontaine Defendants contend that the Complaint fails to plead fraud with particularity and fails to state a claim upon which relief can be granted based on all of the reasons they advanced in support of their Motions to Dismiss Plaintiff's § 10(b) claim. They further assert that Plaintiff's common-law fraud claim is based on mere conclusory allegations.  And the Fontaine Defendants contend that Plaintiff's fraud claim fails because the Complaint does not identify, even in a conclusory manner, a duty they owed to Plaintiff or any special relationship sufficient to give rise to a duty to disclose.

Because Plaintiff's Rule 10(b) claim survives PSLRA review, Plaintiff's common-law fraud claim survives for the same reasons.  *Cf. Glimcher*, 2:09cv797, 2010 WL

1610709, at *4 (S.D. Ohio 2010) (Frost, D.J.) ("PSLRA imposes heightened pleading requirements [above Rule 9(b)'s particularity requirements] in actions brought pursuant to Section 10(b) and Rule 10b–5.").

* * *

Count VI of the Complaint states, "The Dektrix Defendants entered into a contractual relationship with Plaintiff for trucking transportation work and investments. The Dektrix Defendants in conjunction with such agreements, made various representations, advertisements, and other characterizations concerning such services, which ha[ve] been set forth extensively herein, including but not limited to fair dealing, disclosure, transparency, and/or the promise to use investment money for the purchase of Evolution Intermodal Flat Decks from Fontaine." (Doc. #1, ¶s 110-111). The Complaint alleges that the Dektrix Defendants materially breached their contractual duties "as set forth in the Agreements, including but not limited to failure to use the money as required by the contracts, failure to provide security interests in the [Fontaine] Flat Decks as required by the contracts, and spending the money for their own benefit instead of the benefit of Dektrix or its members and investors." *Id.* at ¶113.

The Dektrix Defendants contend that Count VI fails to satisfy Rule 8(a)'s requirements because (1) it does not allege the existence of a contract; (2) Plaintiff breached the Membership Purchase Agreement and the Assignment of Beneficial Use of Assets—the bridge loan—by failing to invest the full $650,000 as required by the Membership Purchase Agreement; (3) Dektrix did not breach the terms of the Membership Purchase Agreement or bridge loan, and (4) Plaintiff proximately caused its own alleged harm by failing "to come

up with more than $100,000 of the $650,000 it agreed to invest, and by [failing] to assign Decks as it agreed to." (Doc. #20, *PageID* #269).

"Under Ohio law, the elements of a breach of contract claim 'include the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.'" *Wheat v. Chase Bank*, 3:11cv309, 2014 WL 457588 at *24 (S.D. Ohio 2014) (Rice, D.J.). (citation omitted).

The Complaint identifies the Membership Purchase Agreement as the contract at issue. *See* Doc. #1, ¶52-54 and Exh. E. The Complaint quotes the Membership Purchase Agreement's imposition of the parties' duties as follow:

> Buyer [Plaintiffs[12]] shall pay $350,000 US to Dektrix LLC by wire transfer no later than Monday December 5, 2016 for which Seller [the Dektrix Defendants] will immediately convey 70,000 preferred membership units to Buyer and shall enter said transaction in the organizational records and shall provide Buyer an authorized signed copy of the same.

(Doc. #1, ¶52 (quoting Exh. E) (Plaintiff's brackets; footnote added)).[13] Neither this paragraph nor any provision of the Membership Purchase Agreement contains the phrase, "Seller shall purchase 73 Fontaine Flat Decks," or the like. So, Plaintiff refers to the Agreement's "Security Interest" provision, which grants it a second lien on certain Fontaine Flat Decks as follows:

> Seller [Dektrix] hereby grants Buyer [Plaintiff] the right to a second lien position, which may be evidenced by the Buyer filing a UCC-1 on any of the first 73 intermodal flat-racks the Seller purchases [and] it is expressly understood by both parties that a 1st lien position will most like be held by the

---

[12] The Membership Purchase Agreement identifies "Buyer" as "Islom Shakhbandarov and Adil Baguirov…, collectively." The Complaint states that these two owners of Plaintiff have "assigned any rights they may have in the present claims to Plaintiff…." (Doc. #1, ¶10).

[13] Plaintiff wired $350,000 to Dektrix on December 5, 2016. Accepting this is true, there is no present issue regarding Plaintiff's performance of this contractual duty. *See id.* at ¶52.

individual or entity extending credit for the acquisition of those intermodal flat-racks and that any security interest herein afforded to the Buyer shall be subordinate to those of the 1st lien holder, without cost to Dektrix, LLC.

*Id*. at ¶54 (quoting Exh. E at *PageID* #170).  The next sentence in the Complaint proposes Plaintiff's interpretation:  "This paragraph demonstrates the parties' intent that the $350,000 was to be used toward the purchase of the first 73 intermodal flat decks from Fontaine."  *Id*. at ¶54.

Plaintiff's interpretation of the Security Interest provision rests on a conclusion of law.  "Construction of a written contract [under Ohio law]…, is a question of law for the court…."  *Arlington Video Productions, Inc. v. Fifth Third Bancorp*, 569 F. App'x 379, 386 (6th Cir. 2014) (citations omitted).  Given this, Plaintiff's interpretation of the Security Interest provision need not be credited at the pleading stage of the case.  *See Handy-Clay v. City of Memphis, Tenn*., 695 F.3d 531, 539 (6th Cir. 2012); *see MoonScoop SAS v. American Greetings Corp*., 489 F. App'x 95, 100 (6th Cir. 2012).

Judicial interpretation of a contract "give[s] effect to the intent of the parties in making the contract.  The parties' intent is presumed to lie in the language they used in their agreement."  *Id*. (citations omitted).  Courts "must read the contract as a whole and give effect to every part of it, if possible."  *Id*. (citation omitted).

In order to give effect to the Security Interest provision in the Membership Purchase Agreement, it must be seen as showing the parties' intent that Dektrix would purchase the 73 Flat Decks it was leasing from Fontaine.  Otherwise, without this purchase and resulting ownership of the Flat Decks, Dektrix did not own the 73 Flat Decks and, axiomatically, it could not grant Plaintiff a security interest in something it did not own.  This interpretation

of the Security Interest provision is in line with its central role in the Membership Purchase Agreement when it is read in its entirety. The duties created by the Agreement—Plaintiff's payment of $350,000 in exchange for Preferred Membership Units in Dektrix—accomplished Dektrix's goal of obtaining Plaintiff's investment and Plaintiff's desire to invest in Dektrix. The Security Interest provision, moreover, must be construed in line with the parties' duties, and doing so, it has significance only if it had value to the parties. The value to Dektrix? If it was contractually bound to purchase 73 Flat Decks, it was much more likely to convince Plaintiff to invest in Dektrix. The value to Plaintiff? It would not have a valuable Security Interest unless this provision required Dektrix to purchase the 73 Flat Decks. This interpretation of the Security Interest provision also gives effect to the parties' intent to provide Plaintiff with more in hand to protect its investment than only its potentially valueless Preferred Membership Units. Such reassurance was needed given the high cost of Plaintiff's investment versus the risky nature of investing in a young company whose continued success hinged chiefly upon the efficacy of a single product—the Fontaine Flat Deck.

Despite the above analysis, interpretation of the Security Interest provision must consider the fact that it does not, as previously noted, say something like, "Seller shall purchase 73 Fontaine Flat Decks." Considering the absence of such words from the Membership Purchase Agreement reveals ambiguity in the Security Interest Provision because it is susceptible to two conflicting yet reasonable interpretations: one requiring Dektrix to purchase 73 Flat Decks; the other giving Dektrix an option to purchase them. *United Tel. Co. of Ohio v. Williams Excavating, Inc*., 125 Ohio App.3d 135, 153 (1997)

("the contract language is susceptible of two conflicting but reasonable interpretations and is therefore ambiguous."); *see also Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 904 (6th Cir. 2006) (citing *Williams Excavating* and *State v. Porterfield*, 106 Ohio St.3d 5, 829 N.E.2d 609, 692-93 (2005)). Such ambiguity must be resolved against the drafter, another problem for Dektrix because it appears to have drafted the contract. Yet, the neither the Complaint nor the contract identifies the drafter.

Plaintiff also claims that Dektrix breached the parties' second contract concerning the bridge loan, "wherein Plaintiff agreed to pay $100,000 as a loan to be repaid by Dektrix Defendants in monthly amounts of $2,400. The terms and conditions of the bridge loan contemplate Dektrix Defendants using the entirety of the funds as a down payment for [Fontaine Flat] Decks." (Doc. #36, *PageID* #428). Because Plaintiff's breach-of-contract claim, based on the Membership Purchase Agreement, survives the Dektrix Defendants' present attacks, it would be superfluous to presently address whether a second contract existed and, if so, whether Defendants breached it.

The Dektrix Defendants contend that it was Plaintiff who breached the Membership Purchase Agreement by failing to cough up $650,000 by January 15, 2017. This allegation is confirmed in addendum B to the Membership Purchase Agreement. Plaintiff essentially acknowledged in addendum B that it had "not fulfilled its commitment to..." invest $650,000 on Dektrix by January 15, 2017. (Doc. #36, Exh. A).

Plaintiff argues that its failure to pay did not constitute a breach because the Membership Purchase Agreement gave them an option to invest in Dektrix. But, this mischaracterizes as an option Plaintiff's mandatory duty in the Membership Purchase

Agreement "to pay Dektrix LLC no later than January 15, 2017 the amount of $650,000 US for which [Dektrix] will convey 70,000 preferred membership units to [Plaintiff]." (Doc. #1, Exh. E). Other language provided Plaintiff with various options to purchase additional Common Membership Units, but Plaintiff had a mandatory duty to invest $650,000 in Dektrix. *See id*.

Despite this problem for Plaintiff, the Dektrix Defendants have not shown dismissal of Plaintiff's breach-of-contract claim is warranted. Although they seek to vitiate their own purported breach of the Membership Purchase Agreement (its alleged failure to purchase 73 Flat Decks), they run into Addendum B in which they agreed to modify the terms of Membership Purchase Agreement that Plaintiff had not satisfied. They also agreed that the new terms (increasing Plaintiff's investment to $850,000 and extending deadlines) superseded the previous pertinent, related terms. This means that issues remain. Did the Dektrix Defendants, by agreeing to modify the Membership Purchase Agreement with "superseding terms," *id.*, effectively waive their right to enforce the previous terms? Do any other events, before or after January 31, 2017, relieve the Dektrix Defendants from breach-of-contract liability, as a matter of law? By focusing on Plaintiff's original breach without addressing these issues, the Dektrix Defendants fail to show that dismissal of Plaintiff's breach-of-contract claim is presently warranted.

Accordingly, the Dektrix Defendants' Motion to Dismiss Count VI lacks merit.

\* \* \*

Plaintiff claims in Count VII of its Complaint that the Dektrix Defendants breached the fiduciary duty they owed to Plaintiff and its owners (Baguirov and Shakhbandarov) by

their conduct including their misrepresentations and circumstances. The Complaint presents a non-exhaustive list of 14 alleged acts and circumstances. (Doc. #1, ¶s 116(a)-(n)).

"In Ohio a breach of fiduciary duty claim has three elements: (1) the existence of a duty arising from a fiduciary relationship, (2) a failure to observe such duty, and (3) an injury proximately resulting therefrom. When a breach of fiduciary duty claim rests on averments of fraud, the allegations of fraudulent conduct must satisfy Rule 9(b)." *Glimcher*, 2:09cv797, 2010 WL 1610709, at *8 (internal citations omitted).

"A fiduciary is 'a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking.' *Haluka v. Baker*, 66 Ohio App. 308, 312, 34 N.E.2d 68 (9th Dist.1941). 'A fiduciary relationship is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust. *In re Termination of Emp.*, 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (1974)." *M.S. by Slyman v. Toth*, 97 N.E.3d 1206, 1216, 2017-Ohio-7791, ¶ 28 (Ohio App. 9 Dist., 2017).

Plaintiff's allegations, accepted as true and construed in its favor, fail to show that it had a fiduciary relationship with the Dektrix Defendants. Instead, the Complaint describes business transactions where the parties dealt with each other at arm's length. No fiduciary relationship exists in this situation. *Id*. (citing *RPM, Inc. v. Oatey Co.*, 9th Dist. Medina Nos. 3282-M, 2005-Ohio-1280, 2005 WL 663057, ¶ 19). Additionally, although a "fiduciary duty may arise out of a contract or an informal relationship…, *id*., the contracts described in the Complaint and attached to it reveal only the imposition of mutual contractual duties without placing the Dektrix Defendants in the role of fiduciary. Indeed,

the Dektrix Defendants are not, under the terms of the contract or as the Complaint tells it, fiduciaries because it had no duty to act primarily for the benefit of Plaintiff. *See id.* (and cases cited therein).

Accordingly, Count VII of Plaintiff's Complaint fails to state a claim upon which relief could be granted.

* * *

Plaintiff's Count VIII—unjust enrichment—alleges that Defendants secured Plaintiff's investment and bridge loan to Dektrix, then used the money for "in their fraudulent business activities and self-dealing, deriving substantial revenues and benefits …." (Doc. #1, ¶120).

The Dektrix Defendants correctly point out that, under Ohio law, a party cannot prevail on a claim of unjust enrichment if there is an express contract between the parties. *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009). The Dektrix Defendants are also right that Plaintiff's Complaint asserts a breach-of-contract claim in Count VI. Yet, Plaintiff maintains that Fed. R. Civ. P. 8 permits it to plead alternative claims wins the day. *See Miami Valley Mobile Health Services, Inc. v. ExamOne Worldwide, Inc.*, 852 F.Supp.2d 925, 939 (S.D. Ohio 2012) (Rice, D.J.) (and cases cited therein).

To avoid this outcome, the Dektrix Defendants criticize Plaintiff's unjust-enrichment claim because it asserts (in their view), "Defendants were unjustly enriched by the alleged 'misuse of Plaintiff's investment, contrary to the parties' contractual agreements.'" (Doc. #20, *PageID* #272 (quoting, in part, Doc. #1, ¶8)). This, however, inaccurately recasts

Plaintiff's unjust-enrichment claim as resting on an alleged breach of contract. Count VIII fails to refer to any express written contract. *See* Doc. #1, *PageID* #36. The Dektrix Defendants also take the language they quote out of context. The sentence in which the quoted language appears in the Complaint's general description of the "Nature Of The Action." *Id.* at *PageID* #s 4-5. Reading the entire sentence the Dektrix Defendants' borrow from divulges a general description of Plaintiff's claims, rather than the presence of an unjust-enrichment claim based on the breach of an express contract. *See id.* at ¶8 ("Such action also primarily involves the Dektrix Defendants' breaches of fiduciary duties and trust, mismanagement, and <u>misuse of Plaintiff's investment, contrary to the parties'</u> <u>contractual agreements</u>." (underline added)).

Moving next to the Fontaine Defendants, they argue that Plaintiff's unjust-enrichment claim fails because Plaintiff did not confer a benefit on them, they were not enriched at Plaintiff's expense, and they are not responsible for Plaintiff's alleged loss. They reason, "Plaintiff's Complaint does not include any plausible allegations to the contrary." (Doc. #33, *PageID* #360).

Plaintiff contends that the Fontaine Defendants "retained a benefit from Plaintiff's investment by the creation of sales for Fontaine Flat Decks. The [Fontaine] Defendants benefitted their companies and in their jobs from the increased market for intermodal shipping containers, and it was unjust of them to receive this benefit at the cost to Plaintiff's investment." (Doc. #26, *PageID* #319). The Complaint, however does not raise facts concerning these alleged market-related benefits and provides no factual support for a reasonable inference that the Fontaine Defendants received such benefits.

Yet, the Complaint succeeds in alleging that Fontaine received a benefit from Plaintiff's bridge loan to Dektrix. It states, "Defendant Harris reported to Plaintiff that Defendants Prochazka and Fontaine had agreed to accept Plaintiff's money as a 'refundable deposit should things not go as we had hoped.' Dektrix wired $50,000 of Plaintiff's money to Fontaine on March 1, 2017." (Doc. #1, ¶60). This was a significant financial benefit to Fontaine.

The Complaint further alleges that when Redlands, a Dektrix creditor, seized the Flat Decks that Fontaine had been leasing to Dektrix, Fontaine used $22,800 of Plaintiff's $50,000 bridge loan to repay Dektrix's debt to Redlands. This, in turn, benefited the Fontaine Defendants because it caused Redlands to release the Flat Decks to Fontaine. *Id.* at ¶s 69-70.

Accordingly, the Dektrix Defendants' and the Fontaine Defendants' Motions to Dismiss Count VIII lacks merit.

**IT IS THEREFORE RECOMMENDED THAT**:

1. The Dektrix Defendants' Motion to Dismiss (Doc. #20) be GRANTED in part and that Count II against Defendant Larson be dismissed, and Counts III, IV and Count VII be dismissed; and DENIED in remaining part; and

2. The Fontaine Defendants' Motion to Dismiss (Doc. #16) be DENIED.


August 2, 2018                                    *s/Sharon L. Ovington*
                                                  Sharon L. Ovington
                                                  United States Magistrate Judge

56

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).