IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

AMERICAN POWER, LLC,               :

     Plaintiff,

  v.                                 :          Case No. 3:17-cv-347

DOUGLAS O. HARRIS, et. al,                    JUDGE WALTER H. RICE

    Defendants.                :

---

DECISION AND ENTRY ADOPTING IN PART AND REJECTING IN
PART UNITED STATES MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATIONS (DOC #43); SUSTAINING IN PART AND
OVERRULING IN PART OBJECTIONS OF THE FONTAINE
DEFENDANTS (DOC. #46); SUSTAINING IN PART AND
OVERRULING IN PART OBJECTIONS OF DEKTRIX DEFENDANTS
(DOC.#48); SUSTAINING IN PART AND OVERRULING IN PART
MOTION TO DISMISS OF MARMON AND FONTAINE DEFENDANTS
(DOC. #16); SUSTAINING IN PART AND OVERRULING IN PART
MOTION TO DISMISS OF DEKTRIX DEFENDANTS (DOC. #20);
DISMISSAL OF COUNT I AS TO THE FONTAINE DEFENDANTS,
COUNT II AS TO DEFENDANTS PROCHAZKA, BUCHANAN AND
DIER, COUNT VI AS TO DEFENDANTS HARRIS, CRANE, MORLEY,
LARSON, DEKTRIX TRANSPORTATION SERVICES, LLC AND
DEKTRIX INTERMODAL, LLC, AND COUNT VIII AS TO DEFENDANT
LARSON IS WITHOUT PREJUDICE TO PLAINTIFF FILING AN
AMENDED COMPLAINT WITHIN 14 DAYS SUBJECT TO THE
STRICTURES OF FED. R. CIV. P.11

---

    This matter is before the Court on Magistrate Judge Sharon L. Ovington's

Report and Recommendations, Doc. #43, and the objections to that judicial filing.

Objections were filed by two groups of Defendants: the "Fontaine Defendants,"

Doc. #46, and the "Dektrix Defendants," Doc. #48. The Defendants filing

objections as the "Fontaine Defendants" are Fontaine Engineered Products, Inc., ("Fontaine"), Henry Prochazka ("Prochazka"), Berkley Buchanan ("Buchanan"), Marmon Highway Technologies, LLC ("Marmon") and Kelly Dier ("Dier").

The Defendants filing objections as the "Dektrix Defendants" are Douglas Harris ("Harris"), Murray Crane ("Crane"), Michael Morley ("Morley"), Scott Larson ("Larson"), Dektrix, LLC ("Dektrix"), Dektrix Transportation Services, LLC ("Dektrix Trans") and Dektrix Intermodal, LLC ("Dektrix Intermodal").

Plaintiff, American Power, LLC ("Plaintiff" or "AMP"), has filed a response to the objections filed by the Fontaine Defendants, Doc. #49, and the Dektrix Defendants, Doc. #54. Plaintiff has also filed a supplemental memorandum, Doc. #61-2. A joint response to Plaintiff's memorandum was filed by the Marmon Defendants[1] and the Fontaine Defendants, Doc. #66, and a response was filed by the Dektrix Defendants, Doc. #69.

The Court has reviewed the Motion to Dismiss filed by the Marmon Defendants and the Fontaine Defendants, Doc. #16, and the Motion to Dismiss filed by Defendants Harris, Crane, Dektrix, Dektrix Trans and Dektrix Intermodal, the "Moving Dektrix Defendants," Doc. #20.[2] The Court has also considered

---

[1] The Marmon Defendants are Defendants Marmon Highway Technologies, Inc. ("Marmon") and Kelly Dier ("Dier").

[2] The Motion to Dismiss filed by the "Moving Dektrix Defendants" did not include Defendants Morley and Larson. Doc. #20. These two Defendants each filed a separate Motion to Dismiss for Lack of Jurisdiction, Doc. ##21 and 22, that the Magistrate Judge has recommended be denied. Doc. #42. No objections were made to this filing and the Court adopted this Report and Recommendations. Doc. #53.

Plaintiff's responses, Doc. ##26 and 36, the replies filed by the Marmon and

Fontaine Defendants, Doc. #33, and the Moving Dektrix Defendants, Doc. #39.

Finally, the Court has reviewed Plaintiff's Supplemental Memorandum in

Opposition to Defendants' Objections, Doc. # 63, and the responses of the

Marmon and Fontaine Defendants, Doc. #66, and the Dektrix Defendants, Doc.

#69.

The Magistrate Judge's filing, Doc. #43, has recommended the following:

1.  The Dektrix Defendants' Motion to Dismiss (Doc. #20) be
    GRANTED in part and that Count II against Defendant Larson be
    dismissed, and Counts III, IV and Count VII be dismissed; and
    DENIED in remaining part; and

2.  The Fontaine [and Marmon] Defendants' Motion to Dismiss (Doc.
    #16) be DENIED.[3]

Doc. #43, PageID#614.

The Court will review the objections filed by the Fontaine Defendants, Doc.

#46, and the Dektrix Defendants, Doc. #48, *de novo*, in accordance with Fed. R.

Civ. P. 72.

---

[3] The Complaint defines the Dektrix Defendants, the Fontaine Defendants and the
Marmon Defendants separately. Doc. #1, PageID##7-8   Although the Report and
Recommendations adopts the Complaint's definition for the Defendants comprising the
Dektrix Defendants, Doc. #43, PageID#561 n. 3, it combines the Fontaine Defendants and
the Marmon Defendants and refers to them collectively as "the Fontaine Defendants." *Id.*,
PageID#565, n. 4.  In their objection filing, the Fontaine Defendants adopt the definition
used by the Magistrate Judge. Doc. #46, PageID#627.

## I. Background Facts

### A. Introduction

Plaintiff is a Dayton, Ohio, logistics and trucking business owned by Adil Baguirov and Islom Shakhbandarov ("Baguirov" and "Shakhbandarov").[4] The business is the assignee of its owners' rights and alleges federal securities law and state common law claims against 12 Defendants, seven individuals and five companies.  Doc. #1, PageID#5.

The Complaint defines these 12 Defendants as (1) the Dektrix Defendants, (2) the Fontaine Defendants, (3) the Marmon Defendants and (4) the Individual Defendants.  *Id.*, PageID##5-8.

The "Dektrix Defendants" consist of three limited liability companies and four individuals. The companies are Defendant Dektrix, LLC ("Dektrix"), a transportation servicing company formed on January 23, 2015, "for the purpose of commercializing a revolutionary intermodal flat-deck shipping solution;" its parent company, Defendant Dektrix Intermodal, LLC ("Dektrix Intermodal") and Defendant Dektrix Transportation Services, LLC ("Dektrix Trans"), a wholly-owned subsidiary of Dektrix.  *Id.*, PageID##5-6.  The four individuals included in the Dektrix Defendants' group are the following: Defendant Murray Crane ("Crane"), the founder of Dektrix, inventor of the intermodal flat-deck shipping system, CEO

---

[4] The following facts are taken from the Complaint, Doc. #1. In setting forth the factual background, the Court has accepted the allegations as true and has construed them in the light most favorable to Plaintiff.

4

of Dektrix and Dektrix Trans and Member-Manager of Dektrix and Dektrix Trans; Defendant Douglas O. Harris ("Harris"), the General Manager of Dektrix and Member of Dektrix and Dektrix Trans; Defendant Michael T. Morley ("Morley"), Member-Manager of Dektrix and Dektrix Trans; and Defendant Scott Larson ("Larson"), the "[C]omptroller, employee, and/or agent of Dektrix and Dektrix Trans." *Id.*, PageID##6-7.

The "Fontaine Defendants" are defined by Plaintiff as consisting of Fontaine Engineered Products, Inc. d/b/a Fontaine Intermodal ("Fontaine"), the manufacturer of the flat-decks used by Dektrix; its president, Defendant Berkley ("Buck") Buchanan ("Buchanan") and Defendant Henry ("Hank") Prochazka ("Prochazka"), a "group president" of a company affiliated with Fontaine. *Id.*, PageID#8.

The Complaint defines the "Marmon Defendants" as Defendant Marmon Highway Technologies, LLC ("Marmon"), "a Berkshire Hathaway Company," and Defendant Kelly Dier ("Dier"), its President and later Chairman.  Plaintiff alleges that the Marmon Defendants owned and operated Fontaine.

The final group defined in the Complaint is the "Individual Defendants." This group consists of Harris, Crane, Morley, Larson, Dier, Prochazka and Buchanan. *Id.*, PageID#8.

Taking the allegations of the Complaint as true, and giving Plaintiff the benefit of every reasonable inference therein, the following appears to be the relationship between the non-individual parties: Fontaine and its owner, Marmon,

5

invented and manufactured the intermodal flat-deck trailers, and gave the Dektrix Defendants an exclusive right to commercialize them over a two year period of time with the possibility of a third year.  In exchange for the right to commercialize the flat-deck trailers for two years, Dektrix was required to purchase 73 trailers it was then renting and, for a third year of exclusivity, purchase 43 more.  Dektrix sought an investment from Plaintiff, American Power, in order to buy the trailers from Fontaine (and, indirectly, from Marmon).

### B.  Allegations of the Complaint

On June 16, 2016, the Dektrix Defendants[5] contacted Plaintiff by phone and introduced it to an investment opportunity in Dektrix, a Nevada intermodal logistics and shipment company incorporated in January 2015.  Doc. #1, PageID##8 and 5. The investment opportunity involved a new type of trailer manufactured by Fontaine and used in "intermodal freight transport."[6] *Id.*, PageID#8. The Complaint refers to this new type of trailer as the "Fontaine Evolution Intermodal Flat Deck," "intermodal deck," "deck" or "flat-deck." *Id.*, PageID##8 and 9.

---

[5] The Complaint gives two different definitions of the "Dektrix Defendants." Doc. #1, PageID#3 and Doc. #1, PageID#7.  The Court will use the definition of the Dektrix Defendants pled in the Complaint, ¶18, Doc. #1, PageID#7.

[6] Intermodal "means the shipment of products using multiple modes of transportation, usually by ship, airplane, train and truck.  A shipping container is 'intermodal' when it has the ability to be carried on ships, railroad cars and as a trailer being pulled by semi-trucks, on the highway." Doc. #1, PageID##7-8.

In July 2016, the Dektrix Defendants "presented a number of investor meetings, presentations and other solicitations to Plaintiff as a potential investor" and on July 28, 2016, these Defendants sent an email to Plaintiff with information about Dektrix. *Id.*, PageID#9.   The email stated that "Dektrix was a well-established company that had earned an exclusive opportunity to use Fontaine Evolution Intermodal Flat[-]Decks to ship loads." *Id*.  The Dektrix Defendants explained the "exclusive opportunity" as follows:

> Based on [Dektrix's] performance[,] the executives at Marmon Highway Technologies and Fontaine Intermodal have granted Dektrix a 3 year exclusive opportunity. They will not produce or sell any decks or similar intermodal products to any other individual or entity for three years. These are the accomplishments of a company which has worked very hard and is now [poised] for rapid growth.

*Id.*; Doc. #1-2, PageID#156.

The email also stated that Dektrix was "not a start-up company," had "moved freight every month since April of 2015 . . . has two yards, 17 FT [full time] employees (both W-2 and 1099 contractors) . . . has moved over 814 loads of freight and …billed more than $2.5M in sales." *Id*.  Other representations made in the email concerned Dektrix's fleet, its carrier agreements and "current contracts and relationships with the logistics executives at several companies." *Id*.

The Complaint alleges that on August 5, 2016, the Dektrix Defendants "presented a number of investor meetings, presentations[,] and other solicitations to prospective investors," including Plaintiff, in Dayton, Ohio.  *Id.*, PageID#9. One of the documents provided was a copy of an August 4, 2016, letter addressed to

Dektrix and signed by Dier, the president of Marmon.  *Id.*, PageID#. The August 4 letter sets forth an offer to Dektrix – "two years of exclusivity from the date that Dektrix purchases all of the 73 Fontaine Intermodal Flat[-]Decks, which are currently being rented to Dektrix." *Id.* The Dier letter also offered a third year of exclusivity to Dektrix if it purchased 43 decks that "Fontaine has in its inventory." *Id.*  Additionally, the August 4, 2016, letter signed by the Marmon President, Dier, stated that

> [f]or the past 18 months we have worked very closely with you and have witnessed first-hand the tenacity of your management team, your innovation and quality work product.  We were impressed when you developed your own internal securement program . . . We were impressed with your decision to compete head to head with other asset[-]based carriers . . . We were impressed when you succeeded in securing a major shipping contract. . .

*Id.*, PageID#.

The August 4, 2016, letter ended with "[W]e are pleased to be taking this next step with Dektrix and hope this period of exclusivity helps you secure your own successful long-term position as the foremost operator of intermodal flat[-]decks." *Id.*

At the August 5, 2016, investor meeting held in Dayton, Ohio, Dektrix's CEO, Crane, and its General Manager, Harris, presented information to Plaintiff and other potential investors. *Id.*  Harris explained at this meeting that the flat-decks purchased from Fontaine with an investor's money would be registered by Dektrix with UCC statements for the benefit of the investors. *Id.,* PageID##10 and 11.  At this same meeting, Crane, a member of the Association of the American

Railroad's, ("AAR"), Intermodal Operations Committee in 2013-14, was asked about the AAR. *Id.*, PageID#13. His response was as follows: "Yes, ok, the Association of American Railroads. It's, they're called the AAR. They're the largest governing body in the world, so even the steam trains from Europe and things come over and are tested here under their guidance in Pueblo, Colorado." *Id.*, PageID#13. Also, during this August 5, 2016, investor meeting, Buchanan, the president of Fontaine, telephoned into the meeting. The Complaint alleges that he stated, "'We stand behind them,' meaning Fontaine stood behind Dektrix." *Id.*, PageID#10. He also allegedly stated "'We' [Fontaine] 'believe in this project strongly enough that we have provided them' [Dektrix] 'an offer of exclusivity on the product.'" *Id.*, PageID##10-11. During this telephone call, Buchanan also "touted Fontaine's relationship with BNSF Railway through Berkshire Hathaway" and "described the millions of dollars in development spent by Fontaine." *Id.*, PageID#11.

On August 6, 2016, the Dektrix Defendants provided Plaintiff's owners with a number of documents, including Dektrix's Private Placement Memorandum ("Private Placement Memorandum" or "PPM"), a Subscription Agreement and the Dektrix Operating Agreement. *Id.* The PPM, attached to the Complaint as Exhibit A, Doc.1-1, PageID##38-155, describes the workings of the "revolutionary intermodal flat-deck shipping system." *Id.* It states that "[t]he flat[-]decks are now in their 4th generation and are manufactured for Dektrix by Fontaine Intermodal, a Berkshire Hathaway Company." *Id.*, PageID#47. Although the Private Placement

Memorandum includes disclaimer language stating that the placement of the securities was "believed exempt from federal and state registration requirements," the document also states that

> …there is no exemption from the stringent requirement that every investor in every investment not purchase under any misrepresentation or omission of any material fact. Reasonable effort has been made in the preparation of this Memorandum to present all information which the Company considers to be material, based upon facts available to it.

*Id.,* PageID#11; Doc. #1-1, PageID#39.

In describing its manufacturer exclusivity arrangement, the Dektrix Defendants also represented in the Private Placement Memorandum that

> at the time of this offering Dektrix has been granted a conditional 3 year exclusivity from Fontaine, such that during the term of exclusivity Fontaine will not build, or sell any intermodal flat[-]decks of any design to any party other than Dektrix which exclusivity is based on two conditions, that Dektrix purchase the 73 decks from Fontaine which are currently in Dektrix's fleet and being rented from Fontaine and second that Dektrix purchase the remaining inventory of 43 Decks from Fontaine, which decks have yet to be assembled by Fontaine [and] if Dektrix is unable to raise the funds anticipated in this PPM or some alternative way of purchasing the required decks from Fontaine it could lose its exclusivity and have limited protection against competitors.

*Id.* PageID#15.

The PPM made other specific representations, including the amount that Dektrix raised in its first round of funding in January 2015, the number of shipping contracts and the extent of its operations. *Id.* PageID#16.

Transportation by railroad was critical to the functionality of the Fontaine flat-decks being used by Dektrix and the Private Placement Memorandum explains

in detail the functioning of the decks. This specificity includes the amount of weight and type of product that flat-decks can support, how they can be stacked when loaded on rail cars and that, once the freight arrives at the railway hub, "'it is offloaded in exactly the same way [and] a local driver and day cab then deliver the freight to its nearby final destination.'" Doc. #1, PageID#12.

Because the decks were integral to the investment opportunity being presented to Plaintiff and its two owners, "they decided to review information that was publicly available about Fontaine and its Evolution Intermodal Flat[-]Decks, particularly with respect to their compatibility with rail transportation." *Id*. An "easy search on the Internet" was done and it was revealed that in 2014 Fontaine had issued a press release quoted by "[S]everal separate industry publications." *Id*. The separate industry publications are attached to the Complaint with dates of January 15, 2014, January 16, 2014 and February 1, 2014. Doc. #1-3, PageID##159, 161, 164, and 165.[7] These 2014 publications quote the press release and include the statement that the flat-decks were "Certified by the Association of American Railroads." *Id*. Plaintiff alleges that this approval is "a standard of quality, safety and acceptability for the industry." *Id*. PageID#14.

Plaintiff relied on Fontaine's statement of the AAR certification in this 2014 republished press release when it decided to invest in Dektrix. *Id., PageID#14. The

---

[7] Two of the Internet articles, Doc. #1-3, PageID##160 and 166, reference the certification by the Association of American Railroads but do not indicate a publication date.

January 15, 2014, republished press release also states that the flat-decks are "virtually maintenance free." *Id.*  PageID##164.[8]  Plaintiff also alleges that a video on the Fontaine website in August 2016 stated that the decks were "'stronger' and 'safer' than any other deck 'to withstand the punishing conditions associated with rail and highway transportation'" and were "'virtually indestructible yet simple to repair if it's ever damaged.'" *Id.*, PageID#15.  As of the filing of the Complaint, the video was still on the Fontaine website.[9]

In November and early December of 2016, the Dektrix Defendants "circulated additional information regarding its organizational structure" including the Private Placement Memorandum, "current balance sheets, critical relationship details, shipping volumes and payables, information that Plaintiff would rely upon in eventually making a decision to invest in the Dektrix business model." *Id.*, PageID#17. The Dektrix Defendants represented to Plaintiff "on numerous occasions" that "it had contractual shipping relationships and/or agreements with a number of carriers" and listed several of them by name. *Id.*  "None of the Defendants" ever disclosed to Plaintiff before it "invested its money" that the flat-decks had never been approved by the Association of American Railroads and

---

[8] Each press release references that Fontaine is a Marmon company.  The Complaint does not allege that any of the press releases ever appeared on either the Fontaine or Marmon webpages.

[9] The Complaint does not allege that Plaintiff viewed the video prior to making its investment.

"had significant engineering problems and were not safe to use on the highway or on the railroads." *Id*.

The Complaint alleges that "[b]ased on Fontaine's representation that it had obtained AAR approval" of the flat-decks, representations made by the Dektrix Defendants that it "had several active broker-carrier agreements," as well as other representations alleged in the Complaint, Plaintiff's owners entered into a Membership Purchase Agreement ("MPA") with the Dektrix Defendants on December 5, 2016. *Id*., PageID##17-18. Plaintiff wired $350,000 to the Dektrix Defendants, received 70,000 preferred membership units in Dektrix and "would retain an option to purchase an additional 130,000 preferred membership units from the Dektrix Defendants by January 15, 2017[,] with an option to purchase 50,000 common membership units for $500,000.00, valid until May 2017." *Id*., PageID#18. The Membership Purchase Agreement also gave the "Buyer" a right to a second lien position "evidenced by the filing a UCC-1 on any of the first 73 intermodal flat-racks the Seller purchases." *Id*.

On January 25, 2017, approximately one month after the signing of the MPA, the Dektrix Defendants inspected the decks and "advised the Marmon and Fontaine Defendants" that "about 50% of the fleet have sheered [sic] bolts on both the front and rear hub [brake] assemblies . . ." *Id*., PageID##18-19. Five days later, on January 30, 2017, the Marmon and Fontaine Defendants wrote to the Dektrix Defendants, terminated the existing lease with them due to their "continued failure to pay rent" and "maintain the decks in good and efficient

13

operating order." *Id.*, PageID#19 Doc. #1-6. They demanded prompt return of the decks and, as alleged by Plaintiff, "an end to the exclusive relationship." *Id.* In early February 2017, however, the Dektrix Defendants continued to represent to others, including Plaintiff, that it had specific active broker-contracts in place. *Id.*, PageID#19.

On February 7, 2017, the Dektrix Defendants told Plaintiff that the termination of the lease with the Marmon and Fontaine Defendants was merely a short-term situation and that any issue of "sheered [sic] bolts" could be repaired and resolved. *Id.* These Defendants did not disclose to Plaintiff that the lease with the Marmon and Fontaine Defendants had been terminated <u>and</u> that the decks were to be returned. *Id.* The Complaint also alleges that on this date "the Marmon and Fontaine Defendants were seeking not only to call back and seek return of all decks, but were actively seeking to physically destroy such decks on the basis that they were unfit, defective, and otherwise unsafe and could no longer be warranted."[10]

Despite the January 30, 2017, letter from the Marmon and Fontaine Defendants to Dektrix terminating the lease, demanding the prompt return of the

---

[10] Although the Complaint alleges that on February 7, 2017, the Marmon and Fontaine Defendants were seeking a return of the decks to destroy them on the basis "that they were unfit, defective, and otherwise unsafe and could no longer be warranted," Plaintiff's "Exhibit G," Doc. #1-7, a letter from Fontaine to Redlands Transport, Inc., a creditor of Dektrix, indicates that this return of all 73 decks, because they were unfit, unsafe and no longer under warranty did not occur until May 24, 2017.

decks and ending the exclusive relationship, the Dektrix Defendants sent a written offer on February 28, 2017, to the Marmon and Fontaine Defendants to purchase 73 decks for $1 million.[11] *Id.* Also, on February 28, 2017, Plaintiff agreed to provide Dektrix, "by way of an Assignment of Beneficial Use Agreement" ("ABUA"),"[12] with "an effective bridge loan of $100,000" to be to be "used for the purchase of assets in the form of Fontaine Trailer decks." *Id.*, PageID#20. The terms of the ABUA required that Plaintiff be paid back monthly in the amount of $2,400 with interest at 15.4%. *Id.*, PageID#20. Plaintiff alleges that Harris, Dektrix's general manager, "reported to Plaintiff that Defendants Prochazka, a group president of a company affiliated with Fontaine, and Fontaine had agreed to accept Plaintiff's money as a 'refundable deposit should things not culminate as we had hoped.'" *Id.* On March 1, 2017, Dektrix wired $50,000 of Plaintiff's money to Fontaine," allegedly as a deposit toward the purchase of decks. *Id.*, PageID##20-21. Plaintiff entered into the ABUA with Dektrix "based upon the material representations by the Dektrix Defendants and Fontaine Defendants."[13]

---

[11] The Complaint does not attach a copy of the "Equipment Purchase Offer Agreement to Sell" nor does it say to whom the agreement was submitted.

[12] The Complaint refers to this document as "Assignment of Beneficial Use Agreement" and "Assignment of Beneficial Use of Assets" and "Assignment of Beneficial Use." Doc. #1, PageID##4, 20, 22. Because the Dektrix Defendants have attached a copy of a signed document, dated February 28, 2017, entitled "Assignment of Beneficial Use of Assets," the Court will refer to this document by that name. Doc. #20-1.

[13] The Complaint does not allege what, if any, representations Fontaine made to Plaintiff, as opposed to representations it allegedly made to Dektrix.

On March 6, 2017, Plaintiff wrote the Dektrix Defendants regarding the "management (fiduciary and otherwise), disclosure and transparency issues," including "the Dektrix Defendants' misuse of the Plaintiff's investment money for salaries and benefits, as opposed to its explicitly intended and designated use to the purchase of assets (i.e. intermodal flat decks) so that the company could generate cash flow." *Id.* Plaintiff's proposals concerning management, compliance and operational changes were rejected by the Dektrix Defendants. *Id.*

On April 6, 2017, the Dektrix Defendants disclosed to Plaintiff "for the first time" that there was no certification of the flat-decks by the Association of American Railroads and that Crane knew of the lack of certification as early as May 20, 2015. *Id.*, PageID#21. Additionally, the Dektrix Defendants admitted to Plaintiff that they had reported defects in the intermodal flat-decks to Buchanan, Fontaine's president, in 2015 and that "Buchanan and Fontaine had the decks crudely repaired at that time." *Id.*

On May 22, 2017, the Dektrix Defendants stated that they intended to file for bankruptcy.  They also told Plaintiff that it was their position that "none of Plaintiff's investment money," including the $100,000 given in conjunction with the Assignment of Beneficial Use of Assets, was limited to purchasing assets. *Id.*, PageID#21.  Of the $100,000 given by Plaintiff pursuant to the ABUA, the Complaint alleges that "$50,000 was given to Fontaine as a deposit toward the purchase of decks," $7,500 was paid to Plaintiff pursuant to the terms of the ABUA and $42,000 was used to pay salaries for Crane and Larson. As for Fontaine, it

16

used $22,800 of the money it received from Dektrix to pay a Dektrix creditor which was holding Fontaine trailers that had been leased to Dektrix. *Id.*, PageID##22-23, Doc. 1-7, PageID##175-76.

On May 24, 2017, the Dektrix Defendants told Plaintiff that Fontaine had written a letter to Redlands, a creditor of Defendant Dektrix, asserting that the "decks are not fit for use or safe for use." *Id.*, PageID#22.  The Fontaine letter to Redlands is attached to the Complaint. Doc. #1-7.  This letter also states that Dektrix defaulted on the lease with Fontaine and that Redlands, which was holding the decks due to a dispute it has with Dektrix, must turn them over to Fontaine "immediately," should not use or transfer them and that all warranties are disclaimed. *Id.* Two days later, on May 26, 2017, Harris, the General Manager of Dektrix, told Plaintiff that Prochazka had personally assured him "that Fontaine would return the $50,000 that Plaintiff had loaned to Dektrix and that Dektrix had sent to Fontaine." *Id.*, PageID#22.  By July 13, 2017, however, Harris told Plaintiff that "Fontaine had not returned the $50,000,[14] as Prochazka had personally assured" Dektrix, and that Fontaine would not make Dektrix whole for the harm caused by the defective flat-decks. *Id.*, PageID#23. Additionally, Plaintiff demanded from the Dektrix Defendants, but did not receive their "monthly agreed upon payment" under the Agreement of Beneficial Use of Assets.

---

[14] The Complaint does not specify of what this amount consists, i.e., whether this is what was left of the $100,000 or otherwise.

On August 21, 2017, an email, written by Harris, the General Manager of Dektrix, was forwarded to Plaintiff. *Id.*, PageID#23.  The Harris email stated that there was "fraud" by Dier, Marmon's president; Prochazka, president of an affiliate associated with Fontaine; Buchanan, Fontaine's president; and others due to claims made by them that the flat deck was AAR certified when it was not. *Id.* Additionally, the Harris email stated that "[S]hortly after putting the decks in service," pins were shearing in the upright support arms and when "we verbally drew this problem to Fontaine's attention, they asked us to keep it quiet and assured us they would immediately fix the problem." *Id.*  The Harris email also stated that "they," Fontaine, falsely claimed it "had not experienced this problem with any of their other" decks in use by other companies and the problem would be immediately fixed. *Id.*, PageID#23.  Harris's email describes the repairs made by Fontaine as "shoddy," stating that there was no design improvement and that the proposed solution "only exacerbated the problem." The email also states that following this repair problem, Dektrix. . . "limped along for several months, . . .[T]he problem was never adequately resolved."

> It wasn't until we were gearing up to service the new Constellium contract in January that we went to Chicago and to California to inspect our fleet. To our surprise many of the main bolts holding the upright arms in place appeared to be missing. . . not knowing when a pin might explode, we realized the entire fleet was unfit to service the Constellium contract.

*Id.,* PageID##23-24.

18

The email concludes with the statement that, following the January 2017 Chicago inspection, Dektrix sent an email to Buchanan. In response, Harris received a call from Prochazka stating that "Fontaine would be calling back all the decks" since Dektrix "had made safety a discoverable issue." *Id.*, PageID#24. As of the filing of the Complaint, both Fontaine and Marmon continue to market and promote the decks on their websites and have not disclosed any safety problems with the flat-decks. *Id.*, PageID#22.

## II. Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendations to which an objection is made. The Court may accept, reject, or modify, in whole or in part, the magistrate judge's findings, may receive further evidence, or recommit the matter to the magistrate judge with instructions. *Id. See also* Fed. R. Civ. P. 72 (b)(3).

Federal Rule of Civil Procedure 8(a) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a complaint on the basis that it "fail[s] to state a claim upon which relief can be

19

granted." The moving party bears the burden of showing that the opposing party has failed to adequately state a claim for relief. *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citing *Carver v. Bunch*, 946 F.2d 451, 454-55 (6th Cir. 1991)). The purpose of a motion to dismiss under Rule 12(b)(6) "is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). In ruling on a 12(b)(6) motion, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis,* 695 F.3d 531, 538 (6th Cir. 2012) (quoting *Treesh*, 487 F.3d at 476).

Nevertheless, to survive a motion to dismiss under Rule 12(b)(6), the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Unless the facts alleged show that the plaintiff's claim crosses "the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555. "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Legal conclusions "must be supported by factual allegations" that give rise to an inference that the defendant is, in fact, liable for the misconduct alleged. *Id.* at 679.

20

In ruling on a Rule 12(b)(6) motion, "the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001).  If, however, "… a plaintiff references or quotes certain documents, … a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment." *Watermark Senior Living Retirement Communities, Inc. v Morrison Management*, 905 F.3d 421 (6th Cir. 2018).

## III. Legal Analysis

### A. Introduction

Plaintiff has voluntarily dismissed Counts III and IV of the Complaint, Doc. #36, PageID#423, and the Magistrate Judge has recommended dismissal of Count II, against Larson,[15] and Count VII, breach of fiduciary duty, alleged against the Dektrix Defendants. Five Counts remain in the Complaint: (1) Count I against the Dektrix Defendants and the Fontaine Defendants for violations of § 10(b) of the Security and Exchange Act of 1934, 15 U.S.C. §78j(b) ("the Exchange Act") and

---

[15] Although Defendant Larson was not one of the "Moving Dektrix Defendants," Doc. #20, the Report recommends his dismissal from Count II. He is now included in the Objections of the Dektrix Defendants. *See* n. 1.

21

Rule 10b-5; [16] (2) Count II against the Individual Defendants, excepting Larson, for violations of § 20(a) of the Exchange Act; (3) Count V against all Defendants for common law fraud; (4) Count VI against the Dektrix Defendants for breach of contract;[17] and (5) Count VIII against all Defendants for unjust enrichment.

Although Plaintiff has not filed an objection to the Report, the Fontaine Defendants have filed five objections and the Dektrix Defendants have filed 18 objections. Doc. ##46 and 48.

The Court will first consider the objections of the Fontaine Defendants.

### B. Objections of the Fontaine Defendants, Doc. #46

#### 1. First Objection: Statements in the Report and Recommendations Improperly Conflate Allegations about the Fontaine Defendants with Allegations about the Dektrix Defendants, Doc. #46, PageID#635

The Fontaine Defendants' first objection is to four "portions of the Report." They contend that these "portions" reach certain conclusions that conflate "non-existent" actions or statements of the Fontaine Defendants with those of the

---

[16] The Court will use § 10(b) to refer to both the statutory provision and Rule 10b-5. *S.E.C. v. Zandford*, 535 U.S. 813 (2002), n.1 (scope of Rule 10b-5 is coextensive with the coverage of § 10(b), (citations omitted)).

[17] Count VI alleges a breach of contract claim against the Dektrix Defendants as well as "Defendants." Doc. #1, PageID#33. Because of these "generic allegations," the Fontaine and Marmon Defendants' motion to dismiss addressed Count VI. Doc. #16, PageID#211. In its response, Plaintiff affirmatively stated that its claim for breach of contract in Count VI only pertains to the Dektrix Defendants, Doc. #26, PageID#318. The Report analyzes only a breach of contract claim against the Dektrix Defendants, yet denies in its entirety the Fontaine Group's Motion to Dismiss. *Id.*, PageID##605-610 and 614. As a result, Plaintiff now asserts that the Report recommended that a viable claim for breach of contract was alleged against the Fontaine and Marmon Defendants, as well. Doc. #49, PageID#700.

Dektrix Defendants. Doc. #46, PageID#635. The portions objected to, and the conclusions reached, are the following: (1) the "Fontaine Defendants began to assist Dektrix in its sale of securities," Doc. #43, 592; Doc. #46, PageID#636; (2) the August 4, 2016, letter from Dier, and given to Plaintiff and other investors by the Dektrix Defendants, "made clear that Fontaine, Marmon and Dektrix, were working together to secure investment money from Plaintiff," *Id.*, PageID##561, 591-593; Doc. #46, PageID#637; (3) "the August 2016 presentation to Plaintiff" was "by Defendants Crane, Harris, and Buchanan," *Id.*, PageID#591; Doc. #46, PageID#638; and (4) Defendant Fontaine knew and failed to "adequately address the bolt-shearing problem," *Id.*, PageID##593, 595, 597 and 599; Doc. #46, PageID#638.

In ruling on this objection, the Court must consider "whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'" *Ohio Pub. Employees Retirement Sys. v. Fed. Home Loan Mortgage Corp.*, 830 F.3d 376, 383 (6th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678.) The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Verble v. Morgan Stanley Smith Barney, LLC*, 676 Fed. Appx. 421, 427 (6th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555)).

The first conclusion objected to by the Fontaine Defendants is the statement in the Report that the "Fontaine Defendants began to assist Dektrix in its sale of securities." Doc. #43, PageID#591-592. They argue that the Report attempts to support this first conclusion with a factually incorrect characterization of the

23

August 4, 2016, offer letter sent by Marmon to Dektrix: "Defendant Dier communicated Marmon's support for Dektrix in his letter of August 4, 2016. Crane and Harris showed this letter to investors, including Plaintiff, during presentations in July and August 2016." *Id.* [18]

The August 4, 2016, letter signed by Marmon's president, Dier, is addressed to Dektrix.  It sets forth the Marmon/Fontaine offer to Dektrix for a period of exclusivity if Dektrix purchases the flat decks. Specifically, it states that if Dektrix purchases the 73 flat-decks that it is currently renting from Fontaine, it will be given a two-year period of exclusivity for the flat-decks.  The August 4, 2016, letter further states that if Dektrix purchases 43 more decks "which Fontaine currently holds in inventory," it will be given three years of exclusivity *Id.*  The offer letter also states that Marmon has confidence in Dektrix's "tenacity," "innovation" and "quality work product."  The August 4, 2016, letter does not establish that "the Fontaine Defendants began to assist Dektrix in its sale of securities."  Accordingly, this conclusion of the Fontaine Defendants first objection is sustained.

The second portion of the Report that the Fontaine Defendants object to concerns a legal conclusion in the Complaint that they contend the Report misconstrues as a factual allegation.  The Complaint states that the August 4, 2016, letter "made it clear that Fontaine, Marmon, and Dektrix were working

---

[18] Because the letter from Dier, president of Marmon, was dated August 4, 2016, it was not shown to Plaintiff until the August 5, 2016, investor meeting in Dayton, Ohio.

.

together to secure investment money from Plaintiff." *Id*. As argued by the Fontaine Defendants, the Magistrate Judge misconstrues this legal conclusion as a factual allegation. Doc. #43, PageID#561. Although the Report does not rely solely on this legal conclusion from the Complaint for its ultimate finding and recommendations, the Court finds that the statement is a legal conclusion not a factual allegation and is not supported by the August 4, 2016, letter. Therefore, the second conclusion in the Fontaine Defendants' first objection is sustained.

The third conclusion in the Report objected to by the Fontaine Defendants is that "the August 2016 presentation to Plaintiff" was "by Defendants Crane, Harris, and Buchanan," *Id*., PageID#591. The Complaint alleges that "[O]n August 5, 2016, Crane and Harris gave a presentation to several potential investors, including Plaintiff, in Dayton, Ohio." *Id*., PageID#10. Plaintiff alleges that Buchanan, president of Fontaine, phoned into this investor meeting and stated that "[W]e [Fontaine] stand behind them [Dektrix]"and "[W]e [Fontaine] believe in this project strongly enough that we have provided them [Dektrix] an offer of exclusivity on the product." The Complaint further alleges that "[H]e touted Fontaine's relationship with BNSF Railway through Berkshire Hathaway" and "described the millions of dollars in development spent by Fontaine." Doc. #1, PageID#11. Plaintiff does not allege that Buchanan was part of a "joint presentation" with Harris and Crane and there are no factual allegations of the length of time of the Crane and Harris presentation or the length of Buchanan's telephone call. However, Plaintiff does allege that Fontaine's president,

25

Buchanan, did phone into the August 5, 2016, meeting and made certain statements to the potential Dektrix investors. Construing these allegations as true and giving to Plaintiff the benefit of every reasonable inference, Buchanan, as president of Fontaine, was part of a presentation at an investor meeting on August 5, 2016, with Harris and Crane for at least some period of time. Accordingly, this third conclusion in the Fontaine Defendant's first objection is overruled.

The final conclusion objected to in the Report is that Defendant Fontaine knew and failed to "adequately address the bolt-shearing problem." *Id.*, PageID##593, 595, 597 and 599; Doc. #46, PageID#638. The Fontaine Defendants argue that this statement in the Report is inaccurate since Plaintiff "never alleges that the Fontaine Defendants knew of any widespread problems with the bolts at any time" before January 2017. They further contend that the Complaint alleges that when the bolt-shearing was reported, Marmon and Fontaine terminated the lease with Dektrix for non-payment of rent and its failure to maintain the flat-decks. A demand was also made in this letter for a return of all the decks. Although the language in the Complaint is confusing, the Court assumes that the "bolt-shearing" problem with the flat-decks is also the same as the "pin-shearing" problem. The Harris email reported that a problem existed with "pins shearing in the upright support arms" shortly after putting the decks in service in 2015 and that when told of this, Fontaine asked Dektrix to "keep it quiet and assured us they would immediately fix the problem." Doc. #1, PageID#23. Repairs were made but

26

"in a shoddy manner" and the welding only "exacerbated the problem." Doc. #1, PageID#23. In January 2017, the flat-decks were inspected in Chicago by Harris and others and the Harris email describes the issue at that time by stating that "the main bolts holding the upright arms in place appeared to be missing" although inspection revealed that they had "exploded within the assembly." *Id*. "Not knowing when *a pin might explode*, we realized the entire fleet was unfit." *Id*. (emphasis added). The letter from Fontaine attached to the Complaint, however, states that Dektrix was in default for "continued failure to pay rent" and for not maintaining the decks. Doc. #1-6. Because the Court construes the allegations of the Complaint in the light most favorable to Plaintiff, the Court finds that there are factual allegations in the Complaint in support of the Report's conclusion that the Fontaine Defendants knew and failed to "adequately address the bolt-shearing problem" experienced by Dektrix. *Id*., PageID##593, 595, 597 and 599. The fourth and final conclusion in the first objection is overruled.

For the reasons stated above, the Court sustains the Fontaine Defendants' objection to the conclusions of the Report stating that (1) the Fontaine Defendants "began to assist Dektrix in its sale of securities," Doc. #43, PageID#592, and (2) the August 4, 2016, letter from Dier "made clear that Fontaine, Marmon[,] and Dektrix, were working together to secure investment money from Plaintiff," *Id*., PageID##561, 591-593. Therefore, these conclusions will not be considered. The Court overrules the Fontaine Defendants objection to the conclusion in the Report that "the August 2016 presentation to Plaintiff" was "by Defendants Crane,

Harris[,] and Buchanan," *Id.*, PageID#591, and the objection of the Fontaine

Defendants to the statement in the Report that Defendant Fontaine knew and

failed to "adequately address the bolt-shearing problem," *Id.*, PageID##593, 595,

597 and 599, is overruled.

> **2.  Second Objection of the Fontaine Defendants: The Report Incorrectly
>     Concludes that Plaintiff Has Stated a Claim Against Defendants
>     Fontaine, Prochazka and Buchanan for Count I, Section 10(b) of the
>     Exchange Act and Rule 10b-5, Doc. #46, PageID#639**

Plaintiff alleges in Count One that the "Dektrix Defendants" and the

"Fontaine Defendants" violated §10(b) of the Exchange Act and Rule 10b–5.  It

alleges that "[T]he Dektrix Defendants and the Fontaine Defendants, and each of

them, carried out a plan, scheme, and course of conduct which was intended to

and did deceive Plaintiff into investing and loaning $450,000 to Dektrix." Doc. #1,

PageID#24. The Report recommends that the Fontaine Defendants' Motion to

Dismiss as to Count I be overruled.  Doc. #43, PageID#600.  Defendants Fontaine,

Prozchazka and Buchanan have filed an objection to this recommendation.[19]

To plead a securities fraud suit under § 10(b), a plaintiff must allege: "(1) a

material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale

of a security; (4) reliance upon the misrepresentation or omission; (5) economic

---

[19] Plaintiff's definition of the Fontaine Defendants in the Complaint does not include the
Marmon Defendants. *See* n.3. However, because the Magistrate Judge includes the
Marmon Defendants in her definition of the Fontaine Defendants, the Court will analyze
the Report's findings as including both Marmon and Dier.

loss; and (6) loss causation." *Iafrate v. Angelo Iafrate, Inc.,* 827 Fed. Appx. 543 (6th Cir. 2020) (citing *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) (quotation omitted). Because Fed. R. Civ. P. 9(b) applies to securities-fraud claims, a plaintiff must also satisfy the heightened standard for pleading fraud by stating with particularity the circumstances constituting the fraud. *Dougherty v. Esperion Therapuetics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018). The complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (citation omitted). Moreover, an actionable §10(b) claim must specifically plead facts showing that the misrepresentations or omissions were both material and false or misleading. Under Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b), "a plaintiff's complaint must also 'allege the time, place, and content of the alleged misrepresentation [or omission] on which he or she relied [and] the fraudulent scheme....'" *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d at 470.[20] Moreover, to successfully plead scienter, the second element of a §10(b) securities

---

[20] The requirements for private securities fraud actions pursuant to 15 U.S.C. § 78u-4(b) that, regarding the misleading statements and omissions, the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* at § 78u-4(b)(1). Additionally, the complaint must allege that, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u-4(b)(2).

fraud claim, a plaintiff must plead "with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." *Id.*, (quoting § 78u–4(b)(2)(A)).  Scienter cannot be pled generally. *Id.* at 473. The requirements for successfully pleading a false and misleading statement or omission in § 10(b) claims and the required state of mind to satisfy scienter "are not easily satisfied" and have been described by the Sixth Circuit as an "elephant sized boulder." *Id.*, at 461.

The Fontaine Defendants first objection argues that Plaintiff has not pled the following elements of a § 10(b) claim with the necessary specificity: (1) scienter; (2) that any "alleged [material] omissions" of these Defendants were "in connection with" the sale of the Dektrix securities; (3) that Plaintiff reasonably relied on the 2014 press release and 2016 promotional material (the Fontaine webpage video); and (4) that "loss causation" exists. The failure to plead any one of these elements is fatal to Plaintiff's § 10(b) claim against these Defendants.

### a. Scienter

The Report and Recommendations dismissed the Fontaine Defendants' argument regarding scienter stating that the motion "does not advance a reasoned analysis by case law concerning [Plaintiff's] lack-of-scienter assertion" and that it was raised for the first time in their reply.  Doc. #43, PageID#594.  These Defendants argue, however, that their motion to dismiss addressed the issue of scienter and cited cases in support, Doc. #16, PageID#203, and that the Complaint's conclusory statements, allegations and references to "Defendants,"

consisting of both individuals and companies, made it difficult to address scienter in any detail in the motion. Doc. #46, PageID##640-41. The Court agrees. The scienter issue was addressed, albeit generally, by the Fontaine Defendants in their motion to dismiss, Doc. #16, PageID#203. Following Plaintiff's response, the Fontaine Defendants addressed scienter in greater detail in their reply. Doc. #33, PageID##351-353. Accordingly, the Court will review the merits of the Fontaine Defendants' objection that the Complaint did not allege scienter against them.

The Sixth Circuit has defined scienter to include a "knowing and deliberate intent to manipulate, deceive, or defraud [or] recklessness." *Doshi v. General Cable Corporation*, 823 F.3d 1032, 1039 (6th Cir. 2016) (citing *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008)), abrogated on other grounds by *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48-50 (2011). Recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care" and "akin to conscious disregard." *Doshi,* 823 F.3d at 1039 (citing *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681(6th Cir. 2004), abrogated on other grounds by *Matrixx*, 563 U.S. at 48–50)). "Before drawing an inference of recklessness, courts typically require multiple, obvious red flags, demonstrating an egregious refusal to see the obvious, or to investigate the doubtful." *Doshi*, 823 F.3d at 1039. In determining whether a plaintiff has satisfied the scienter requirement in the context of a motion to dismiss, the Court must not only "accept all factual allegations in the complaint as true," but it must "consider the complaint in its

31

entirety" to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Dougherty*, 905 F.3d at 979 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-324 (2007)). "To qualify as 'strong'" under the PSLRA,". . .an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

The Magistrate Judge concluded that the Complaint sufficiently alleged scienter regarding the Fontaine Defendants because of their failure to "correct its 2014 press release about AAR certification and its misrepresentations in a later press release and video."  Doc. #43, PageID#595 Additionally, the Report states that scienter exists since those Defendants "allegedly asked Dektrix to keep the bolt-shearing problem quiet" in early 2015, failed "to adequately address the bolt-shearing problem" and "kept the unfixed bolt-shearing problem quiet during the potential-investor meetings in July and August 2016" *Id.*  Finally, scienter was established, according to the Report, because the Fontaine Defendants maintained their webpage video which "falsely represented" that the decks were "safer," "stronger" "virtually maintenance free" and "able to withstand the punishing conditions associated with rail and highway Transportation."  Doc. #43, PageID#595.

The Court will review the Complaint's factual allegations relating to the scienter of the Fontaine Defendants.

### (1) AAR Certification

Plaintiff has attached Exhibit C, Doc. #1-3, to the Complaint.  It consists of several industry publications dated January and February 2014, which contain a press release issued by Marmon on behalf of Fontaine announcing the Fontaine flat-decks. It states that the decks are AAR certified and "virtually maintenance free."  This information was allegedly obtained by Plaintiff pursuant to an "easy Internet search" at some time before investing and was relied on by Plaintiff. Despite these allegations, there are no factual allegations in the Complaint that the Fontaine Defendants were aware and intended that the 2014 press release regarding AAR certification was published in other trade publications, and still accessible on the Internet and relied upon by Plaintiff at the time of its investments in December 2016 and February 2017.  As such, Plaintiff has not adequately pled that there was a "knowing and deliberate intent to manipulate, deceive, or defraud." *Doshi v*, 823 F.3d at 1039.

### (2) Pin and Bolt-Shearing

Plaintiff alleges that it received a forwarded email from Harris dated August 21, 2017. Although not attached to the Complaint, the email allegedly states that in early 2015, Dektrix was having a "pin-shearing" problem on the flat-decks and was told by the Fontaine Defendants to "keep quiet" about it. The Complaint also alleges that the Harris email states that Dektrix was told by Fontaine that it had never experienced this problem before, that Fontaine's attempts to correct the problem were unsuccessful and that as a result, Dektrix "limped along for several

months" until January 2017 when Dektrix discovered a "bolt-shearing" problem with the flat-decks.  In response to this problem, Fontaine sent a letter to Dektrix terminating the lease citing Dektrix's "continued default" in failing to pay rent and in failing to maintain the decks in "good and efficient operating order" as required by the manufacturer.  Although Dektrix told Plaintiff of this termination approximately one month after it signed the Membership Purchase Agreement and had paid Dektrix $350,000, Dektrix represented to AMP that it was a "short-term" problem.  By the end of February 2017, Dektrix and Plaintiff had signed the $100,000 bridge loan allegedly for the purchase of an "initial 73 decks."  There are no factual allegations that any of the Fontaine Defendants represented the repair history of the flat-decks to Plaintiff or were involved in the negotiation of the "bridge loan" Plaintiff signed with Dektrix. Therefore, Plaintiff has not pled factual allegations that scienter exists as to the Fontaine Defendants based on any alleged pin and bolt shearing problem on the flat-decks.

### (3) August 2016 Communication and the Fontaine Webpage Video

With respect to any direct communication between the Fontaine Defendants and Plaintiff, the Complaint alleges only a telephone call from Buchanan, Fontaine's President, on August 5, 2016, during the Harris and Crane presentation.  However, there are no factual allegations in the Complaint that he was asked anything about AAR certification, that he made any representation concerning it or discussed any repair issues on the flat-decks.  As such, there is

34

no untrue statement of a material fact or failure "to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 CFR § 240.10b-5(b) (2010).

With respect to the Fontaine webpage video regarding the flat-decks, the Complaint alleges that this remained on the site from August 2016 through the filing of the Complaint.  The promotional video allegedly stated that the flat-decks are "safer," "stronger" "virtually maintenance free" and able to withstand "punishing conditions associated with rail and highway transportation." Statements such as these are considered "immaterial statements" upon which a reasonable investor would not rely. *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570, 59 Fed. R. Serv. 3d 777, 2004 Fed. App. 0275P, 2004 WL 1873808 (6th Cir. 2004) (statements regarding "commitment to quality, safety, and corporate citizenship" although misleading, are not material since they are "either mere corporate puffery or hyperbole" and no reasonable investor would view them as significantly changing the general gist of available information).

### (4) Conclusion

Having analyzed the allegations of the Complaint regarding scienter as a whole, *Tellabs, Inc.*, 551 U.S. at 326, 127 S.Ct. 2499 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"), the Court concludes that Plaintiff's factual allegations, when considered together, do not give rise to a strong inference that the Fontaine Defendants acted with scienter resulting in Plaintiff's investments in Dektrix on

35

December 5, 2016, and in the ABUA on February 28, 2017. Simply stated, the facts alleged by Plaintiff do not show that any one of the Fontaine Defendants exhibited a "knowing and deliberate intent to manipulate, deceive, or defraud" or that these Defendants engaged in "highly unreasonable conduct which is an extreme departure from the standards of ordinary care" and "akin to conscious disregard" at the time of Plaintiff's investments. *Doshi*, 823 F.3d at 1039. Factually, the Complaint does not state the "strong inference" of scienter that is required under the PSLRA. The scienter alleged must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314.

### b. In connection with the purchase or sale of securities

Plaintiff's § 10(b) violation must also allege facts showing that the representation or omission of the Fontaine Defendants was "in connection with the purchase or sale of securities" or "coincides" with the purchase or sale of securities. *Merrill Lynch Pierce, Fenner & Smith Inc. v Dabit*, 547 U.S. 71, 85 (2006) ("The requisite showing … is deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller." (citation omitted)). This phrase is construed broadly. *Id*.

As alleged in the Complaint, the Fontaine Defendants made certain misrepresentations or omissions of material fact "in connection with" or that "coincide[d] with" Plaintiff's December 8, 2016, investment in Dektrix or later its February 28, 2017, "effective bridge loan." The Complaint alleges that the

Fontaine Defendants made four communications: (1) the republished January and February 2014 press release; (2) the August 4, 2016, Dier letter to Dektrix offering the exclusive use of the flat-decks for two years from the date Dektrix purchases the 73 rented decks; (3) the statement of Buchanan at the August 5, 2016, investor presentation attended by AMP in which he allegedly represented that Fontaine "stands behind" Dektrix; and (4) the promotional flat-deck video on the Fontaine webpage.

Of the four communications in the Complaint that were allegedly made by the Fontaine Defendants, only Buchanan's statement at the August 5, 2016, investment presentation conducted by Harris and Crane was made in connection with or coincided with the purchase or sale of securities. The 2014 republished press releases were nearly three years old at the time of Plaintiff's December 2016 purchase, the August 4, 2016, Marmon letter authored by Dier was addressed to Dektrix and not Plaintiff and, because there are no factual allegations in the Complaint of when Plaintiff became aware of the flat-deck video on Fontaine's webpage, these communications do not satisfy the element of being made in connection with or coinciding with the purchase or sale of securities.  However, by alleging that Buchanan, the president of Fontaine, telephoned in to the August 5, 2016 investor meeting, Plaintiff has satisfied the third element of a § 10(b) claim, that the misrepresentation or omission is in connection with or coincides with the purchase or sale of a security.

37

### c.  Reasonable Reliance on a Material Misrepresentation or Omission

To allege § 10(b) securities fraud against the Fontaine Defendants, Plaintiff must also allege that its investments in December 2016 and February 2017 relied on a material misrepresentation or omission by these Defendants and that the reliance was reasonable.  As to the Fontaine Defendants, the Complaint alleges two misrepresentations or omissions: the flat-deck video on the Fontaine webpage and the 2014 republished Fontaine press releases.

Although the Complaint alleges that the August 2016 Fontaine webpage video is a false communication since it states that the decks were "virtually maintenance free," stronger," "safer" than any other deck and "able to withstand the punishing conditions associated with rail and highway transportation," the Complaint does not allege facts stating when this allegedly false communication was viewed by Plaintiff or that it relied on it before investing.   Additionally, such statements, are not "material misrepresentations" required by §10b-5.  *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d at 570, ("'Immaterial statements include vague, soft, puffing statements or obvious hyperbole' upon which a reasonable investor would not rely.") (quotation omitted); *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670, 2005 Fed. App. 0052A, 2005 WL 264130 (6th Cir. 2005)(public statements affirming the safety or quality of Firestone's tires such as "best tires in the world," "no reason to believe there is anything wrong with [its ATX tires]" and that its products demonstrated "global consistent quality" under "[r]igorous testing under diverse conditions" are

38

"too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision.")

The only communication that Plaintiff alleges it relied on prior to making its initial $350,000 investment in December 2016 is the Fontaine 2014 AAR republished press release which Plaintiff found on the Internet.  While the Report and Recommendations concludes that a "rebuttable presumption of reliance arises" due to the Fontaine Defendants' omissions in failing to correct the 2014 press release, Doc. #43, PageID#596, the Court does not agree.

A rebuttable presumption of reliance arises in two circumstances, neither of which exist herein: (1) if there is an omission of a material fact by one with a duty to disclose in which case the investor, to whom the duty was owed, need not provide specific proof of reliance and (2) where fraud-on-the-market applies since reliance is presumed when the statements in question become public. *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) (no rebuttable presumption of reliance existed since the customers and vendors had no duty to disclose any alleged deceptive acts that were not communicated to the investing public and even if inaccurate financial statements released to the public were based, in part, on the alleged deception of the vendors and customers, their acts were too remote to satisfy the reliance requirement).

As alleged in the Complaint, the Fontaine Defendants had no duty to disclose to Plaintiff in 2016 that the AAR certification claim republished on the

39

Internet by third parties more than two years earlier by separate industry publications was false. There are no allegations in the Complaint that Plaintiff asked the Fontaine Defendants anything about the AAR certification prior to investing, that they made any statement to Plaintiff that was misleading, or that there was any fiduciary relationship between these Defendants requiring them to disclose the lack of an AAR certification.[21] Although the August 6, 2016, telephone call was made by Buchanan to those present at an investor meeting, there are no allegations, as previously stated in this Decision and Entry, that Buchanan said anything false or failed to disclose a material fact concerning the flat-decks. A claim under §10(b) does "not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc., v Siracusano*, 563 U.S. 27, 45, 131 S. Ct. 1309 (2011) (citing 17 CFR § 240.10b–5(b) and *Basic Inc. v. Levinson*, 485 U.S. 224, 239, n. 17, ('Silence, absent a duty to disclose, is not misleading under Rule 10b–5')). As noted by the Supreme Court "[R]eliance is tied to causation, leading to the inquiry whether respondents' deceptive acts were immediate or remote to the injury." *Stonebridge*, 552 U.S. at 149. The alleged deceptive act of not removing from the Internet false claims of AAR certification

---

[21] The Report and Recommendations found that the Dektrix Defendants were not fiduciaries of Plaintiff and recommended dismissal of Count VII, breach of fiduciary duty, as to the Dektrix Defendants. No objection was filed by Plaintiff. There was no allegation made in the Complaint that the Fontaine Defendants acted as fiduciaries.

published by third parties nearly three years prior to its investment in Dektrix, is too remote to satisfy the reliance requirement." *Id.* Although such statements may arguably be fraudulent, "Section 10(b) does not incorporate common-law fraud into federal law." *SEC v. Zandford,* 535 U.S. 813, 820, 122 S. Ct. 1899(2002).

### d. Loss Causation

The last objection of the Fontaine Defendants concerning Count I is that Plaintiff failed to establish loss causation. In order to prove a securities fraud violation, a plaintiff must plausibly allege that "the act or omission of the defendant alleged to violate [the Securities Exchange Act] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

> As pleading requirements go, this one is 'not meant to impose a great burden upon a plaintiff.' (citation omitted) Rather it is meant to prevent disappointed shareholders from filing suit merely because their shares have lost value and then using discovery to determine whether the loss was due to fraud. (citation omitted). Thus, at the pleading stage, a plaintiff need only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.' (citation omitted).

*Norfolk County Retirement System v. Community Health Systems, Inc.,* 877 F.3d 687, 695 (6th Cir. 2017) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

Although the Court is required at this stage to accept the allegations of the Complaint as true and draw all reasonable inferences in favor of the plaintiff, AMP is, nevertheless, required to show a causal connection that their loss, the December 5, 2016 and February 28, 2017, investments was the result of a misrepresentation or omission of the Fontaine Defendants.

41

The Court finds that the allegations of the Complaint have provided "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc.* 544 U.S. at 347. Accordingly, Plaintiff has satisfied this element.

### e. Conclusion

Because AMP has failed to allege facts establishing each element of a § 10(b) securities fraud claim, the objection of the Fontaine Defendants to Count I of the Report and Recommendations is sustained.

### 3. Third Objection of the Individual Fontaine Defendants: The Report Incorrectly Concludes that Count II, Pursuant to § 20(a) of the Exchange Act, States a Claim Against Defendants Buchanan and Prochazka, Doc. #46, PageID#652

Count II of the Complaint alleges violations under § 20(a) of the Exchange Act against the "Individual Defendants" as "controlling persons of Dektrix." Doc. #1, PageID#28. Section 20(a) of the Securities Exchange Act provides that "[e]very person who ... controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." *Doshi*, 823 F.3d at 1045, (quoting 15 U.S.C. § 78t(a)). Accordingly, "the 'controlled person' must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder" and second, "the 'controlling person'… must have directly or indirectly controlled the person liable for the securities law violation." 17 C.F.R. § 230.405. *In re Huntington Bancshares Inc. Securities Litigation*, 674 F. Supp. 2d 951 (S.D. Ohio 2009) (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671,

696 (6th Cir. 2004), *abrogated on other grounds by Matrixx Initiatives*, 563 U.S. 27 (2011).

The Court has sustained the first objection of the Fontaine Defendants as to Count I, finding that Plaintiffs have not pled a violation of § 10(b) securities fraud as to these Defendants and, although not pled by Plaintiff, has included the Marmon Defendants, as did the Magistrate Judge, in its analysis.  Accordingly, no control person liability exists under § 20(a) for Buchanan, Prochazka and Dier.  The Report, however, recommends that this Count not be dismissed as to Buchanan, Prochazka and Dier because of their "high-level position" with Marmon and Fontaine.  Plaintiff, however, pled only the job titles for these three Individual Defendants and, as to Buchanan, alleged simply that he was Prochazka's supervisor.  Doc. #1, PageID#8.  These bare allegations, even considering Fontaine's request to Dektrix to keep the pin-shearing quiet, do not establish that Buchanan, Prochazka or Dier were control persons of Dektrix.  The third objection of the Fontaine Defendants is sustained.

### 4. Fourth Objection of the Fontaine Defendants: The Report Impermissibly Concludes that Count V Pleads a Common Law Fraud Claim against the Fontaine Defendants Because a § 10(b) Claim Was Pled, Doc.#46, PageID#656

Count V of the Complaint alleges "common law fraud" against "Defendants. It alleges ten separate instances of fraud against Defendants and specifically identifies Defendants Marmon and Fontaine in certain of the allegations. Doc. #1, PageID#31-32.  The Report found that a fraud claim was pled

because a § 10(b) claim was pled in Count I against the Fontaine Defendants. The Magistrate Judge included the Marmon Defendants in her analysis. Doc. #43, PageID#565 and 604-605. In this objection, the Fontaine Defendants object on behalf of three individuals, Buchanan, Prochazka and Dier and two corporate entities, Fontaine and Marmon. They assert three reasons in support of their objection.

These Defendants first contend the Report is incorrect in concluding that a fraud claim has been pled against them, merely because a § 10(b) claim was pled, arguing this was wrong, given that the Magistrate Judge failed to consider whether Plaintiff pled a securities fraud claim against Marmon. As stated, the Magistrate Judge included the Marmon Defendants in her analysis of Plaintiff's 10(b) securities fraud claim. The Court, however, has determined that no § 10(b) fraud claim was pled as to either the Fontaine or the Marmon Defendants. As such, the first ground of the Fontaine Defendants' objection is both factually incorrect and, in any event, moot.

These Defendants next assert that if the same reasoning of the Private Securities Litigation Reform Act of 1995 is applied to Count V, common law fraud, then Plaintiff has not alleged a fraud claim. Finally, the Fontaine Defendants argue that the Report incorrectly determined that the Fontaine Defendants had a duty of disclosure to Plaintiff. Before analyzing these reasons, the Court will briefly review the legal elements to state a common law claim for fraud and the pleading requirements pursuant to Fed. R. Civ. P. 9(b).

In *Burr v. Bd. of Cty. Commrs. of Stark Cty.*, 23 Ohio St.3d 69 (1986), paragraph two of the syllabus, the Ohio Supreme Court set forth the legal elements for a cause of action based on fraud.

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Id.*

In addition to pleading the legal elements of fraud, a plaintiff must also comply with Rule 9(b) of the Federal Rules of Civil Procedure and state "with particularity" the circumstances constituting fraud. The rationale for this rule is to (1) alert parties to the particulars of the allegations against them so they can intelligently respond, (2) prevent "fishing expeditions," (3) protect reputations against fraud allegations and (4) whittle down potentially wide-ranging discovery to only relevant matters. *Chesbrough v. VPA, P.C.,* 655 F.3d 461, 466–67 (6th Cir.2011). Accordingly, Rule 9(b) is satisfied when a party's pleading (1) specifies the time, place and content of the alleged misrepresentation, (2) identifies the fraudulent scheme and the fraudulent intent of the defendant and (3) describes the injury resulting from the fraud. *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir.2008).  Despite this additional pleading requirement, the Sixth Circuit has also held that Rule 9(b) "should not be read to defeat the general policy of 'simplicity and flexibility' in pleadings contemplated by the Federal

Rules." *U.S. ex rel. SNAPP, Inc.* at 503-04 (quoting *Michaels Bldg Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 678 (6th Cir. 1988).

> The Sixth Circuit has explained that '[s]o long as a [party] pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met.

*MyVitaNet.com v. Kowalski*, No. 2:08cv48, 2008 WL 2977889, at *5, 2008 U.S. Dist. LEXIS 57745, at *14 (S.D. Ohio July 29, 2008) (citing *United States v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir.2008)).

The Court finds that the Fontaine Defendant's second reason in support of their objection, that the Court's reasoning on the Private Securities Litigation Reform Act from Count I should be applied to Count V, is without merit.  A claim for common law fraud need not meet the stringent requirements for securities fraud under the PSLRA, and Plaintiff satisfies the pleading requirements of Rule 9(b) as to representations and omissions made by the Marmon and Fontaine Defendants.  As to these Defendants, Plaintiff alleges with particularity a number of misrepresentations and omissions including the nature of the allegedly fraudulent AAR certification press release, the Fontaine webpage video, the August 4, 2016, letter to Dektrix from Marmon stating its support for Dektrix, and the statement of support made by Buchanan at the August 5, 2016, investor meeting.  Factual allegations detailing who made allegedly fraudulent statements or failed to make certain disclosures and where and when this occurred are alleged in the Complaint.  The alleged fraudulent scheme, intent and damages to Plaintiff are also alleged in the Complaint.  As a result, these Defendants possess

sufficient information to respond to the allegation of fraud. *U.S. ex rel. Sheldon v Kettering Health Network*, 816 F.3d 399 (6th Cir. 2016) (citing *SNAPP I*, 532 F.3d at 504). Accordingly, the factual allegations of the Complaint satisfy Rule 9(b) and this ground of the Fontaine Defendants' objection is without merit.

With respect to the Fontaine Defendants third reason, that the Magistrate Judge erred in finding that the Fontaine Defendants had a duty of disclosure to Plaintiff in a fraud claim, the Court notes that this point was made in connection with the Report's analysis of Plaintiff's 10(b) securities fraud claim and not AMP's common law fraud claim alleged in Count V.

The Fontaine Defendants objection as to Count V, common law fraud, is overruled.

### 5. Fifth Objection of the Fontaine Defendants: The Report Erroneously Concludes that Plaintiff Adequately Pled Unjust Enrichment Against the Fontaine Defendants, Doc.#46, PageID#657

In Count VIII, AMP alleges unjust enrichment against all Defendants. It alleges that "Defendants. . .came into possession of the payments, investment and loan money" and "enjoyed the use, benefits, and privileges of possession. . . in their fraudulent business activities and self-dealing." Doc. #1, PageID#36. The Magistrate Judge recommended that the Motion to Dismiss of the Fontaine Defendants be denied as to Plaintiff's unjust enrichment claim.

> Yet, the Complaint succeeds in alleging that Fontaine received a benefit from Plaintiff's bridge loan to Dektrix. It states, "Defendant Harris reported to Plaintiff that Defendants Prochazka and Fontaine had agreed to accept Plaintiff's money as a 'refundable deposit should things not go as we had hoped.' Dektrix wired $50,000 of

47

Plaintiff's money to Fontaine on March 1, 2017." (Doc. #1, ¶60). This
was a significant financial benefit to Fontaine.

Doc. #43, PageID#614.

This benefit occurred, according to the Report, when Dektrix wired $50,000
of Plaintiff's money to Fontaine on March 1, 2017, and this Defendant "used
$22,800 of the loan money to repay Dektrix's debt to Redlands." *Id*. In return,
Fontaine received its flat-decks that Redlands, Dektrix's creditor, was holding as
collateral, thus obtaining a benefit from Plaintiff's $100,000 investment. *Id*.

To prove an unjust enrichment claim, a plaintiff must establish that it
conferred a benefit on the defendant, that the defendant had knowledge of the
benefit and retained it under circumstances where it would be unjust for him to do
so without payment. *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179,
183, 465 N.E. 2d 1298. The Fontaine Defendants argue that no claim for unjust
enrichment has been pled since Fontaine used $22,800 to pay a Dektrix creditor to
receive its own property and returned $27,200 to Dektrix. Doc. # 46, PageID#658.

The Fontaine Defendants are correct that merely because one party has
been enriched does not result in a claim of unjust enrichment, *U.S. Health
Practices, Inc. v. Byron Blake, M.D. Inc.*, No. 00AP–1002, 2001 Ohio App. LEXIS
1291, at *6, 2001 WL 277291, at *2 (Mar. 22, 2001) (citation omitted) (plaintiff's
unjust enrichment claim not established where defendant physician, although
receiving fees and  increased capacity to treat patients without paying salary of
plaintiff's physician, made no money from his association with plaintiff while

48

plaintiff's physician who worked with defendant received growing client base and invaluable experience from defendant). A plaintiff must show "a superior equity," making it "unconscionable for the defendant[s] to retain the benefit." *Directory Servs. Group v. Staff Builders Int'l, Inc.*, No. 78611, 2001 *838 Ohio App. LEXIS 3108, at *7, 2001 WL 792715, at *3 (July 12, 2001). Additionally, there must be a "tie of causation" between the loss and the gain. *Fairfield Ready Mix v Walnut Hills Associates, Ltd.*, 60 Ohio App. 3d 1 572 N.E. 2d 114 (1988).

Construing the factual allegations in favor of Plaintiff, a claim of unjust enrichment has been pled as to Defendants Fontaine and Marmon. As alleged, Fontaine "is owned and operated by Marmon," Doc. #1, PageID#8, and the Fontaine letter to Redlands demanding return of the flat-decks indicates that it is a Marmon company. Doc. #1-7. Accordingly, the fifth objection of the Fontaine Defendants is overruled as to Defendants Fontaine and Marmon.

For the reasons set forth above, the objections of the Fontaine Defendants are sustained as to Count I, Section 10(b) of the Exchange Act and Rule 10(b)-5, Count II, § 20(a) of the Exchange Act, and overruled as to Count V, common law fraud, and Count VIII, unjust enrichment.

## C. Objections of the Dektrix Defendants

The Dektrix Defendants have filed 18 objections to the Report and Recommendations. The first 12 objections relate to the Report's findings concerning Count I, § 10(b), of the Complaint. Objection 13 to the Report concerns

Count V, common law fraud, and Objections 14, 15, 16 and 17 relate to Count VI,

breach of contract.  Finally, Objection 18, relates to the Report's findings regarding

Count VIII, unjust enrichment.

1. **Count I, Violations of § 10(b) of the Exchange Act and Rule 10(b), Objections 1-12, Doc.# 48**

The Dektrix Defendants contend that Plaintiff alleged theories of securities

fraud "based on material misrepresentations or omissions" and that the Report

ultimately made factual findings concerning these theories that are "based on

impermissible inferences" and "not supported by the allegations of the

Complaint." Doc. #48, PageID#667.  The theories identified by the Dektrix

Defendants' first 12 objections relate to the following: (1) the AAR certification of

the decks (Objections 1, 2, 3, 4 and 5); (2) the failure to disclose the mechanical

condition or safety of the decks (Objections 6, 7 and 8); (3) the failure to use

Plaintiff's investment money to purchase decks (Objection 9); (4) the financial

condition of Dektrix's business (Objections 10 and 11); and (5) the second

investment, the $100,000 "effective bridge loan" (Objection 12).

The Court will analyze each objection separately using the theory identified

by the Dektrix Defendants.

a. **The AAR Certification of the Fontaine Decks: Objections 1, 2, 3, 4 and 5 (Falsity, Justifiable Reliance and Loss Causation), Doc #48, PageID#668-677**

The first five objections of the Dektrix Defendants concern the Magistrate

Judge's finding that the Complaint pled facts establishing that the Dektrix

Defendants misrepresented that the flat-decks were AAR certified. The objections

contend that the Complaint does not plead that the Dektrix Defendants (1) made a

false or misleading material misrepresentation or omission, in 2016, that the flat-

decks were AAR certified; (2) that Plaintiff justifiably relied on any such

misrepresentation and that (3) loss causation was pled.

The Report cites to an AAR reference in the Private Placement

Memorandum, under the section "Competition." The PPM, a 118-Page single

spaced document, Doc. 1-1, PageID##38-155, was given to Plaintiff on or about

August 6, 2016, some four months before their $350,000 payment to Dektrix. Doc.

#1, PageID#11. The relevant portion, which is the concluding paragraph of the

"Competition" section of the PPM, reads as follows:

> Other trailer manufacturers could produce a competitive deck
> product but it may take up to three years from the time they make the
> decision to get into the market to design around the Fontaine patents,
> test the equipment and go through several production models before
> the competitive deck would be ready for AAR approval to operate on
> Class 1 railways.

Doc. 1-1 PageID# 74.

Based on this language, the Report stated that the "Private Placement

Memo used AAR certification as a means of misleading potential investors into

thinking Dektrix held a strong competitive advantage." Doc. #43, PageID#574. The

Report further stated that

> [R]eading this in Plaintiff's favor reinforces the significance of AAR
> approval for intermodal flat[-]decks and the need for a Dektrix
> competitor to obtain AAR approval to operate on Class 1 railways.
> This, in turn, invites the reasonable inferences that Dektrix has a

significant head start on potential competitors and a strong competitive advantage over their foes in the marketplace because the AAR had already certified the Fontaine Flat[-]Deck.

*Id.*

The Dektrix Defendants argue that this isolated statement in the "Competition" section of the Private Placement Memorandum did not state that it had AAR certification and is nothing more than a promotional statement concerning Dektrix's competitive strategy. "Accordingly, the [Report and Recommendations] erred in jumping to the conclusion that Dektrix's claimed competitive-advantage could only come from Fontaine decks already being AAR certified." Doc. #48, PageID#679. These Defendants contend that Plaintiff knew that Dektrix had already put the decks in operation and that ultimately the Magistrate Judge "ignored the only plausible conclusion: that Dektrix's competitive advantage comes from having decks ready for either AAR approval or otherwise ready to operate on Class 1 railways." *Id.* Dektrix affirmatively represented in the PPM that it "had obtained operating authority for all Class 1 railways in North America." Doc. 1-1, PageID#61.

Although the one statement in the Private Placement Memorandum did not affirmatively represent that the Fontaine intermodal decks had AAR certification, it is not, as the Dektrix Defendants argue, "soft information" since Plaintiff alleged additional facts showing that the Dektrix Defendants had knowledge of the lack of an AAR certification. *Omnicare, III,* 769 F.3d at 470 (citing *Omnicare I*, 583 F.3d at 945–46)("When an alleged misrepresentation concerns 'soft information,' which

'includes predictions and matters of opinion' (citations omitted), a plaintiff must additionally plead facts showing that the statement was 'made with knowledge of its falsity'"). In addition to the statement in the PPM, the Complaint alleges that Crane was a member of the Intermodal Operations Committee of AAR in 2013-14, Doc. #1, PageID#14, and "had actual knowledge of the lack of certification from a May 20, 2015, email, sent to him by Michael Lesniak with the AAR." Doc. #1, PageID#21. Crane, however, never disclosed the lack of AAR certification to Plaintiff until April 2017. Finally, the Complaint alleges that during an investor meeting on August 5, 2016, Crane, in response to a question about AAR certification, stated the following:

> Yes, ok, the Association of American Railroads. It's, they're called the AAR. They're the largest governing body in the world, so even the steam trains from Europe and things come over and are tested here under their guidance in Pueblo, Colorado.

*Id.*, PageID#13.

Based on these allegations from the Complaint, and as stated by the Magistrate Judge, "[T]he Dektrix Defendants had an affirmative duty to disclose." Doc. #43, PageID#577. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, 131 S.Ct. 1309, 1321 (2011) (disclosure required under § 10(b) and Rule 10(b)(5) only "to make ... statements made, in the light of the circumstances under which they were made, not misleading." citing 17 CFR § 240.10b–5(b)); *Omnicare, III,* 769 F.3d at 471 ("A duty to affirmatively disclose 'may arise when there is. . . an inaccurate, incomplete[,] or misleading prior disclosure.'"(citation omitted)).

53

The first three objections of the Dektrix Defendants are overruled.

The fourth objection of the Dektrix Defendants is that Plaintiff did not justifiably rely on any representation or omission from the Dektrix Defendants regarding AAR approval.  As seen in the previous discussion, the Detkrix Defendants had a duty to disclose the omission of this material fact, i.e., that there was no AAR certification for the flat-decks. Failure to make such a disclosure in this instance results in a rebuttable presumption of reliance. *See Stoneridge*, 552 U.S. at 159 ("a rebuttable presumption arises … if there is an omission of a material fact by one with a duty to disclose …..").  The fourth objection of the Dektrix Defendants is overruled.

The fifth and final objection of the Dektrix Defendants, regarding the issue of the lack of an AAR certification for the flat-decks, is that Plaintiff "failed to tie any loss it experienced" to any alleged false AAR certification. "As pleading requirements go, this one is 'not meant to impose a great burden upon a plaintiff.'" *Norfolk County Retirement System,* 877 F.3d at 695 (quoting *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 347, (2005)). The allegation must provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.*  The Court finds that Plaintiff has provided the Dektrix Defendants "with some indication of the loss and the causal connection" for its § 10(b)5 claim. The fifth objection is overruled.

### b. The Condition of the Decks: Falsity and Justifiable Reliance, Objections 6, 7 and 8, Doc.#48, PageID#678-682

The Dektrix Defendants sixth and seventh objections concern findings in the Report and Recommendations that the Dektrix Defendants either misrepresented or failed to disclose material facts concerning repairs to the flat-decks. The sixth objection states that the Magistrate Judge "erred in finding that Dektrix owed a duty to disclose" to Plaintiff about the repairs performed on the decks in 2015 due to "pin shearing." The seventh objection concerns the Report's finding that the Dektrix Defendants "failed to disclose known mechanical problems (in the decks) prior to Plaintiff's second investment" made on February 28, 2017.

The findings of the Magistrate Judge objected to by the Dektrix Defendants in the sixth and seventh objections are based on an August 21, 2017, email from Harris that was forwarded to Plaintiff. Doc. #1, PageID#23. The Harris email discusses "pin-shearing," which occurred shortly after Dektrix put the decks in service in 2015, and "bolt-shearing" of the decks, discovered by the Dektrix Defendants in January 2017.[22] According to the Harris email, Fontaine's repairs of the pin-shearing in 2015 were "shoddy," the solution only "exacerbated the problem" and although Dektrix "limped along for several months" with Fontaine trying different possible fixes, [T]he problem was never adequately resolved." *Id.* The bolt-shearing problem referenced in the Harris email was discovered by

---

[22] As stated earlier in this Decision and Entry, the Court assumes that the flat-decks "bolt-shearing" problem and "pin-shearing" problem are the same issue.

Dektrix in January 2017 when it inspected the decks in California and Chicago.  In

conjunction with this January 2017, inspection, Harris stated that "we realized the

entire fleet was unfit to service the Constellium contract" and when they advised

Buchanan, Prochazka called and said that "Fontaine would be calling back all the

decks." *Id.*, PageID##23 and 24.

Based on the Harris email, the Report and Recommendations concluded

that "Dektrix had an affirmative duty to disclose safety and security issues with

the Fontaine Flat[-]Decks in 2015." Doc. #43, PageID#579.

> Accepting these facts as true, they identify crucial intelligence
> about the Fontaine Flat[-]Deck that a reasonable investor would have
> viewed as significantly altering the mix of information it received
> about the safety and quality of the Fontaine Flat[-]Deck. Not only
> would such information be pertinent to whether Dektrix could fulfill
> its shipping contracts, it potentially exposed Dektrix to liability for
> personal or property damage caused by shearing bolts. Both events
> were possible, thus exposing Dektrix to much greater financial risk
> than Plaintiff knew about. Consequently, Dektrix had an affirmative
> duty to inform Plaintiff about the "never adequately resolved" (Doc.
> #1, ¶71) pin-shearing problem before Plaintiff invested in and loaned
> money to Dektrix.

Doc. #43, PageID#580.

The Dektrix Defendants argue that the Report "conflates" Dektrix's duty to

disclose a past repair history" and "whether Dektrix owed a duty to disclose

Harris's dissatisfaction with a past repair problem."  Doc. #48, PageID#678. These

Defendants contend that although the repairs were crudely done, they were, in

fact, made and even Plaintiff "alleges, without any claim of falsity, that Dektrix

moved hundreds of loads on the decks through 2016 without any safety

problems." Doc. #48, PageID#678.  Finally, the Dektrix Defendants assert that §
10(b) does "not create an affirmative duty to disclose any and all material
information" and that "[D]isclosure is required under these provisions only when
necessary 'to make ... statements made, in the light of the circumstances under
which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (citing
17 CFR § 240.10b-5(b).  As such, "Dektrix owed no duty to disclose the past,
effective repairs.  Nor was the duty to disclose triggered by any Dektrix affirmative
representation regarding repair history." Doc. #48, PageID#679.

Although the Complaint does not allege that any representation was made
by the Dektrix Defendants regarding the repair history of the decks so that any
affirmative duty to disclose these repairs was created, the Complaint does
sufficiently allege that Dektrix represented that its business was growing, it
"currently has more demand for its decks than it can satisfy with 73 decks" and it
"is currently taking steps to secure additional decks and fund its ongoing growth."
Doc. #1, PageID##16 and 17. The Complaint also alleges that the investor
presentations included copies of the August 4, 2016, offer letter from Dier
concerning an exclusive opportunity to Dektrix concerning the flat-decks.  These
factual allegations, for purposes of a motion to dismiss, collectively create
"enough facts to state a claim to relief that is plausible on its face" and crosses
"the line from conceivable to plausible." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.
The Court agrees with the Magistrate Judge that "a reasonable investor" would
have viewed information of the repair history of the decks "'as having

57

significantly altered the "total mix" of information made available.'" *Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 232, quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). This is particularly true, given that the Harris email states that Dektrix "limped along for several months" and that [T]he problem was never adequately resolved." Doc. #1, PageID#23. The sixth objection of Dektrix is overruled.

The seventh objection concerns known mechanical problems with the decks prior to Plaintiff's second investment of $100,000 on February 28, 2017.  For the reasons stated above, this objection is overruled.  Because there are enough facts alleged, for purposes of a motion to dismiss, "to state a claim to relief that is plausible on its face" and crosses "the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955, the Dektrix Defendants should have disclosed the bolt-shearing problem it discovered in January of 2017 before Plaintiff entered into the Assignment of Beneficial Use of Assets on February 28, 2017.[23]

The eighth objection of the Dektrix Defendants claims that the Magistrate Judge "erred in failing to analyze whether Plaintiff justifiably relied on any misrepresentation or omission regarding the condition of decks." Doc. #48,

---

[23] Although the Dektrix Defendants assert that "Plaintiff inspected the Decks before making any additional investment. Doc. #20, PageID# 232-233," and "Plaintiff researched Fontaine's website which disclosed the repairs needed to upgrade the decks.  Doc. #1, ¶45," the Court was unable to find support in the Complaint or exhibits for these statements.

PageID#681. These Defendants assert that "[I]t is implausible that Plaintiff would invest in 2017 despite knowing of an *unrepaired* mechanical defect but would not have invested in December 2016 if it had known about a repaired mechanical defect." Doc. #48, PageID#681. They argue that the Report never addressed the issue of reasonable reliance and that this Court should therefore review it, "*de novo*, and dismiss the allegations of fraud related to the AAR certification, "because Plaintiff's allegations precludes [sic] an inference that the lack of AAR certification was the cause of their damages." Doc. #48, PageID#682.[24]

Having conducted its *de novo* review pursuant to 28 U.S.C. § 636(b)(1), the Court finds that reliance, "the essential element of the § 10(b) private cause of action," *Basic Inc.*, 485 U.S. 243, has been sufficiently alleged and that Plaintiff reasonably relied on the decks not having a significant and unresolved repair history or any issue that would result in their inability to be used for their intended purposes. Plaintiff alleges that Dektrix stated it "currently has more demand for its decks than it can satisfy with 73 decks" and it "is currently taking steps to secure additional decks and fund its ongoing growth" Doc. #1, PageID##16 and 17. These allegations, coupled with the investor meetings and discussions with Plaintiff of the exclusive offer for Dektrix to purchase decks from Fontaine, made it reasonable for Plaintiff to rely on the decks having no material repair issues.

---

[24] The Court has previously overruled objections 1 through 4 of the Dektrix Defendants concerning the AAR certification of the decks.

The Court overrules the eighth objection of the Dektrix Defendants.

### c. The Use of Investment to Purchase Decks: Objection 9 (Falsity), Doc. #48, PageID#682

In their ninth objection, the Dektrix Defendants assert that the Report "erred in finding a duty to use Plaintiff's investment solely to buy decks." Doc. #48, PageID#682. In support of this objection, these Defendants refer the Court to its objections under "Section VIII, Breach of Contract."[25]  *Id.*, PageID#688.

Although the Report does not state that any "duty" existed, the Magistrate Judge did find that it was a "material misrepresentation" for the Dektrix Defendants not to disclose that investment funds would be used for purposes other than purchasing flat-decks. Doc. #43, Doc. #581-582. According to the Report, this non-disclosure was a material misrepresentation, because it "painted an inaccurate and incomplete portrait of Dektrix's ability to perform its obligations under current and future shipping contracts and its ability to profit from the strong competitive advantages it professed to have in the intermodal-shipping market." *Id.*

As alleged by Plaintiff, the first investment it made in Dektrix occurred on December 5, 2016, the date it executed the MPA and wired $350,000 to Dektrix. In return, Plaintiff received 70,000 preferred membership units in Dektrix. AMP's second investment occurred on February 28, 2017, the date it executed the

---

[25] The Court assumes that the Dektrix Defendants are referring to Section VIII, Doc. #48, PageID##688-693. This section includes objections 14, 15 and16.

Assignment of Beneficial Use of Assets, and made "an effective bridge loan" to

Plaintiff of $100,000.

Although not determinative in deciding whether a § 10(b) securities fraud

claim under Count One is alleged against these Defendants for not using Plaintiff's

investment to purchase flat-decks, the Report's analysis of the Membership

Purchase Agreement contract is helpful. [26]  As the Magistrate Judge succinctly

stated, no provision in the MPA contains the phrase "'Seller shall purchase 73

Fontaine Flat[-]Decks,' or the like." Doc. #43, PageID#606.[27]  As to Plaintiff's second

investment, the Report stated that because the MPA "survives the Dektrix

Defendants' present attacks, it would be superfluous to presently address whether

a second contract existed and, if so, whether Defendants breached it." Doc. #43,

PageID#609.  The Court notes, however, that the Assignment of Beneficial Use of

Assets, like the MPA, contains no provision stating that Dektrix shall use the

$100,000 to "purchase 73 Fontaine Flat[-]Decks, or the like." Doc. #20-1,

PageID#273.

Although neither of the two contracts requires Dektrix to use Plaintiff's

investment money solely for the purchase of flat-decks, the Complaint alleges that

oral representations were made by Harris and the Dektrix Defendants that

---

[26] Both Plaintiff and the Dektrix Defendants refer to the MPA, Doc. #1-5, as a "contract."

[27] The Report ultimately found that dismissal of Plaintiff's breach of contract count was not warranted since the MPA was deemed to be "ambiguous" due to language in the MPA regarding a "security interest" in the flat-decks. *Id.*, PageID#608-609.

Plaintiff's investments would be used for that purpose. Doc. #1, PageID##11, 32-33 and 35. In reviewing the Membership Purchase Agreement, the Report found that a provision granting Plaintiff a second lien on the first 73 flat-decks purchased was ambiguous. Doc. #43, PageID#608. Accordingly, although the Court does not find that these two contracts are the source of any "duty" by the Dektrix Defendants to use Plaintiff's investment to purchase decks, factual allegations of material misrepresentations are alleged that Plaintiff's investments would be used to purchase Fontaine flat-decks. Because the Court is required to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff," *Handy-Clay*, 695 F.3d at 538 (quotation omitted), the ninth objection is overruled.

### d. The Financial Condition of Dektrix: Falsity and Scienter, Objections 10 and 11

In their tenth objection, the Dektrix Defendants state that the Report "erred in finding that "Defendants also intentionally or recklessly misled Plaintiff by failing to forewarn it about Dektrix's poor financial health in the fall of 2016." Doc. #43, PageID#585-586. The eleventh objection states that the "Report erred in concluding that Plaintiff established a strong inference of scienter because 'Dektrix held a strong motivation not to tell Plaintiff about this because Dektrix's poor financial health presented a serious impediment to obtaining Plaintiff's[,] or a reasonable investor's[,] investment or bridge loan.' Doc. #43, PageID#586." Doc. #48, PageID#684. The Court will analyze each of these objections separately.

62

**(1) Tenth Objection**

The Dektrix Defendants contend that the Magistrate Judge "overlooked Dektrix's many citations to where '[t]he [Private Placement Memorandum] details Dektrix's financial standing, quarter by quarter, including disclosure of financial losses (in the millions). Doc. #39, PageID#475 (citing Doc.#1, PageID## 93-96); Doc. #20, PageID##230-231 (quoting risk factors from PPM)." Doc. #48, PageID#682. Based on this information in the PPM, they contend that there was full disclosure of Dektrix's financial situation in 2016. The Private Placement Memorandum, which Plaintiff received in early August 2016, lists Dektrix's monthly financials from January 2015 through June 2016, showing a negative net income of over $1.4 million. Doc. #1-1, PageID#93. It also discloses that the rental agreement that Dektrix had with Fontaine for the flat-decks was "an escalating rental agreement" and "in late 2015, it had weeks with no freight moving." Doc. #1-1, PageID##97and 99. In the first quarter of 2016, the PPM states that the competition "forced Dektrix to 'drop the price' and 'sacrifice margin'" and in the second and third quarters of 2016, Dektrix "'experienced [] significant challenges' including 'sporadic waves' of work'" which resulted in 'suspended shipping' by Dektrix." *Id.*, PageID##100, 101 and 103. Finally, the PPM states that "We [Dektrix] require additional capital to continue development of our products and to fund day-to-day operations." Doc.#1-1, PageID#51.

The second page of the Private Placement Memorandum states that the securities are "speculative," that Dektrix "is in its development stage, has a

limited history of earnings and is subject to all of the risks inherent in a new business enterprise." As an investor, Plaintiff was also warned that it should "be able to withstand a total loss of their investment. . . "*Id.*, PageID#40. Finally, the Private Placement Memorandum contains a separate section entitled "Risks." This section of the PPM states that Dektrix "is still within its development stage, meaning it has had limited revenues from sales of products or services. . . has a limited operating history which began in January 2015." *Id.*, PageID#51. It also includes the statement that "[T]he profit potential of our business is unproven and speculative." *Id.*, PageID#51.

Although the Private Placement Memorandum was received by Plaintiff and is attached to the Complaint, the Complaint also alleges that the Dektrix Defendants sent an email to Plaintiff on July 28, 2016. Portions of this email state that

> Dektrix is not a start-up company. . . [i]t has moved freight every month since April of 2015 . . . has two yards, 17 FTE employees (both W-2 and 1099 contractors). . . has moved over 814 loads of freight. . . has billed more than $2.5M in sales. . . has obtained all of its operating authorities as well as broker authorities. It is authorized to operate on all class 1 railways in North America. . . It has a fleet of 73 decks and nine 2016 Freightliner tandem axel day cabs which it leases from Penske. . . Dektrix has executed multiple carrier agreements and has current contracts and relationships with the logistics executives at several companies.

Doc. #1, PageID#9.

The Complaint also cites to topics in the PPM, "highlighting the company's various achievements and milestones. *Id.*, PageID#15-17; Doc. 1-1, PageID##60-62.

Because this is a motion to dismiss and the Complaint alleges "'sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face,'" *Ohio Pub. Employees Retirement Sys.*, 830 F.3d at 383 (citation omitted), the tenth objection is overruled.

### (2) Eleventh Objection

The Dektrix Defendants assert that this objection should be sustained because "[T]he R&R improperly used motive and opportunity to establish scienter."  In support they cite *In re Comshare Inc. Securities Litigation*, 183 F.3d 542, 549(6th Cir. 1999) (scienter not established by motive and opportunity to commit securities fraud).  The Magistrate Judge, however, did not find that "a strong inference of scienter" was based on Dektrix's "strong motivation" not to disclose to Plaintiff its "poor financial health."

A review of this portion of the Report regarding the Dektrix Defendants' scienter shows that it addresses more than Dektrix's "strong motivation" not to disclose Plaintiff's "poor financial health."  The Report states that "the material omissions at issue- - -especially the non-AAR certification and the not-fixed bolt-shearing problems- - -painted a far rosier portrait of Dektrix than its actual ability to utilize Fontaine Flat[-]Decks to revolutionize the shipping industry (using its words)."Doc. #43, PageID#585.  These material omissions, also described in the

65

Report as "intentional or reckless conduct"' are supported by Harris's August 2017 email. *Id.*

The Report states that the "poor financial health did not come to light until the January 30, 2017 letter" that Prochazka sent to Harris declaring a default for "continued failure" to pay rent and not maintain the decks. *Id.*, PageID#586. The statement in question reads "*Additionally*, Dektrix held a strong motivation not to tell Plaintiff about this because Dektrix's poor financial health presented a serious impediment to obtaining Plaintiff's. . . investment or bridge loan." *Id.* (emphasis added).

The eleventh objection is overruled.

### e. Plaintiff's Second Investment and Scienter: Objection 12, Doc. #48, PageID#685

The Dektrix Defendants final objection concerning Count I is that the Magistrate Judge erred in finding that they acted with scienter in soliciting $100,000 from Plaintiff on February 28, 2017. These Defendants argue that the Report finds scienter only by erroneously concluding from the Complaint that (1) Dektrix did not believe that the decks were repairable, (2) Dektrix was continuing to mislead Plaintiff by minimizing the bolt-shearing problem, (3) Dektrix never used the "bridge loan" proceeds to purchase Fontaine flat-decks and (4) Dektrix falsely represented that the Constellium contract was in place in May 2017.

In order to establish scienter, the Complaint must allege facts showing that the Dektrix Defendants, at the time they were soliciting Plaintiff's second

66

investment, were engaged in a "knowing and deliberate intent to manipulate, deceive, or defraud" AMP or that they did so with recklessness. *Doshi*, 823 F.3d at 1039 (citation omitted). In examining the allegations of the Complaint holistically, *Tellabs, Inc.*, 551 U.S. at 326, the Court finds that scienter was pled.

The Complaint alleges that as of January 25, 2017, the Dektrix Defendants knew that "about 50% of the fleet have [sheared] bolts on both the front and rear hub [brake] assemblies . . ." and yet in early February 2017, continued to represent to others, including Plaintiff, that they "had working active broker-carrier contracts in place including with. . . Constellium." Doc. #1, PageID#19. The Complaint further alleges that in response to the January 25, 2017, letter from Dektrix regarding the sheared bolts, the Marmon and Fontaine Defendants wrote to the Dektrix Defendants on January 30, 2017, terminating the existing lease and demanding prompt return of all decks. Plaintiff alleges that on February 7, 2017, the Dektrix Defendants represented to Plaintiff that the termination of the existing lease was "short-term" and that any issues regarding [sheared] bolts was repairable and could be resolved. [28]

---

[28] The Complaint also alleges that in the February 7, 2017, time frame the Dektrix Defendants did not provide Plaintiff "any indication that the Marmon and Fontaine Defendants were seeking not only the return of all decks, but were actively seeking to physically destroy such decks on the basis that they were unfit, defective, and otherwise unsafe and could no longer be warranted." Doc. #1, PageID#19. Doc. 1-7, however, shows that statements that Fontaine claimed that the decks were "unfit, defective, and otherwise unsafe were not made until May 24, 2017. Additionally, neither the January 30 nor the May 24, 2017, letters state that Fontaine intended to "physically destroy" the decks.

Finally, the  Complaint alleges that Plaintiff was forwarded the Harris email dated August 21, 2017, stating that the repairs to the flat-decks suggested by Fontaine in early January only made the pin-shearing worse, that the problem "was never adequately resolved" and that after inspecting the flat-decks in January 2017, they "realized the entire fleet was unfit to service the Constellium contract." Doc. #1, PageID#23.

With respect to the ABUA, Plaintiff alleges that "[T]he terms and conditions of the Agreement required the $100,000 bridge loan to be used for the purchase of assets in the form of Fontaine trailer decks." *Id.* This document, however, does not require that Dektrix use the $100,000 it received from Plaintiff to purchase flat-decks.  Instead, the ABUA only sets forth the terms of repayment to Plaintiff, permits Dektrix to use the "specific intermodal flat-deck assets" owned by Plaintiff and states that there is an "attached addenda to this agreement, which addenda shall specify the make, model and serial number of each assigned asset." *Id.* at PageID#273. No flat-decks are listed on Addendum A to the ABUA.

Although the language of the ABUA does not show any requirement that the $100,000 would be used to buy decks, Plaintiff alleges that this was the basis upon which the money was given to Dektrix and relies on a provision in the Membership Purchase Agreement granting Plaintiff the right to a second lien "on any of the first 73 intermodal flat-racks the Seller purchases. . ."  The Report found that this second lien provision created an ambiguity.  As such, the intent of the

parties can be ascertained by the introduction of parol evidence. *Illinois Controls, Inc. v. Langham*, 70 Ohio St.3d 512, 521, 639 N.E.2d 771 (1994).

Based on these allegations from the Complaint, the twelfth objection is overruled.

### 2. Count V, Fraud, Objection 13, Doc. #48, PageID#687

Count V alleges fraud against 12 "Defendants, collectively and individually." Doc. #1, PageID#31.  The Dektrix Defendants object to the Report stating that "[T]he R&R errantly concluded that 'Because Plaintiff's Rule 10(b) claim survives PSLRA review, Plaintiff's common-law fraud claim survives for the same reasons.'" Doc. 43, PageID#604.  The Dektrix Defendants state that they do not contest this statement in the Report.  They argue, however, that Plaintiff has not pled "sufficient claims under Rule 10(b)," and "for the same reasons Plaintiff's 10(b) claims fail, their common-law claim fails as well." Doc. #48, PageID#688.

The Court, however, has overruled Dektrix's objections to Count I.  Moreover, the standard for a securities fraud § 10(b) claim is more stringent than a claim for fraud.  Accordingly, the thirteenth objection is overruled.

### 3. Count VI, Breach of Contract, Objections 14, 15, 16 and 17, Doc. #48, PageID##688, 691 and 693

Count VI, breach of contract, is alleged against the "Dektrix Defendants," a group consisting of three corporate entities and four individuals. Although the words "agreements" and "the agreement" are referenced in this count, no contract is identified. Doc. #1, PageID#33-34.  The factual allegations of the

Complaint, however, reference two agreements: the Membership Purchase

Agreement and the Assignment of Beneficial Use of Assets. The MPA was

entered into between the assignees of Plaintiff and Dektrix. Doc. #1-5. The parties

to the ABUA are Dektrix Trans and Plaintiff. Doc. 20-1, PageID#275. Plaintiff's

breach of contract alleges that "representations" were made in conjunction with

the "agreements" and that Defendants

> materially breached their contractual duties. . .as set forth in the
> Agreements including but not limited to failure to use the money as
> required by the contracts, failure to provide security interests in the
> Evolution Intermodal Flat[-]Decks as required by the contracts, and
> spending the money for their own benefit instead of the benefit of
> Dektrix or its members and investors.

Doc. #1, PageID#33.

In analyzing Count VI, the Magistrate Judge found that the Membership

Purchase Agreement has no provision in it stating that Dektrix "shall purchase 73

Fontaine Flat[-]Decks,' or the like." Doc. #43, PageID#606. The Report also finds,

however, that the MPA is ambiguous because it contains language regarding a

"security interest" in the flat-decks. As alleged by Plaintiff, this language

"demonstrates the parties' intent that the $350,000 would be used toward the

purchase of the first 73" flat-decks. Doc. #1, PageID#18. The relevant security

interest language reads as follows:

> Seller [Dektrix] hereby grants Buyer [Plaintiff] the right to a second
> lien position, which may be evidenced by the Buyer filing a UCC-1 on
> any of the first 73 intermodal flat-racks the Seller purchases [and] it is
> expressly understood by both parties that a 1st lien position will most
> likely be held by the individual or entity extending credit for the
> acquisition of those intermodal flat-racks and that any security

interest herein afforded to the Buyer shall be subordinate to those of the 1st lien holder, without cost to Dektrix, LLC.

Doc. #1, PageID#18; Doc. #1-5, PageID#170.

Although there is no similar language in the ABUA regarding security interests, the Report states that that because the Membership Purchase Agreement "survives the Dektrix Defendants' present attacks, it would be superfluous to presently address whether a second contract existed and, if so, whether Defendants breached it." Doc. #43, PageID#609. The Magistrate Judge recommends that the breach of contract claim against the Dektrix Defendants for both the Membership Purchase Agreement and the ABUA not be dismissed.

The three objections of the Dektrix Defendants to Count VI only reference the MPA and do not address the ABUA.

Objection 14 states that the Report "failed to dismiss non-parties to the MPA (including individual Dektrix Defendants)." Objections 15 and 16 are closely related. Objection 15 states that the Magistrate Judge "erred in finding that the MPA 'must be seen as showing the parties' intent that Dektrix would purchase the 73 Flat[-]Decks it was leasing from Fontaine." Doc. #43, PageId#607. In Objection 16, the Dektrix Defendants assert that the Report "improperly applied an ambiguity analysis to the MPA" and wrongly concluded that Dektrix had a duty to purchase decks."

As to Objection 14, although the allegations of Count VI are against the Dektrix Defendants, Dektrix was the only signatory to the MPA. The Complaint,

analyzed in its entirety, does not allege facts that Dektrix Trans and Dektrix Intermodal are liable for the debts of Dektrix. Similarly, there are no factual allegations that Harris, Crane, Morley and Larson are personally liable for Dektrix's alleged breach of contract. "A fundamental rule of corporate law is that, normally, shareholders, officers, and directors are not liable for the debts of a corporation." *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 287, 617 N.E.2d 1075, 1085. "The exception to this rule arises at equity to permit recovery of damages from a stockholder who has dominated its corporation." *Longo Construction, Inc. v. ASAP Technical Services, Inc.*, 140 Ohio App.3d 665,761, 748 N.E.2d 1164 (Ohio Ct.App.2000) (corporate veil pierced and liability imposed on principal shareholder after transfer to avoid paying subcontractor). Objection 14 is sustained as to Dektrix Trans, Dektrix Intermodal, Harris, Crane, Morley and Larson.

As to Objections 15 and 16, the Court agrees that the "construction of a written contract under Ohio law is a question of law for the court…." *Arlington Video Productions, Inc. v. Fifth Third Bancorp*, 569 F. App'x 379, 386 (6th Cir. 2014) (citations omitted) and that the intent of the parties is presumed to lie in the language that they used in their agreement. *Id.* The Court finds, however, that in examining the four corners of the Membership Purchase Agreement, the terms of the contract are not clear as to the parties' intent in purchasing flat-decks and that the language is susceptible to two or more reasonable interpretations. Because

the meaning of the language is construed against Dektrix, the drafter, *Id.*, Objections 16 and 17 are overruled.

### 4. Count VIII, Unjust Enrichment, Objection 18, Doc. #48 PageID#695

Count VIII is for unjust enrichment and is alleged against the "Defendants." Doc. #1, PageID#36.  Objection 18 states that it was error for the Report not to dismiss Larson from Plaintiff's unjust enrichment claim since the Complaint did not allege that a benefit was conferred upon him or that he engaged in misconduct.  Instead, it was only alleged that $42,000 of Plaintiff's investment was used for his salary.  Plaintiff contends that a claim for unjust enrichment does not require a finding of bad intent or misconduct but only that a benefit was conferred upon a defendant, the defendant knew of the benefit, and that it was retained under circumstances making it unjust vis-a-vis the plaintiff to retain the benefit. *Hambelton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179, 183, 465 N.E.2d 1298 (1984). It exists when a person "has and retains money or benefits which in justice and equity belong to another." *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 834 N.E.2d 791, 799 (Ohio 2005).

As to Larson, the Complaint alleges only that "such investment money was used to repay the bridge loan (approximately $7,500) and otherwise enrich themselves [Defendants]in the form of salaries ($42,000 going directly to Crane and Larson)." Doc. #1, PageID#21-22.   Because Plaintiff has not pled that Larson knew of the benefit being conferred upon him, Objection 18 is sustained.

73

## IV. Conclusion

For the reasons set forth above, the Court ADOPTS in part and rejects in part the United States Magistrate Judge's Report and Recommendations Doc #43; sustains in part and overrules in part Defendants' objections thereto, Docs. ##46 and 48, sustains in part and overrules in part the Marmon and Fontaine Defendants' Motion to Dismiss, Doc. #16 and the Dektrix Defendants' Motion to Dismiss, Doc. #20.

The following counts remain pending against the following Defendants: Count I for violation of § 10(b) remains pending against the Dektrix Defendants; Count II for violations of Section 20(a) remains pending against Defendants Harris, Crane, and Morley; Count V alleging fraud remains pending against the Dektrix, Marmon and Fontaine Defendants; Count VI, alleging breach of contract, remains pending against Defendant Dektrix; and Count VIII for unjust enrichment remains pending against Defendants Fontaine and Marmon and all the Dektrix Defendants, except Defendant Larson.

The dismissal of Count I as to the Fontaine and Marmon Defendants; Count II as to Defendants Buchanan, Prochazka and Dier; Count VI as to Defendants Harris, Crane, Morley, Larson, Dektrix Trans and Dektrix Intermodal; and Count VIII as to Defendant Larson is without prejudice to Plaintiff filing an amended

complaint within 21 days from the date of this filing subject to the strictures of

Fed. R. Civ. P. 11.

Date: February 19, 2021                    _(tp - per Judge Rice authorization after his review)_

WALTER H. RICE
UNITED STATES DISTRICT JUDGE